**UNITED STATES of America**

v.

**Paul CASTELLANO, et al., Defendants.**

**No. SSS 84 Cr. 63 (ADS).**

United States District Court,
S.D. New York.

June 6, 1985.

See also, 610 F.Supp. 1151.

**1378**

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the U.S.; Walter S. Mack, Jr., Mary Lee Warren, Michael Kellogg, Mark Feldman, New York City, of counsel.

LaRossa, Cooper, Axenfeld, Mitchell & Bergman, New York City, for defendant Paul Castellano; James M. LaRossa, Edward M. Chikofsky, New York City, of counsel.

Michael Rosen, New York City, for defendant Anthony Frank Gaggi.

Herald Price Fahringer, New York City, for defendant Joseph Carmine Testa, Jr.

Gustave H. Newman, New York City, for defendant Patrick Testa; Deborah A. Schwartz, New York City, of counsel.

Robert L. Ellis, New York City, for defendant Henry Borelli.

Joel Winograd, New York City, for defendant Peter LaFroscia.

Jay Goldberg, New York City, for defendant Anthony Michael Senter.

Lawrence Hochheiser, New York City, for defendant Ronald Ustica.

Richard S. Berne, New York City, for defendants Judith May Hellman and Wayne Hellman.

Larry J. Silverman, New York City, for defendant Sol Hellman; Vivian Shevitz, New York City, of counsel.

Jerry L. Tritz, New York City, for defendant Paul Dordal.

Gerald L. Shargel, New York City, for defendant Richard Mastrangelo; Jonathan J. Silbermann, New York City, of counsel.

David S. Greenfield, New York City, for defendant Ronald Turekian.

Leon Port, Brooklyn, N.Y., for defendant Herman Weisberger.

Jay M. Zerin, New York City, for defendant Edward John Rendini.

Irwin Rochman, New York City, for defendant Douglas Rega.

Thomas H. Nooter, New York City, for defendant Pedro Luis Rodriguez.

Clapp & Eisenberg, Newark, N.J., and Evseroff & Sonenshine, Brooklyn, N.Y., for defendant Gus Kalevas; Salvatore T. Alfano, Newark, N.J., of counsel.

Melvin M. Lebetkin, Kew Gardens, N.Y., for defendant Salvatore Mangialino; Joseph W. Ryan, Jr., Kew Gardens, N.Y., of counsel.

Peter Shelley Zeiler, New York City, for defendant Carlo Profeta.

## OPINION AND ORDER

SOFAER, District Judge:

The seventy-eight count indictment in this case names twenty-four defendants, twenty-one of whom are before the court and scheduled for trial. Count 1 of the indictment names all the defendants, along with others, and alleges that they participated in a racketeering enterprise of extensive scope and variety. 18 U.S.C. § 1962(c) (1982) ("RICO"). The enterprise alleged is termed a "crew," of which Roy DeMeo acted as "street leader" until he was murdered, and over which the defendants Anthony Frank Gaggi and Paul Castellano acted respectively as "captain" and "boss." These leaders and the other defendants are alleged to have engaged in eighty acts of racketeering in furtherance of the enterprise, including twenty-six murders, bribery, extortion, narcotics violations, thefts from interstate shipments, mail and wire fraud, obstruction of justice, transportation of stolen property, and transportation of women for purposes of prostitution. The

enterprise is alleged to have existed from on or about January 1, 1972 until February 28, 1983, in the Southern District of New York and elsewhere. The acts of racketeering include several alleged conspiracies and schemes.

Count 2 alleges a "racketeering conspiracy," 18 U.S.C. § 1962(d) (1982), in which all the defendants, and others, conspired to conduct or participate in the enterprise alleged in count 1. Count 2 incorporates by reference virtually all of the allegations and racketeering acts described in the first count. The remaining seventy-six counts include substantive offenses and conspiracies, all of which are either charged as, or are claimed by the government to be related to, the racketeering acts charged in count 1.

Defendants jointly filed a 21-point Omnibus Motion. In addition, fourteen defendants filed individual motions. These challenges to the indictment are grouped into four broad categories. Part I of this opinion addresses jurisdictional challenges to the indictment which, if granted, would result in dismissal of counts. Part II examines the government's use of RICO with respect to both the sufficiency of its theory of the case and to its decision to join all these defendants for trial. Part III concerns motions to dismiss particular counts or strike specific acts of racketeering. Part IV addresses evidentiary claims and other, miscellaneous individual motions.

### I. Jurisdictional Challenges.

#### A. *Statute of Limitations and Preindictment Delay.*

The general federal statute of limitations bars prosecution of a noncapital offense unless an indictment is found within five years of its commission. 18 U.S.C. § 3282 (1982) ("section 3282"). Defendants claim that section 3282 prevents the government from prosecuting a violation of the substantive RICO provision, 18 U.S.C. § 1962(c), by proving the commission of acts of racketeering that occurred more

than five years prior to a RICO indictment. Second, they claim that section 3282 bars the prosecution of other, unenumerated counts of the indictment. Finally, defendants argue that the due process clause should preclude proof of certain acts of racketeering in connection with the RICO substantive count, and should preclude the prosecution of various other counts, even if prosecution is not barred by section 3282.

The first indictment in this case, captioned *United States v. Richard DiNome and Ronald Ustica*, 84 Cr. 63, was filed on January 20, 1984. That indictment charged only one of the defendants named in the present indictment, Ronald Ustica, and concerned only offenses relating to automobile thefts. (Current acts of racketeering 55–71 and counts 31–47 can be traced back to the first indictment.) On March 29, 1984, the first superseding indictment, captioned *United States v. Paul Castellano et al.*, S 84 Cr. 63, was filed. That indictment added twenty defendants and deleted one defendant, Richard DiNome, because he had been murdered in early February 1984. It also added thirty-three counts. Among those counts were two multidefendant RICO counts, one for a violation of the substantive RICO provision, section 1962(c), and one for conspiracy to violate RICO, section 1962(d). Seventy-three acts of racketeering were specified in count one of the first superseding indictment; these appear as acts of racketeering 1–27, 29–36, 38–48, 52–74, and 77–80 in the present indictment. In addition to the two main RICO counts, twenty-nine other offenses were charged; with two exceptions, discussed in the next paragraph, these appear as counts 3–4, 7–22, 30–53, 55–56, and 66–69 of the present indictment.

On September 19, 1984, a second superseding indictment was filed. *United States v. Paul Castellano et al.*, SS 84 Cr. 63. This second superseder added three additional defendants—Carlo Profeta, Dennis Testa, and Abdullah Mohammad Hassan Hussain—who were all named in

counts 1 and 2. It also added acts of racketeering 28, 37, 49–51, and 75–76 to the substantive RICO count; named additional defendants with respect to acts of racketeering 3, 29, 41, 54–72, and 77–78; changed the dates of acts of racketeering 38, 41, 44–48, 53–55, 72, 74, 77, and 78; and removed defendant Patrick Testa's name from acts of racketeering 16 (where the name of the victim was changed from Vincent Ragucci to Dominick Ragucci) and 78. In addition, the second superseder added counts 5–6, 23–29, 54, 57–65, and 70–78, and changed count 68 from a substantive count to a conspiracy count; named additional defendants in connection with counts 7–8, 30–48, 55–56, and 66–68; and changed the dates alleged in counts 7–8, 30, 48, 55–56, and 66–69. Finally, it deleted count 39 of S 84 Cr. 63, which charged a conspiracy to transport stolen property involving fourteen of the defendants.

The pending indictment was filed on October 4, 1984. *United States v. Paul Castellano et al.*, SSS 84 Cr. 63. It apparently made one change, adding defendant Profeta to act of racketeering 27, and it is the indictment in reference to which the current motions have been made.

### 1. *The Statute of Limitations and Non-RICO Counts.*

■ Each of the seventy-six non-RICO counts of the current indictment stands alone as an independent charge, which the government seeks to join at trial pursuant to Fed.R.Crim.P. 8. Each one must satisfy the time limitation of section 3282.

■ Normally, "[o]nce an indictment is brought, the statute of limitations is tolled as to the charges contained in that indictment." *United States v. Grady*, 544 F.2d 598, 601 (2d Cir.1976). If a superseding indictment is brought while the original indictment is still validly pending, the superseder can adopt the original indictment's date of filing, "if and only if it does not broaden the charges made in the first indictment...." *Id.* at 602. In this case, four possible dates exist for establishing the outside limit under section 3282: January 30, 1979; March 29, 1979; September 19, 1979; and October 4, 1979, five years, respectively, before the filing of each of the indictments.

The January 30, 1979 limitation date is appropriate only as to defendant Ustica, and only with regard to counts 31–47 of the present indictment. No other present defendant was named in the first indictment, and no other criminal activity was then charged against Ustica. The changes made in the first superseding indictment therefore cannot be viewed as "trivial" or "innocuous." *Grady*, 544 F.2d at 602 (quoting *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960) (dealing with variance between indictment and charge to jury)). Similarly, with respect to defendants Profeta, Dennis Testa, and Hussain, the March 29, 1979 date is inappropriate, since they were not named as defendants until the September 19, 1984 indictment. Thus, until September 19, they were not "put on timely notice ... that they [would] be called to account for their activities and should prepare a defense." *Grady*, 544 F.2d at 601. Finally, the October 4 superseder made only one change, adding defendant Profeta as to act of racketeering 27. This change has no relevant effect on the statute of limitations question, since Profeta was charged with committing several acts of racketeering (28, 41, 44, and 54) within five years of the September 19 indictment and because the act of racketeering first charged on October 4—a conspiracy to murder James Bennett—was not completed until April 29, 1981, and would therefore be chargeable under either indictment.

Based on the foregoing history, any charge concerning a crime committed after September 19, 1979 poses no statute of limitations problem. Those counts charging substantive offenses that allege their commission within five years of indictment

therefore satisfy the requirements of section 3282. *See* counts 9–12, 14–29, 33–47, 59–64, and 69. Counts 57 and 58 allege that defendant Gaggi willfully attempted to evade taxes and willfully made a false declaration in connection with his 1979 tax return. 26 U.S.C. §§ 7201 and 7206(1) (1982). These crimes allegedly occurred in April 1979 and were not charged until the September 19, 1984 superseder, but their inclusion poses no limitation difficulty because the special statute for tax offenses provides that a prosecution may be instituted within six years of the commission of the offense. *Id.* § 6531(2) and (5) (1982).

■ With respect to conspiracy counts, an offense is properly charged, for statute of limitations purposes, if, for those conspiracy counts that require overt acts, at least one overt act was committed within five years of the indictment, *Grunewald v. United States*, 353 U.S. 391, 396–97, 77 S.Ct. 963, 969–70, 1 L.Ed.2d 931 (1957), and, for those conspiracy counts that require no overt act, the conspiracy was not terminated before that date, *United States v. Tolub*, 187 F.Supp. 705, 709 (S.D.N.Y.1960). Thus, counts 4–8, 30, 54, 65, 68, and 70 are properly charged.

An analogous rule for calculating the cut-off date applies to continuing offenses, such as 18 U.S.C. § 1962(b) (1982), the Travel Act, 18 U.S.C. § 1952 (1982), or the Hobbs Act, 18 U.S.C. § 1951 (1982). *See, e.g., United States v. Provenzano*, 334 F.2d 678, 684–85 (3d Cir.), *cert. denied*, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). Counts 3, 49–53, and 55 are covered by this principle and therefore are properly charged. Defendants must be provided with proper notice, either through informal discovery or through a bill of particulars, of the specific activities charged against them, and the government will have the burden of proving beyond a reasonable doubt at trial that the conspiracies were still in existence or that the continuing offenses were still being committed within the relevant period. But the indict-

ment is sufficient to permit the government that opportunity.

■ The propriety of prosecution on the remaining counts turns, initially, on whether March 29, 1979 or September 19, 1979 is the proper cut-off date for limitations purposes. Any defendant charged in a particular count in the March 29 superseder may properly be required to stand trial on that count as long as the activity alleged took place after March 29, 1979, even if it took place before September 19, 1979. On the other hand, a defendant named with regard to a particular count only in the September 19 indictment cannot be required to stand trial for that charge if he was not named in the March 29 indictment, and the crime is alleged to have been committed after March 29, 1979 but before September 19, 1979. *Cf. Grady*, 544 F.2d at 602–03 & n. 5 (if correlative count in later indictment differs in respect to dates and specific names "it might accordingly constitute an improper amendment"). To the extent that the running of the statute of limitations frees potential defendants from the anxiety of potential prosecution, those defendants are entitled to repose. When an indictment containing particular charges has been filed, the fact that a potential defendant was not named may "serve to draw [his] attention away" from the necessity of preserving evidence and preparing to defend himself. *United States v. O'Neill*, 463 F.Supp. 1205, 1207 (E.D.Pa.1979). The same principle applies, of course, to totally new counts in the second superseder.

■ The complexity of the indictment requires that we consider the remaining counts individually. Count 13 charges defendant Rega with mail fraud involving a mailing on approximately March 5, 1979, more than five years before the first superseder. That the scheme of which this count is one manifestation allegedly existed until February 1983 does not cure the deficiency in this count, since the only act charged in the count did not occur within

the period set by section 3282. *See United States v. Allen*, 554 F.2d 398, 408–09 (10th Cir.) (setting aside mail fraud conviction on counts where matter was not mailed within five years of indictment), *cert. denied*, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977). Count 13 must therefore be dismissed.

Counts 31 and 32 charge defendants Castellano, Gaggi, Joseph Testa, Patrick Testa, Borelli, LaFroscia, Senter, Ustica, Mastrangelo, Turekian, Weisberger, Rendini, Guglielmo, Dennis Testa, and Hussain with violations of 18 U.S.C. §§ 2314 and 2 (1982). They allege that, "on or about the dates specified," these defendants illegally transported stolen cars and false automobile certificates of title in interstate and foreign commerce. The date specified in the two counts is August 20, 1979. To satisfy section 3282, therefore, a defendant must have been indicted on or before August 20, 1984. Defendant Ustica was first charged with this count in the original indictment, on January 30, 1984; defendants Castellano, Gaggi, Joseph Testa, Patrick Testa, Borelli, LaFroscia, Senter, Mastrangelo, Turekian, Weisberger, Rendini, and Guglielmo were added to these counts in the first superseder, on March 29, 1984. They all were thus properly charged. But defendants Dennis Testa and Hussain were first named in these counts in the second superseder, on September 19, 1984, roughly one month after the five-year period had run. As to them, therefore, counts 31 and 32 must be dismissed, if these two defendants are alive and appear for trial.

Count 48 of the present indictment charges defendants Joseph Testa, Patrick Testa, Borelli, LaFroscia, Senter, Ustica, Mastrangelo, Turekian, Weisberger, Rendini, and Rodriguez with transporting and aiding and abetting the transportation of stolen automobiles and engines, and counterfeit automobile certificates of title in violation of 18 U.S.C. § 2314 (1982). It alleges that this offense took place "[f]rom on or about January 1, 1972, up to and including February 28, 1983 . . . ." It traces its origin back to count 39 of the first superseding indictment, which charged defendants Castellano, Gaggi, Joseph Testa, Patrick Testa, Borelli, La Froscia, Senter, Ustica, Mastrangelo, Turekian, Weisberger, Rendini, Guglielmo, and Rodriguez with conspiring to violate section 2314 during the period June 1, 1977 to June 30, 1982. That count alleged overt acts in 1980 by defendants Weisberger and Rodriguez.

Unlike count 39 of the first superseder, however, current count 48 does not allege a conspiracy, but simply the commission of the substantive offense by a large number of defendants, over a long period of time. Similar charges are made in counts 56, 66, and 67. As discussed below, all these counts violate the rule against charging multiple offenses in a single count. These misjoinders of offenses, known as duplicity, also create problems with respect to the statute of limitations. If count 48, for example, were alleged as a conspiracy, it would pose no statute of limitations problem, since it charges an offense that continued until 1983. Conspiracies are continuing offenses and thus section 3282 does not begin to run in conspiracy cases until the commission of the last overt act alleged in the indictment. *Grunewald*, 353 U.S. at 396–97, 77 S.Ct. at 969–70. In this case, however, the manner in which the offenses in the counts involved are charged precludes treating them as continuing ones under either prong of the test enunciated in *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). *See infra* Section III.D. All these counts must therefore be dismissed, since some of the charges contained in them extend beyond the statutory period.

Count 48 by its terms alleges the commission of offenses during the period from January 1, 1972 to March 29, 1979, and section 3282 bars prosecution of such stale charges. Count 56 charges defendants Gaggi, Joseph Testa, Kalevas, and Profeta with violating the Mann Act, 18 U.S.C. § 2421 (1982), "[f]rom on or about January

1, 1972, up to and including [October 4, 1984.]" Charges against defendants Gaggi and Kalevas concerning the transportation of women before March 29, 1979, and against defendants Testa and Profeta concerning crimes before September 19, 1979 are prohibited by section 3282. Moreover, to the extent that this count intimates a conspiracy, it leaves unclear: (a) whether any particular *defendant* violated section 2421 within five years of the indictment, or (b) that any *violations* of section 2421 occurred during the applicable period. For a conspiracy to have existed, only an overt act—even one innocent in itself—need have been committed within five years. Count 66 charges defendants Dordal, Mastrangelo, Profeta, and Dennis Testa with criminal liability for the period April 1, 1979 to October 4, 1984. The period April 1 through September 19, 1979, however, is barred by section 3282, since they were not named in count 66 until the second superseding indictment. Moreover, count 66 incorporates by reference a number of other counts in the indictment. Counts 13 and 48, which are both incorporated, are themselves defective on statute of limitations grounds. Count 67 contains no external reference to suggest when any particular defendant did any of the acts alleged. By its terms, count 67 could charge defendant Dordal, for example, with altering a weapon on April 1, 1979. Since he was first named in this count on September 19, 1984, however, the statute of limitations prohibits prosecuting him for such an act.

■■■ Finally, counts 71 through 78 allege that defendants Patrick Testa and Weisberger rolled back odometers in violation of 15 U.S.C. § 1984 (1982) and 18 U.S.C. § 2 (1982). Aside from the overall vagueness of the prefatory language—although each count alleges alteration in connection with a single vehicle, the counts are supposedly "not limited to the motor vehicles specified"—the crimes were allegedly committed "[f]rom in or about 1979, up through and including in or about

1982. . . ." To the extent that the crimes were committed during the period January 1 to September 19, 1979, prosecution is barred by section 3282. The government must provide, in a bill of particulars, details about the actual dates on which these crimes are alleged to have been committed that are sufficient to ensure that only crimes allegedly committed after September 19, 1979 are being prosecuted.

2. *The Statute of Limitations and RICO.*

■■■ Count one—the substantive RICO count—charges the defendants with participating in the affairs of an enterprise—the DeMeo crew—through a pattern of racketeering activities. A defendant can be convicted on count one if the jury finds that he committed at least two acts of racketeering with which he is charged. In considering the statute of limitations, the relevant question is whether a charge of participating in the enterprise, and not whether particular acts of racketeering could still be charged under applicable state or federal law. Thus, if a defendant committed two acts of racketeering, as defined by section 1961(1)(A) in 1980, he could not escape a RICO prosecution on the ground that the state statute of limitations applicable to those acts had expired. The applicable statute of limitations in a RICO prosecution is section 3282, which is five years. *See United States v. Davis,* 576 F.2d 1065, 1066–67 (3d Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978).

Section 3282 does require that each defendant be named in at least one act of racketeering which is alleged to have occurred in the last five years. *See United States v. Field,* 432 F.Supp. 55, 59 (S.D.N.Y.1977) (Lasker, J.), *summarily aff'd,* 578 F.2d 1371 (2d Cir.), *cert. denied,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). In this respect, RICO resembles conspiracy law, where at least one overt act within the limitations period must be alleged. Thus,

"the statute of limitations for violations of the Act runs from the date of the last alleged act of racketeering activity." *Id.* RICO also resembles other continuing offense statutes; if a part of the continuing course of conduct falls within the limitation period, the defendant may be prosecuted for the entire course of conduct.

In this case, every defendant is named in connection with at least one act of racketeering allegedly committed within five years of the first indictment in which it was included. That other acts of racketeering have been charged which did not occur within this five-year period is inconsequential. The statute contemplates "pattern[s] of racketeering activity" involving such acts. Section 1961(5) defines such patterns as consisting of "at least two acts of racketeering activity, ... the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." Under the statute, then, a defendant could be convicted of a pattern in which he committed one armed robbery in January 1980 and one in March 1985 even though the state statute of limitations might preclude prosecuting him on the earlier crime. Moreover, a defendant who committed an armed robbery in 1960, served twenty years in prison, and then committed another armed robbery in 1985 would also have engaged in a pattern of racketeering activity under section 1961(5). By its explicit language, section 1961(5) encompasses patterns of racketeering activity in which prior acts of racketeering may be separated from the most recent act by more than five years. In such cases, the earlier acts will *always* fall outside the five-year limit of section 3282. Defendants' reading of section 3282 therefore contradicts the explicit intent of Congress and would render section 1961(5) meaningless. *See United States v. Boffa,* 513 F.Supp. 444, 480 (D.Del.1980).

■ Defendants raise an additional argument. They claim that the indictment improperly charges a single "enterprise," and that "at the very least, a series of separate and unrelated 'enterprises' " is alleged, Defendants' Memorandum at 89, many of which presumably terminated more than five years prior to indictment. The indictment in this case, however, does adequately charge a single enterprise, *see infra* Section II.A., so a defendant's culpability can be established by proving a pattern of racketeering stretching back before the limitations period. Whether the government has adequately proved the existence of a single enterprise rather than multiple enterprises is a question for the jury. *See United States v. Bagaric,* 706 F.2d 42, 63 n. 18 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Alessi,* 638 F.2d 466, 472–76 (2d Cir.1980). If the evidence at trial fails in fact to prove a single enterprise, the government will be barred from proving a defendant's participation in a given enterprise if the only acts of racketeering a defendant committed in connection with that enterprise occurred more than five years prior to indictment.

■ Count 2—the RICO conspiracy count—poses no statute of limitations problem. When a conviction for conspiracy requires no proof of an overt act, as is true with respect to section 1962(d), *see United States v. Ivic,* 700 F.2d 51, 59 (2d Cir.1983), the limitations period begins to run only when the agreement itself is terminated. *See United States v. Tolub,* 187 F.Supp. at 709. The government's position appears to be that the enterprise terminated after the murder of Roy DeMeo on approximately January 10, 1983, when "the organization of [the] crew changed extensively...." Transcript of Oral Argument at 9 (Mar. 7, 1985). Count 2 incorporates by reference a number of acts alleged in count 1 to have been committed within the past five years. *E.g.,* acts of racketeering 22, 25, 28(a), 29–37. This satisfies the limitations requirement in that it implicitly alleges that the agreement continued into the statutory period.

### 3. *Due Process Constraints on Pre-Indictment Delay.*

In *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977), the Supreme Court stated:

[S]tatutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide " 'the primary guarantee against bringing overly stale criminal charges.' " ... [Nevertheless], the "statute of limitations does not define [defendants'] rights with respect to the events occurring prior to indictment" ... [T]he Due Process Clause has a limited role to play in protecting against oppressive delay.

(quoting *United States v. Marion*, 404 U.S. 307, 322, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971) and *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966); second interpolation in original). Defendants argue that the indictment in this case involves an "inordinate delay" that has substantially prejudiced their ability to defend themselves, and should therefore be dismissed. Defendants' Memorandum at 91.

To establish a violation of the due process clause, a defendant "must carry [the] heavy burden" of showing both "actual prejudice to the defendant's right to a fair trial *and* unjustifiable Government conduct." *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979) (emphasis in original). *See United States v. Gouveia*, —— U.S. ——, 104 S.Ct. 2292, 2300, 81 L.Ed.2d 146 (1984) (fifth amendment applies "if the defendants can prove that the government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice"). Defendants have failed to meet this burden.

a. *Actual Prejudice.* Defendants claim, with respect to counts 4, 7–8, 30–49, 54–55, 57–60, and 65–69, that the delay in prosecution is so substantial that actual prejudice should be inferred. The delays claimed range from three to twelve years, but in fact defendants frequently misrepresent the actual delay involved. They often list the date of occurrence as the date on which a conspiracy or continuing offense began, and ignore the government's allegation that these offenses continued throughout the existence of the enterprise alleged in count 1 or until the date of the indictment itself. *See, e.g.*, counts 7–8, 30, 48, 54–55, 55–58. Defendants also claim actual prejudice due to the difficulties they allegedly face with regard to various homicide allegations.

"Actual prejudice" is a "fairly stringent" standard. *Stoner v. Graddick*, 751 F.2d 1535, 1544 (11th Cir.1985) (per curiam); *cf. Lovasco*, 431 U.S. at 796–97, 97 S.Ct. at 2051–52 (in five years between *Marion* and *Lovasco*, "so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay"). The passage of time, and the attendant loss of evidence and dimming of witnesses' memories, is insufficient by itself to show prejudice. *Elsbery*, 602 F.2d at 1059. Courts have refused to infer prejudice from delays of five years, *United States v. Slochowsky*, 575 F.Supp. 1562 (E.D.N.Y.1983); *United States v. Puma*, 521 F.Supp. 258 (E.D.N.Y. 1981), of six years, *United States v. Ruggiero*, 726 F.2d 913 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), and even, in one case, of nineteen-and-a-half years, *Stoner*, 751 F.2d 1535. Nor is the death or absence of potential witnesses or the loss of documentary evidence sufficient to establish actual prejudice. *See, e.g., United States v. Solomon*, 688 F.2d 1171, 1179 (7th Cir.1982); *United States v. Surface*, 624 F.2d 23, 25 (5th Cir.1980); *United States v. Partyka*, 561 F.2d 118, 123 (8th Cir.1977), *cert. denied*, 434 U.S. 1037, 98 S.Ct. 773, 54 L.Ed.2d 785 (1978); *United States v. King*, 560 F.2d 122, 131 (2d Cir.) *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977).

To prevail, defendants must show that material, admissible evidence has been

lost by the passage of time. *See, e.g., United States v. Brown,* 742 F.2d 359, 362 (7th Cir.1984) (defendant failed to show actual prejudice when he made no effort to find missing witnesses); *United States v. Kidd,* 734 F.2d 409, 413 (9th Cir.1984) (defendant must demonstrate substance of missing witnesses' testimony and efforts to locate them); *United States v. Radue,* 707 F.2d 493, 495–96 (11th Cir.1983) (per curiam) (defendant must make proffer of testimony and show its substantiality); *United States v. Heldon,* 479 F.Supp. 316, 320 (E.D.Pa.1979) (defendant must provide details about missing evidence). Otherwise, defendants may attempt to rely on "conveniently unavailable" witnesses as tools for dismissing proper indictments. *See United States v. Williams,* 738 F.2d 172, 176 (7th Cir.1984).

 In this case, defendants have failed to make sufficiently particularized claims. They argue that "it is virtually impossible for the defendants to come forward and show specific examples of how the delay has prejudiced them [because] [t]he extreme delay in the case itself frustrates production of that kind of evidence." Defendants' Memorandum at 93. But the cases make clear that the passage of time, however damaging, is inadequate to sustain a due process challenge when the applicable statute of limitations allows indictment. The presumption of legitimacy provided by compliance with the statute of limitations outweighs a nonspecific claim of prejudice. If defendants' claims of prejudice become more definite as the trial progresses, the court retains the right to dismiss those counts on which actual prejudice is shown. "Events of the trial may demonstrate actual prejudice, but at the present time, [defendants'] due process claims are speculative and premature." *United States v. Marion,* 404 U.S. at 326, 92 S.Ct. at 466.

 Defendants' arguments concerning the unfairness of using state crimes on which acquittals were obtained are particularly weak. To the extent that evidence marshalled several years ago was instrumental in obtaining an acquittal, either that evidence is still present and usable or it has disappeared, in which case defendants should be able to demonstrate prejudice with the requisite specificity. If the evidence was not discovered and used at earlier trials, however, the delay in indictment in this case cannot automatically be viewed as the cause of its disappearance, since it never appeared in the past. *Cf. United States v. Ewell,* 383 U.S. at 122, 86 S.Ct. at 777 (defendants' earlier prosecution on similar charges "might well have enhanced [their] ability to defend themselves, for they were at the very least put on early notice that the Government intended to prosecute them for [the crimes] for which they were then and are now charged"). Defendants' claim with regard to those alleged murders with which they were not previously charged—that "when a series of homicides occurred seven, eight, or nine years ago" no one should expect to have to defend himself against such accusations—is undermined by New York's statute of limitations which permits prosecutions for such murders to be "commenced at any time." N.Y.Crim.Proc.L. § 30.10(2)(a) (McKinney 1981). Thus, defendants have failed to satisfy the threshold requirement of showing actual prejudice due to the permissible delay in indicting them.

b. *Impermissible Government Conduct.* "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2049. Defendants have failed to show that the delay in indicting them was in any way caused by unjustifiable prosecutorial conduct, the second prong of the due process test. They mistakenly suggest that the burden lies on the government to provide a justifiable reason for the delay. Defendants' Memorandum at 92. But "the burden [is] on [defendants] to establish ... that the delay was an intentional device to gain tactical advantage over the accused." *United*

*States v. Mejias,* 552 F.2d 435, 443 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977) (quoting *Marion,* 404 U.S. at 325, 92 S.Ct. at 466).

Prosecutors are under no duty to file charges before becoming satisfied that they will be able to prove guilt at trial. *Lovasco,* 431 U.S. at 791, 97 S.Ct. at 2049. Even after a prosecutor has obtained enough evidence to ensure a conviction, no constitutional requirement to commence prosecution exists:

> [C]ompelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice. In other cases, the prosecutor would be able to obtain additional indictments despite an early prosecution, but the necessary result would be multiple trials involving a single set of facts. Such trials place needless burdens on defendants, law enforcement officials, and courts.

*Id.* at 792–93, 97 S.Ct. at 2049–50. A "fundamental" difference exists between "investigative delay" and "delay undertaken by the Government solely 'to gain tactical advantage over the accused....'" *Id.* at 795, 97 S.Ct. at 2051 (quoting *Marion,* 404 U.S. at 324, 92 S.Ct. at 465).

In this case, the metamorphoses of the indictment suggest continuing investigation by the government. Given the scope of the criminal activity alleged, and therefore of the investigation involved, the delay in this case appears to have been necessary to allow the government to assess the effect of prior state proceedings, complete its investigation, determine the need for and breadth of the federal charges, and obtain the evidence to present to the grand jury. *See United States v. Mejias,* 552 F.2d at 443 (two-year delay for

such purposes permissible); *see also, e.g., United States v. Mastroianni,* 749 F.2d 900, 911 (1st Cir.1984) (seven-month delay permissible while investigating scope of continuing criminal enterprise); *United States v. Surface,* 624 F.2d at 25 (fifteen-month delay permissible when government thought defendant might be part of a larger conspiracy); *United States v. Slochowsky,* 575 F.Supp. at 1569 (six-month delay is "not an unreasonable amount of time given the scope of the investigation" but rather is "good faith investigative delay").

Moreover, the court is aware that significant evidence and testimony became available only after the demise of the enterprise alleged in the RICO counts, in mid-winter 1983. The recent availability of such evidence also explains and justifies the pre-indictment delay in this case. *See United States v. Ricco,* 549 F.2d 264, 272 (2d Cir.) (when witness began cooperating only one year before indictment, 2½ year delay was acceptable), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *United States v. Slochowsky,* 575 F.Supp. at 1564, 1569 (six-month delay after major witness began cooperating and government's attempt to obtain more witnesses justified almost five-year delay in bringing some parts of RICO indictment); *United States v. Puma,* 521 F.Supp. at 260 (five-year delay permissible in case involving informant); *cf. United States v. Partyka,* 561 F.2d at 123 (government's desire to protect informant can provide legitimate reason for delay).

No obvious explanation exists for the pre-indictment delay related to some of the counts of the indictment. *E.g.,* counts 57–60 (tax violations by defendant Gaggi in 1979 and 1980). Such counts cannot, however, be viewed in isolation for due process/pre-indictment delay purposes. To the extent that unfair prejudice results from the government's decision to try this case in one proceeding, that issue is better addressed with reference to the motions for severance, discussed below. *Lovasco* establishes that the passage of time attributable to governmental decision-making

**1388**

about whether to bring prosecutions—because of either evidentiary or resource-management concerns—is legitimate delay. In any event, those counts as to which the pre-indictment delay seems the least readily explicable also seem to be those counts in which the potential for actual prejudice is least likely.

### B. *Challenges to Venue.*

■■■■■ Defendants have moved to dismiss the entire indictment, as well as many individual counts, on the ground that venue is improper in the Southern District of New York. A criminal case must be tried "in a district in which the crime was committed." Fed.R.Crim.P. 18. Where the crime is committed depends upon the nature of the crime alleged, and the location of the act or acts constituting it. *See United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946); *United States v. Candella,* 487 F.2d 1223, 1227–28 (2d Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974). The government may prosecute a case involving a "continuing offense" in any district in which such an offense was begun, continued, or completed. 18 U.S.C. § 3237(a) (1982). Venue is an essential part of the government's case in a criminal prosecution, *see United States v. Buckhanon,* 505 F.2d 1079, 1083 (8th Cir.1974), and the government must prove at trial by a preponderance of the evidence that venue is proper, *United States v. Grammatikos,* 633 F.2d 1013, 1022 (2d Cir.1980). At this stage of the proceedings, however, the government need only allege, with sufficient specificity, that venue is appropriate by reason of the commission of the charged acts in the Southern District. *See United States v. Valle,* 16 F.R.D. 519, 521–22 (S.D. N.Y.1955). Where the indictment is insufficient on its face, moreover, the government may meet this burden either by amending the indictment to reflect the commission of the charged acts in the Southern District, or through a sworn bill of particulars. *See United States v. Honneus,* 508 F.2d 566, 570 (1st Cir.1974) (holding that an indictment is not legally insufficient for failure to allege where the offense took place, but noting that defendant would have been entitled to the information had he sought a bill of particulars), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). "[S]ince defendants have a constitutional right to be tried in the proper forum, not the right to be charged with the proper venue, a pleading is sufficient that contains no statement of the place of the crime, although in such a case defendant should be advised of the place by a bill of particulars in order to avoid any possibility of prejudicial surprise." C. Wright, *Federal Practice and Procedure: Criminal 2d* § 125, at 380–81 (1982) [hereinafter cited as *Federal Practice and Procedure: Criminal 2d* ].

■■■■ In this case, the government has sufficiently alleged venue with respect to counts 1–2, 5–22, 30–49, 51, 54, 57, 59, and 68. The first count, which charges defendants with participating in a racketeering enterprise, alleges a continuing offense. As such, this RICO count may be prosecuted in any district in which the criminal activity was begun, continued, or completed. 18 U.S.C. § 3237(a) (1982). In charging a pattern of racketeering activity, the government has alleged 80 racketeering acts, several of which are alleged in general terms to have occurred in the Southern District, and with respect to a few of which the government has alleged concrete details supporting venue in this district. *See, e.g.,* acts of racketeering 42 (extortionate extension of credit to theatre in Westchester County) 45–48 (matter alleged to have been mailed to Manhattan and Yonkers). In count 2, which charges defendants with a conspiracy to violate RICO, the government has properly alleged venue in the Southern District inasmuch as the underlying substantive offense is alleged to have occurred, at least in part, in the Southern District.

■■■■ Defendants accurately argue that virtually every significant racketeering act alleged in the indictment occurred in the Eastern District of New York. They con-

tend that, even if the technical requirements of Rule 18 are satisfied by a handful of relatively insignificant contacts with the Southern District, venue has constitutional and supervisory dimensions which require this trial to be held in the Eastern District. *See generally United States v. Fernandez,* 480 F.2d 726, 729–35 (2d Cir.1973). Questions of venue sometimes raise "deep issues of public policy," *United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944), but not here. No unfairness or hardship has been identified as having been created by the trial of this case at the Manhattan end of the Brooklyn Bridge as opposed to the Brooklyn end. Nor has any reason been advanced to suggest that this district is more favorable to the prosecution than the Eastern District would be. Defendants' venue contentions as to Counts 1 and 2 are, in fact, based on the technical requirements of Rule 18, and lose their strength entirely when examined in terms of the policies underlying truly substantive questions of venue.

Count 3 charges defendant Sol Hellman with unlawfully acquiring and maintaining an interest in and control of an enterprise, the Glenwood Flea Market in Brooklyn, which affected interstate and foreign commerce. The indictment alleges that the offense occurred in the Eastern District, but the government asserts in a Memorandum of Law that Hellman "acquired the Glenwood Flea Market at the offices of Saxe, Bacon & Bolan in Manhattan." *See* Government's Memorandum of Law in Opposition to Defendants' Joint Omnibus and Individual Motions at 85 (hereinafter cited as "Government's Memorandum"). The government must make this claim in a sworn bill of particulars. Counts 58, 60, 62, and 64 charge Gaggi or Sol Hellman with signing false tax returns in the Southern and Eastern Districts, respectively. The government has conceded these counts must be dismissed for lack of venue, absent a waiver by the defendants, because all the returns involved were signed in the Eastern District. No other charge in the indictment fails on its face to include an allegation of venue that could at least be construed to include the Southern District.

Several counts of the indictment allege that the crimes charged occurred in some district other than the Southern District of New York, but add the words "and elsewhere." For example, counts 23–29 charge Judith and Wayne Hellman with mail or wire fraud "in the District of New Jersey and elsewhere." These counts suggest no basis for placing venue in the Southern District of New York, apart from the possibility that "elsewhere" was meant to include this district. The government claims that it will establish venue with respect to these counts through expert testimony to the effect that the mail involved traveled through this district. This claim must be made in a sworn bill of particulars, based on actual knowledge that such testimony will be offered on each of the counts at issue. Similar allegations are contained in counts 50 (Turekian and Guglielmo extorted property from no-show jobs in Brooklyn); 52 (Sol and Wayne Hellman extorted property from business in Brooklyn); 53 (Gaggi and Kalevas extorted property from house of prostitution in New Jersey); 61 (Sol Hellman evaded taxes for 1980); and 63 (Sol Hellman evaded taxes for 1981). The government claims it will establish venue in the Southern District for each of these counts, and has made some representations as to the proof they will offer. But the government's claims respecting these counts must be made in a bill of particulars. The claim regarding counts 61 and 63 is particularly vague; the government must allege under oath the existence of evidence that Hellman committed acts of attempted evasion in the Southern District during 1980 and 1981 sufficient to confer venue, or the counts must be dismissed.

Other counts of the indictment allege that the crimes took place "in the Southern District of New York," but provide no basis for this allegation. For example, counts 31–47 charge many defendants with transporting stolen automobiles

and engines and counterfeit certificates of title in interstate commerce, "in the Southern District of New York and elsewhere," but the crimes alleged apparently took place primarily in Brooklyn and nothing in the charges suggests a connection to the Southern District. The government claims, however, that it will prove venue by showing that the invoices involved in these crimes were mailed to or through this district, that the cars involved were shipped over waters within the district, and in other ways. Any of the bases for venue claimed by the government to exist is sufficient in principle, but a basis for venue must be alleged in a bill of particulars for each of the counts at issue. This form of possible insufficiency is also present in connection with counts 55, 57, 59, 69 and 71–78. The government has made sufficient oral or written representations concerning most of these counts to satisfy the venue requirement at this stage. *See, e.g.,* Government's Memorandum at 86–87. The government must, however, make its representations formal through a bill of particulars. (Counts 48, 56, 66, and 67 would also fall into this category of venue problems, but for reasons given below they must be dismissed for duplicity.) The representations concerning counts 57 and 59 seem insufficient as a matter of law; here, as in connection with counts 61 and 63, the government must affirm the existence of evidence sufficient to prove acts of attempted evasion of taxes by Gaggi, in this district, during 1978 and 1979, or the counts should be dismissed.

Counts 9–22 charge various defendants with certain schemes or artifices to defraud. These offenses are continuing offenses. The government has properly alleged venue with respect to counts 9–13, 18, and 21–22 on the ground that matter was mailed from or to the Southern District in furtherance of the schemes charged. With respect to counts 14–17 and 19–20, the government must provide information in a bill of particulars similar to that required with respect to counts 23–29.

In Counts 4–8, 30, 54, 65, 68, and 70, the government charges certain defendants with various conspiracies. Prosecutions for conspiracy may be had in a district in which an agreement was formed or in any district in which an overt act in furtherance of the conspiracy occurred. *Bellard v. United States,* 356 F.2d 437, 438 (5th Cir.), *cert. denied,* 385 U.S. 856, 87 S.Ct. 103, 17 L.Ed.2d 83 (1966). In each of these counts, the government has alleged that at least one overt act was performed in the Southern District. Count 4 presents a special problem. It charges defendants Joseph Testa, Senter, Ustica, Borelli, and Guglielmo with conspiring to deprive Ronald Falcaro and Khaled Daoud of their right to be witnesses against the defendants. On its face, the count explicitly alleges venue "in the Southern District of New York and elsewhere," and it charges in overt act 2 that that Ustica completed freight forwarding invoices in Manhattan. Defendants argue, however, that Ustica's preparation of invoices had nothing to do with the deaths of Falcaro and Daoud, and they claim that the government has no other basis for placing venue in this district. Acts that may appear innocuous can suffice to establish venue in a conspiracy count, but they must be acts undertaken in furtherance of the conspiracy charged. In this case, the invoices allegedly prepared by Ustica played a part in the illegal automobile scheme in which the defendants are claimed to have participated, and concerning which the two dead men may have wanted to testify. But the government must demonstrate how the invoices were part of the scheme by which defendants conspired to deprive the deceased of their civil rights; more specifically, the government must show that the completion of the invoices accompanied or followed the formation of the conspiratorial agreement and that this act was undertaken in furtherance of the plan to deprive Falcaro and Daoud of their right to be witnesses against the defendants. *See Williams v. United States,* 271 F.2d 703 (4th Cir.1959). The government must present its theory for justifying venue for

trying count 4 in this district before a final determination of its propriety is made.

Similar claims as to the sufficiency of the venue allegations in counts 5 and 6 are meritless, since the meetings alleged in those counts to have occurred in this district are claimed by the government to have been part of the scheme by defendants to determine whether their alleged victims were cooperating. Count 54 arguably poses a problem similar to that posed by count 4. The charge properly alleges venue as to a prostitution scheme, and asserts as an overt act that Kalevas "held an interest in the 'Roxy Theater' located on 42nd Street, in Manhattan." The government has adequately met this argument, however, by representing that the interest allegedly held by Kalevas was an aspect of the conspiracy charged. The government should also make clear in its bill of particulars that in counts 49, 55 and 56 the term "New York" means Manhattan or the Bronx.

### C. *Grand Jury Irregularities.*

Defendants move to dismiss the entire indictment because of possible irregularities before the grand jury. Defendants have presented no evidence to support their claim of irregularities, contending instead that "experience has taught us that the areas of due process earmarked in this application are well-identified sectors where serious abuses have occurred in the past." Defendants' Memorandum at 115. Essentially, defendants seek discovery, requesting a list of all persons who appeared before the grand jury during the course of its investigation in order to determine whether any unauthorized person appeared before the grand jury in violation of Fed.R. Crim.P. 6, and a full inspection of the grand jury minutes to determine whether hearsay was relied upon exclusively, whether the grand jurors who actually voted the indictment against the defendants heard all the evidence presented, whether the government failed to disclose favorable or exculpatory evidence, and whether the government presented irrelevant and prejudicial evidence.

A presumption of regularity attaches to grand jury proceedings and, as Judge Weinfeld stated in *United States v. Wilson,* 565 F.Supp. 1416, 1436 (S.D.N.Y.1983), "[c]ounsel's unsupported view that abuses may have occurred ... with respect to the grand jury system is insufficient ... to overcome the presumption of regularity of the grand jury proceedings and does not justify disturbing the traditional secrecy surrounding such proceedings." As a precautionary measure, this court requested the government to review the grand jury proceedings in this case and to certify that the proceedings complied with the relevant rules in all respects. Assistant United States Attorney Walter Mack has stated in a sworn affidavit, *inter alia,* that (1) no unauthorized person was present during the grand jury proceedings or deliberations; (2) the government warned the grand jury of the differences between hearsay and non-hearsay testimony; (3) the government did not knowingly withhold exculpatory materials from the grand jury; (4) the government made no statement or argument calculated to inflame the grand jury unfairly against defendants; and (5) twelve or more grand jurors concurred in the filing of the indictment. Affidavit of Walter S. Mack, Jr. at 1–2 (Dec. 31, 1984) (*reprinted in* Appendix to Defendants' Memorandum). This procedure helps ensure that the government has not unintentionally overlooked any irregularity that may have occurred in the grand jury proceedings without materially disturbing the presumption of regularity that avoids needless and wasteful judicial inquiry when no evidence of any impropriety has been presented.

No basis exists on this record for dismissing the indictment on the ground of "possible" irregularities in the grand jury proceedings.

### II. **The Government's Use of RICO.**

#### A. *Alleged Failure to Charge a Single Enterprise.*

Defendants claim that the substantive RICO count must be dismissed because

it fails adequately to charge a single enterprise and a common pattern of illegal activity. The indictment does, however, charge that defendants are a group of persons who associated for a common business purpose. *See United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). The "crew" they formed is alleged to have had a street leader, above whom was a "captain," who in turn took direction from a "boss." This is a structure, with a hierarchy and an ongoing core of members sharing the common interest in profiting from certain illegal activities. Some defendants are not claimed to have been long-term members, but the allegations about the core group with continuing, joint activities satisfactorily alleges an enterprise.

■ The statutory requirement of a "pattern of racketeering activity" is defined only as "at least two acts of racketeering ... within ten years...." 18 U.S.C. § 1961(5) (1982). The Second Circuit has expressly rejected the defendants' contention that the acts charged must have some relationship to one another. *United States v. Weisman,* 624 F.2d 1118, 1121–23 (2d Cir.1980). Chief Judge Feinberg pointed out in *Weisman* that, since "the predicate acts constituting a 'pattern of racketeering activity' must all be done in the conduct of the affairs of an 'enterprise' ..., [t]he enterprise itself supplies a significant unifying link between the various predicate acts specified in section 1961(1) that may constitute a 'pattern of racketeering activity.'" *Id.* at 1122. Furthermore, the government's arguments in this case, and to an extent the indictment, reflect that most of the enterprise members charged operated as a stereotypical organized crime group, engaging in the conventional variety of illegal activities, with the added role of serving in effect as a death squad. This is "pattern" enough to satisfy the statute; indeed, it is the pattern that most influenced Congress' decision to adopt RICO.

### B. *Claimed Multiplicity and Merger of Counts One and Two.*

■ Defendants claim that counts 1 and 2 of the indictment, which respectively allege violations of a substantive provision of RICO, 18 U.S.C. § 1962(c), and of the conspiracy provision, *id.* § 1962(d), charge the same offense and are therefore multiplicitous. "Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes." *Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). To negate the normal presumption that an indictment can charge a substantive offense and a conspiracy to commit that substantive offense, defendants rely on two, similar tools of statutory analysis —Wharton's Rule and the *Blockburger* test. Wharton's Rule provides that "[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." *Id.* at 773 n. 5, 95 S.Ct. at 1288 n. 5 (quoting 1 R. Anderson, Wharton's Criminal Law and Procedure § 89, at 91 (1957)). Under the *Blockburger* test, a single act can be prosecuted and punished as a violation of two statutes if "each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

Defendants' argument focuses on the indictment's identification of the alleged enterprise as the "DeMeo crew," "a group of individuals associated in fact to conduct, participate in and commit acts of racketeering activity...." Indictment ¶ 2. Defendants contend that, because the government has defined the enterprise as a group of individuals united for the purpose of committing acts of racketeering, the enterprise itself is an agreement. Thus, "[i]f the Government proves Count One, perforce it necessarily proves Count Two. Count Two is thus the 'same offense' as Count One because it requires proof of no fact that Count One does not." Defendants' Memorandum at 25.

Defendants' argument is flawed in two fundamental respects. First, both Whar-

ton's Rule and the *Blockburger* test are "rule[s] of statutory construction," and because "[they] serv[e] as a means of discerning congressional purpose the rule[s] should not be controlling where, for example, there is a clear indication of contrary legislative intent." *Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981); *see Iannelli,* 420 U.S. at 782, 95 S.Ct. at 1292. Second, even if the *Blockburger* test does apply to this case, the indictment satisfies *Blockburger*'s requirements.

The Second Circuit has suggested that the "plain language and different elements of § 1962(c) and § 1962(d) combined with the absence of a contrary legislative intention, support[s] the imposition of consecutive sentences for violations of both subsections." *United States v. Bagaric,* 706 F.2d 42, 63 n. 18 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). The language and structure of section 1962 in fact manifest affirmatively Congress' intention to allow dual prosecutions, rather than simply the absence of an intention to forbid them. Contrary to defendants' claims, Congress did not intend to create a group offense by enacting section 1962(c)— the substantive RICO provision involved in count one. Section 1962(c) contains no language suggesting that its violation requires any proof of group activity. It penalizes individuals for participating in the affairs of an enterprise through a pattern of racketeering activity. Furthermore, the definition of "enterprise" explicitly recognizes that an individual may constitute an enterprise for purposes of RICO. 18 U.S.C. § 1961(4) (1982). Therefore, that the enterprise involved in a particular RICO may be a group—either formal or informal, either legitimate or wholly illegal—has nothing to do with the question whether an individual committed racketeering activities while participating in the affairs of that enterprise. Conversely, an individual who in fact engages in group activity by participating in a RICO conspiracy cannot be prosecuted and punished under section 1962(c) unless the government proves that he alone committed two acts of racketeering.

In addition, the enactment of section 1962(d) itself strongly suggests that Congress viewed it as distinct from section 1962(c). Normally, conspiracies to violate particular substantive provisions of Title 18 are prosecuted under the general federal conspiracy statute, 18 U.S.C. § 371 (1982). RICO, however, contains its own conspiracy provision, section 1962(d). Congress' decision to enact a new conspiracy statute at the same time that it created a substantive offense that might often involve an enterprise which was simply "a group of persons associated together for a common purpose of engaging in a course of [criminal] conduct," *United States v. Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528, is "persuasive evidence" that Congress viewed sections 1962(c) and 1962(d) as separate crimes. *United States v. Ohlson,* 552 F.2d 1347, 1349 (9th Cir.1977) (per curiam). *See United States v. Hawkins,* 516 F.Supp. 1204, 1207 (M.D.Ga.1981).

Finally, the ways in which section 1962(d) differs from traditional conspiracy law suggest that Congress did not intend its enactment to subvert the normal presumption that both substantive and conspiracy counts could be charged in the same indictment. First, unlike section 371, section 1962(d) does not require proof of overt acts in furtherance of the conspiracy. *See United States v. Barton,* 647 F.2d 224, 237 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). More importantly, section 1962(d) was designed both to permit the prosecution of agreements that would not be reachable under traditional conspiracy doctrine, *see United States v. Elliott,* 571 F.2d 880, 902–04 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Loften,* 518 F.Supp. 839, 853 (S.D.N.Y. 1981), and to provide harsher penalties than those attached to section 371, *see Barton,* 647 F.2d at 237–38. The thrust of section 1962(d) is "to establish 'new penal prohibitions, and ... enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."

*United States v. Boylan*, 620 F.2d 359, 361 (2d Cir.) (quoting Statement of Findings and Purpose of Organized Crime Control Act of 1970), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). Like the enactment of multiple statutory schemes for controlling narcotics trafficking, the enactment of sections 1962(c) and 1962(d) may be said to "revea[l] the determination of Congress to turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter." *Albernaz*, 450 U.S. at 343, 101 S.Ct. at 1144 (quoting *Gore v. United States*, 357 U.S. 386, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958)). A reading of sections 1962(c) and 1962(d) that permits prosecution under both statutes better comports with this clear congressional purpose.

Wharton's Rule requires a "focu[s] on the statutory requirements of the substantive offense rather than the evidence [that may be] offered to prove those elements at trial...." *Iannelli*, 420 U.S. at 780, 95 S.Ct. at 1291. It "applies only to offenses that *require* concerted criminal activity, a plurality of criminal agents." *Id.* at 785, 95 S.Ct. at 1293 (emphasis in original). Section 1962(c) does not *require* concerted criminal activity. It requires only that an individual commit at least two acts of racketeering while participating in the conduct of an enterprise. This distinction is clearer, of course, when the enterprise charged has an existence wholly unrelated to any agreement to commit acts of racketeering, as the government's example of a corporate officer who commits two murders to benefit the corporation suggests. Defendants concede that under such circumstances prosecution under both RICO provisions might be permissible, but they argue that

the nature of the enterprise alleged is relevant to whether acts of racketeering committed in the conduct of its affairs can support a RICO prosecution. The Supreme Court has already rejected this argument, however. In *Turkette*, the Court held that an enterprise that was a group of individuals associated in fact for the purpose of violating the narcotics laws is within RICO's ambit. *See* 452 U.S. at 590–91, 101 S.Ct. at 2532–33. The Court found that it would be "incongruous" to insulate the wholly criminal enterprise from prosecution under RICO ...." *Id.* at 587, 101 S.Ct. at 2531. Defendants' contention in this case would have a similar incongruous result. It would permit consecutive sentences for defendants who committed their acts of racketeering in the conduct of legitimate businesses while preventing such sentences in cases involving wholly criminal enterprises. Congress cannot be said to have intended such a result.

*Blockburger* requires a similar conclusion. Like Wharton's Rule, the *Blockburger* test "focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli*, 420 U.S. at 785 n. 17, 95 S.Ct. at 1294 n. 17; *see Illinois v. Vitale*, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980). Section 1962(c) requires proof that a defendant actually committed two acts of racketeering. The heart of a section 1962(c) offense is participation in the affairs of an enterprise through acts of racketeering. Section 1962(d), however, requires no proof of any act—of racketeering or otherwise.[1]

---

1. Defendants' claim that a RICO conspiracy count is defective if it fails to allege overt acts has been rejected by the Second Circuit and other courts. *United States v. Ivic*, 700 F.2d 51, 59 (2d Cir.1983); *Barton*, 647 F.2d at 237. Nor is the RICO conspiracy statute unconstitutional on account of its failure to require an overt act. *See, e.g., Singer v. United States*, 323 U.S. 338, 340–42, 65 S.Ct. 282, 283–85, 89 L.Ed. 285 (1945). The common law never required proof of an overt act for conspiracy, and that require-

ment has never been read into our Constitution. *See Nash v. United States*, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913). If limits do exist on the government's power to prosecute unimplemented agreements they would be inapplicable here. The RICO conspiracy statute does require proof of an agreement to commit at least two acts of racketeering, an obligation that more substantially assures both procedural and substantive due process than the relatively formalistic overt-act requirement. Further-

Conversely, section 1962(d) requires proof that a defendant agreed with other persons to participate in the affairs of an enterprise through the commission of acts of racketeering. *United States v. Ruggiero,* 726 F.2d 913, 923 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). Proof of a conspiratorial agreement is not a necessary element of a prosecution under section 1962(c). Defendants claim this rationale is inappropriate when the enterprise alleged is an association "in fact" rather than a formal entity of some kind. An association in fact can exist, defendants argue, only when two or more persons combine together, and proof of such a combination will always and necessarily establish the existence of a conspiracy under section 1962(d). The short answer to this contention is that *Blockburger* turns on the elements of a crime, and not on the potential proof at trial. Furthermore, proof of a defendant's participation in an association in fact will not necessarily establish his membership in a conspiracy. To prove that a defendant participated in a *de facto* enterprise through a pattern of racketeering, the government need prove only that the defendant was aware that such an enterprise existed and that he engaged in two acts of racketeering that were related to the activities of, or affected, that enterprise. *See United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980) *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Thus, for example, once the government proves that *some* "members" formed the DeMeo crew, it will not be required to do more concerning other "members" or "associates" than to show that each defendant performed two acts of racketeering that affected the enterprise. *United States v. Ruggiero,* 726 F.2d at 921. *See also infra* Section II.D. To prove that a defendant joined a conspiracy to participate in the affairs of an enterprise through acts of racketeering, however, the government must prove that a defendant himself has *"objectively manifested an agreement* to participate, directly or indi-

rectly, in the affairs of an enterprise [through a pattern of racketeering.]" *Laterza v. American Broadcasting Co.,* 581 F.Supp. 408, 413 (S.D.N.Y.1984) (emphasis added) (quoting *Elliott,* 571 F.2d at 903).

The Second Circuit stated in *Scotto* that "[w]e have no reason to believe, ... from the words of the statute or from general criminal law doctrine, that the quantum of *mens rea* required for a RICO conspiracy conviction should be different from or greater than that required for a substantive RICO offense." 641 F.2d at 56. This statement, however, must be taken in context. First, *Scotto*'s holding concerning the quantum of *mens rea* required to prove a violation of section 1962(c)—that no proof of scienter beyond that required to prove the underlying acts of racketeering is necessary, *id.* at 55–56—was made in response to the claim that some specific intent to violate RICO must be shown. *Scotto* explicitly acknowledged that "[s]imply committing predicate acts which are unrelated to the enterprise or to one's position within it would be insufficient" to establish a violation of RICO. *Id.* at 54. This suggests a requirement that some level of awareness of the existence of an enterprise be shown. The Second Circuit also recently approved instructions that permit the jury to find a defendant guilty of a RICO conspiracy only if they find that the defendant "conspired to *participate in the affairs of the [enterprise]* by engaging in the predicate offenses." *Ruggiero,* 726 F.2d at 923 (emphasis added). This ruling suggests that more than an agreement to commit acts of racketeering, without any connection to an enterprise, is required. In addition, *Scotto*'s clear reference to "general criminal law doctrine" undermines any suggestion that *Scotto* meant to eliminate the traditional requirement that a conspirator have manifested a deliberate agreement to join the conspiracy. Although RICO conspiracies may not require proof of overt acts, and may allow charging more diffuse agreements than section 371 would permit,

more, this case raises no associational interests warranting first amendment concern, but rather

an alleged agreement to associate to engage in murder and other serious crimes.

the essential requirement that the government prove a conspirator knowingly became part of a criminal enterprise remains.

The preceding analysis also shows why count one is not a lesser-included offense of count two. If count one were a lesser-included offense of count two, then application of the *Blockburger* test would have shown that count two requires proof of an element for which count one does not, but that proof of count two necessarily results in proof of count one. But, as we have seen, count one does require proof of an element—the actual commission of two acts of racketeering in the conduct of the affairs of the enterprise—that is not required for conviction on count two. Thus, proof sufficient to establish count 2 would not necessarily establish count 1, so the counts do not merge.

C. *Claimed Multiplicity of Count 2 and Non-RICO Conspiracies.*

■ Defendants also argue that the non-RICO conspiracies alleged in the indictment—counts 4–8, 30, 54, 65, 68 and 70—are all multiplicious with the RICO conspiracy charged in count two. Proof of some of those conspiracies, however, requires proof of an overt act, an element not required to prove conspiracy under section 1962(d). In addition, the RICO conspiracy differs from the other conspiracies in that a defendant can only be convicted if the government proves that he personally agreed to commit at least two of the predicate acts of racketeering alleged in count one. The Second Circuit has ruled that Congress intended to enhance the penalties faced by persons who conspire to violate RICO beyond those available to punish people who violate other conspiracy provisions. *Barton*, 647 F.2d at 234–38.

D. *Claims of Misjoinder.*

Several individual defendants claim that their joinder with all the other defendants in counts 1 and 2 violates Fed.R.Crim.P. 8(b), because the RICO charges against them are legally insufficient, or because those charges should be tried separately.

In addition, some defendants raise joinder arguments concerning the joinder of substantive counts with the two RICO counts. Finally, counts 48, 56, 66, and 67 improperly join more than one offense, and are therefore invalid as duplicitous.

1. *Joinder of Defendants in the RICO Counts.*

■ The indictment on its face satisfies the requirements of Rule 8(b) with respect to the RICO counts. The rule permits two or more defendants to be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." The limitations on the government's charging power imposed by this language are largely eliminated when a conspiracy is alleged. The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense. The presence of a substantive RICO count under 18 U.S.C. § 1962(c), and of a RICO conspiracy count under 18 U.S.C. § 1962(d), further broadens the government's power to charge multiple defendants together. A RICO charge under § 1962(c) necessarily incorporates allegations that each of the defendants named was associated with or employed by the same enterprise, and participated in the enterprise by engaging in at least two acts of racketeering related to the enterprise. In short, by loosening the statutory requirements for what constitutes joint criminal activity, Congress limited the force of Rule 8(b) in such situations. Indeed, even if a defendant is not named in a conspiracy or RICO count, he may be charged in a separate count, in the same indictment, if he is alleged to have participated in the same series of acts or transactions that constituted the conspiracy or RICO offense, despite the fact that his participation may have been too limited to permit his being included as a co-conspirator or co-

racketeer. *See, e.g., Barton,* 647 F.2d at 240; *Weisman,* 624 F.2d at 1129.

The present indictment meets the requirements of Rule 8(b), since all the defendants are alleged to have participated in, or to have conspired to participate in, the enterprise charged in counts 1 and 2. Defendants seem to recognize this fact, but argue that, in the circumstances presented here, the court should require the government to show in advance of trial that it has at least a prima facie case for trying each of the moving defendants along with the "crew" members. The government rejects this claim, properly treating it as a motion to dismiss and arguing therefore that, so long as the indictment is sufficient on its face, defendants must make this claim at the end of the government's case, under Fed.R.Crim.P. 29. The government argues that the RICO counts and acts of racketeering may be dismissed against a particular defendant only "if the Count or Act is legally insufficient on its face," for example, "if the Act charged a state law misdemeanor ... or a federal crime not within the specified list...." Government's Supplemental Memorandum of Law in Opposition to Defendants' Joint Omnibus and Individual Motions at 2 n.* [hereinafter cited as "Supplemental Memorandum"]. The government is correct in contending that defendants generally may not move to dismiss criminal charges that are facially sufficient. *See Costello v. United States* 350 U.S. 359, 362–63, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956). Here, some defendants are attempting to do just that, because their claims of misjoinder are based on the proposition that, whatever is alleged, the government lacks sufficient evidence to justify prosecuting them on the RICO counts under any legally sufficient theory.

The established process for evaluating a motion under Rule 8(b) is to determine whether the defendants "are alleged" to have participated in the same series of transactions constituting an offense. The rule anticipates only that the government will, through the grand jury, proceed in good faith. As construed in this Circuit, the government acts in good faith unless it knowingly relies on a theory of joinder which has previously been held insufficient, or acts without a "reasonable expectation that sufficient proof will be forthcoming at trial," *United States v. Ong,* 541 F.2d 331, 337 (2d Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977); *see United States v. Aiken,* 373 F.2d 294, 299 (2d Cir.), *cert. denied,* 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967). These determinations have usually—though not invariably—been made after trial.

No authority appears to exist, however, that prohibits pretrial scrutiny of the sufficiency of the government's theory, and of the evidence it represents it expects to be able to introduce at a joint trial. This process differs from an examination of the sufficiency of the government's evidence, which would greatly and improperly burden the government's right to prosecute persons duly indicted by a grand jury. Pretrial scrutiny can be strictly limited to testing the theory the government espouses and the sufficiency of its expected proof. This exception to the general rule barring a pretrial test of the sufficiency of the government's case is supported by the language of Fed.R.Crim.P. 12(b)(1), which provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." The sufficiency of the government's theory, or of the facts it represents its evidence will prove, can both be determined without a trial. And this limited review enables a court to protect persons from the enormous burdens and risks of a major trial, without significantly or improperly limiting the government's right to prosecute.

A recent Second Circuit decision, *United States v. Travisano,* 724 F.2d 341 (2d Cir. 1983), illustrates the operation of the limited review appropriate in the circumstances of this case. Judge Eginton had granted defendant's pretrial motion to dismiss both counts of an indictment, one of which charged the defendant as a prior felon with

possession of a firearm that had affected commerce. *See* 18 U.S.C.App. § 1202(a) (1982). On appeal, the government argued that, while it had no evidence that the shotgun involved had actually traveled in interstate commerce, it could prove that the gun's manufacture itself had had a substantial impact on commerce. The Second Circuit affirmed Judge Eginton's ruling, and concluded that the facts which the government represented it could prove through its evidence would be insufficient to establish a violation of the statute. *See* 724 F.2d at 347–48. Similar rulings have been rendered in RICO cases. *See United States v. Kaye*, 586 F.Supp. 1395, 1400 (N.D.Ill.1984); *United States v. Cryan*, 490 F.Supp. 1234, 1243–44 (D.N.J.), *aff'd*, 636 F.2d 1211 (3d Cir.1980).

a. *The Government's Theory.* Several defendants challenge the sufficiency of the RICO claims against them, and the common argument they raise is that the government will be unable to prove that they were "associated with" or "employed by," or that they conspired with, the enterprise alleged in the indictment. Thus, the Hellmans claim that, even if they participated in a scheme with some crew members to enable Gaggi to avoid conviction for murder, and even if they engaged in other illegal conduct with the money the enterprise paid them, they cannot be shown to have become associated with the DeMeo crew's central activities of murder, car theft, narcotics dealings, loansharking, and prostitution. At most, they contend, they were bribed to perform a service to some crew members, and were unaware of even the existence of the enterprise alleged. The indictment charges them in only a few of the 80 acts of racketeering, and the government claims that the Hellmans first became associated with the crew in 1980, some eight years after the crew's activities commenced. Similar arguments are made by defendants Rega, Mangialino, Kalevas, and Rodriguez, each of whom claims that the government cannot show that his alleged dealings with crew members constitute a legally sufficient association with the crew.

The government claims it has no obligation to prove that any defendant actually became a member of the enterprise alleged in the indictment, or that he or she possessed any particular degree of knowledge about the enterprise or its activities. The government argues that the elements of proof under 18 U.S.C. § 1962(c) are:

1. That an enterprise existed;
2. That the enterprise affected interstate or foreign commerce;
3. That the defendant was associated with or employed by the enterprise;
4. That the defendant conducted or participated in the affairs of the enterprise; and
5. That this conduct or participation by the defendant was through a pattern of racketeering activity.

Supplemental Memorandum at 4 (quoting L. Sand, J. Siffert, W. Loughlin & S. Reiss, *Modern Federal Jury Instructions* ¶ 52.-04, at 52–35 (1984)) [hereinafter cited as *Jury Instructions*]. Furthermore, the government contends that requiring proof of association with an enterprise and participation in its affairs have no significance independent of the requirement that each defendant participate in an enterprise through a pattern of racketeering activity. "In effect the third and fourth elements collapse into or are subsumed within the fifth element." Supplemental Memorandum at 5 n.*. What the government means by this argument, in plain English, is that the statutory requirements of proof that the defendant was associated with, and participated in, an enterprise, are established when the government proves that defendant engaged in a pattern of racketeering activity. Under the government's view, therefore, it need only prove two elements other than an effect upon interstate commerce: (1) the existence of an enterprise; and (2) participation by the defendant in a pattern of racketeering activity that has some effect on that enterprise.

■ The significance of the government's theory lies in the low threshold of proof it would require with respect to a

particular defendant's membership in or awareness of the enterprise alleged in the indictment. The government can establish the existence of an enterprise by proving the existence of a group of persons having common purposes, a community of interests, and a continuing core of personnel. *See, e.g., United States v. Errico,* 635 F.2d 152, 156 (2d Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981); *Jury Instructions, supra,* ¶ 52.04 at 52–36. For the purposes of pretrial review of the indictment, this requirement is satisfied by the allegations concerning the "DeMeo crew," which the government claims possessed a hierarchical structure and an ongoing group of members who associated for the agreed purpose of profitting from a variety of interrelated criminal activities.

The requirement of proving a pattern of racketeering activity relates to every individual charged. But the government claims that it need not show that any particular defendant was a member or was aware of the enterprise. A sufficient nexus exists, the government claims, between a defendant's acts and the enterprise when the standard established in *Scotto,* 641 F.2d at 54, is satisfied:

> [For RICO purposes] one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise.

The government contends that some of the defendants who have moved to dismiss the indictment on the grounds of misjoinder fall within the first category described in *Scotto:* they were in fact "members" or recognized "associates" of the enterprise who were enabled to commit the predicate offenses with which they were charged solely because of their involvement with the enterprise. Persons satisfying the first prong of *Scotto*'s test would know of the existence of the enterprise, since they occupy a "position" within it or are "involve[d]" in or "control" its affairs.

The government recognizes, however, that "[m]ost of the challenged activities [of the moving defendants] ... fall in the second 'nexus' category [described in *Scotto* ], that of activities 'related to' the enterprise." Supplemental Memorandum at 8. Activities "related to" the enterprise, the government argues, are simply activities "having some inpact on the affairs of the enterprise," whether beneficial or detrimental, *id.* at 9, and the law should impose no requirement that a defendant who engages in such activities must be shown to have had any particular state of mind with respect to the enterprise affected. Relying on *Scotto,* 641 F.2d at 55–56, and other authorities, the government notes that "courts have refused to engraft an additional RICO knowledge requirement onto the pre-existing scienter requirements of the charged predicate acts." Supplemental Memorandum at 16. The only *mens rea* courts have thus far required the government to prove in RICO cases is that required to establish the criminality of at least two acts of racketeering charged in the indictment. *See Boylan,* 620 F.2d at 361–62. The authors of a recent treatise on federal jury instructions explained:

> The second group of instructions which might be expected but which is purposely not provided is that dealing with the requisite intent, or *mens rea,* of the various RICO offenses. The reason why there are no such instructions is simple: none are [*sic*] required. The *mens rea* required to commit a RICO criminal violation is identical to that required for the underlying predicate crimes [citing *Scotto* ]. The type of *mens rea* instruction given, therefore, will depend on what predicate crimes are charges.

*Jury Instructions, supra,* ¶ 52.01, at 52–5. This proposition, if accepted, would result in an individual being subject to prosecution under RICO if the government could prove the existence of an enterprise, and the commission by the defendant of two acts of racketeering "having some impact

on the affairs of the enterprise," irrespective of the degree of the defendant's knowledge of or involvement with enterprise members and associates. *Cf. id.* ¶ 52.04, at 52–39 to 52–40.

The government's argument, and its use of *Scotto,* is a classic instance of a claim that proves too much. This reading of the statute could lead to results unwarranted by the act's language or legislative history. For example, a robber who committed two robberies at a social club could be named in a RICO count on the government's claim that a criminal enterprise operated out of the club, and the robberies of two of its members deprived it of assets or equipment used in its dealings. Another hypothetical, presented at oral argument, was the case of a cashier who works at a bank, which the government alleges also harbors an enterprise consisting of a group of bank officers engaged in the illegal activity of laundering cash. Under the government's view, strictly applied, the cashier who handles transactions at the request of bank officers, knowing the transactions are improper under banking regulations, could be named as a RICO defendant even though he or she had no knowledge whatever of the source of the funds or the overall scheme involved. Even more extreme, but nevertheless logical, the government's theory would permit naming a cashier in such an indictment merely because he or she engaged in two acts of independent embezzlement from the bank, even if he or she was unaware that a cash laundering enterprise was simultaneously operating.

To the government's credit, it acknowledged at oral argument that the cashier in the hypothetical case could not be named in a RICO count based on the laundering enterprise. In its Supplemental Memorandum, the government implicitly concedes that each defendant named in a RICO count must be shown to have had some degree of awareness of the RICO scheme alleged. It argues:

> When the requirements of proof of an associated-in-fact enterprise are combined with the requirements of proof of a defendant's participation in the conduct of its affairs, *only some limited knowledge of the larger scheme is demanded of the defendant.*

Supplemental Memorandum at 16 (emphasis added). In fact, every decision cited by the government, and apparently every reported case decided under RICO since its passage, involved defendants who were aware they were participating to some degree in the enterprise alleged in the indictment. *See, e.g., United States v. Provenzano,* 688 F.2d 194 (3d Cir.) (defendant was official in labor union enterprise), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982); *United States v. Lemm,* 680 F.2d 1193 (8th Cir.1982) (defendants approached leader of arson ring enterprise for assistance), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *Scotto,* 641 F.2d 47 (defendant was president of labor union enterprise); *Errico,* 635 F.2d 152 (defendant was "linchpin" of "network" of bettors and crooked jockeys). Where a defendant was acting illegally on his own, the Eighth Circuit refused to allow his prosecution under RICO. *United States v. Dennis,* 458 F.Supp. 197 (E.D.Mo.1978) (defendant who extorted money from coworkers in corporation's parking lot was not participating in the affairs of the corporation for RICO purposes), *aff'd,* 625 F.2d 782 (8th Cir.1980).

The problem with the government's position is that it lacks a rationale to explain why the government must prove any degree of knowledge of the "larger scheme" in a RICO case. If no *mens rea* requirement relating to the enterprise exists, and if the statute truly requires only proof of two predicate acts that affect the enterprise, then on what basis must the government prove *any* degree of individual knowledge of the enterprise's existence and activities? And if the law does in fact require some degree of knowledge of the enterprise's existence and activities, then why is the appropriate test "only some limited knowledge of the larger scheme," as the government concludes?

The government's conceptual difficulty stems ultimately from the failure of courts explicitly to recognize that RICO itself expressly requires that any defendant prosecuted under section 1962(c) must be shown to have been aware of at least the general existence of the enterprise named in the indictment. Section 1962(c) expressly applies only to persons "employed by" or "associated with" an enterprise involved in interstate or foreign commerce. These phrases can only be given content in association-in-fact cases by a requirement that the government show, at a minimum, that the defendant was aware of the existence of a group of persons, organized into a structure of some sort, and engaged in ongoing activities, which the government can prove falls within the definition of enterprise contained in section 1961(4). In addition, section 1962(c) requires proof that the defendant "conduct[ed]" or "participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs...." This choice of words also reflects a view of the defendant as aware of the existence of the named enterprise, since it requires a particular kind of connection between the defendant's behavior and the enterprise's affairs. To collapse the requirements of "association" and "conduct or participation" into the requirement that the defendant engage in a pattern of racketeering activity is commanded by neither logic nor the statute's purpose. Rather, the "pattern" requirement should be read as indicating only the form and extent of participation which a defendant's activities must take for him to be convicted under RICO. *See United States v. Stofsky*, 409 F.Supp. 609, 613 (S.D.N.Y.1973) (Pierce, J.) (RICO requires proof of a "connection between the person who would commit the enumerated predicate acts and the enterprise, and between the acts and that person's participation in the operations of the enterprise").

This interpretation is also supported by RICO's legislative history. As the Supreme Court noted in *Turkette*, "the legislative history forcefully supports the view that the major purpose of [RICO was] to address the infiltration of legitimate business by organized crime. The point is made time and again during the debates and in the hearings before the House and Senate." 452 U.S. at 591, 101 S.Ct. at 2532. A defendant could not "infiltrate" a entity of whose existence he was totally unaware. Moreover, if Congress had meant to permit defendants to be prosecuted under section 1962(c) without any proof of awareness of the existence of the enterprise alleged, it could have simply prohibited "affecting" an enterprise through a pattern of racketeering activity. The decision to require proof that a defendant conducted or participated in the conduct of an enterprise reflects Congress' resolve that some connection more significant than a fortuitous effect on some enterprise be shown.

This reading is also consistent with the Second Circuit's language in *Scotto*. Scotto was the president of the labor union that the indictment identified as the affected enterprise. He was therefore completely aware of its existence, and fully satisfied RICO's requirement of "association." Moreover, his acts of racketeering involved accepting payments designed to affect his conduct as an officer of the named enterprise. It was in this factual context that Judge Oakes wrote *Scotto*, and the test on which the government relies expressly refers to a defendant employed by an enterprise who "conducts the activities of" that enterprise, 641 F.2d at 54; the opinion does not expressly address how courts are to determine whether a defendant has "associated with" and "participate[d]" in the affairs of an enterprise. A person who "conducts" an enterprise will necessarily know of its membership and activities, and any special *scienter* requirement would be superfluous. But a person who merely associates with some members of an enterprise, and who participates in activities which somehow affect the enterprise, will not necessarily know anything about the enterprise. To justify exposing such a person to dramatically enhanced RICO sanctions war-

rants proof of awareness on the defendant's part.

The defendants have also moved to dismiss the RICO conspiracy charge against them, as being based on a legally insufficient theory, or as wholly lacking in evidentiary support. Most courts that have ruled on the degree of knowledge required in RICO conspiracy cases have held that the government must prove that each defendant consciously agreed to participate in an enterprise by committing the required acts of racketeering. Thus, the Fifth Circuit has held:

> [T]he object of a RICO conspiracy is to violate a substantive RICO provision—here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity—and not merely to commit each of the predicate acts necessary to demonstrate a pattern of racketeering activity.... [The court must be able to] reasonably infer that each crime was intended to further the enterprise's affairs. To find a single conspiracy, we must still look for agreement on an overall objective. What Congress did was to define that objective through the substantive provisions of the Act.

*United States v. Elliott*, 571 F.2d at 902–03. Several other courts of appeal have reached the same conclusion. *See United States v. Boffa*, 688 F.2d 919, 937 (3d Cir. 1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *United States v. Melton*, 689 F.2d 679, 683 (7th Cir.1982); *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981). Requiring an agreement to participate in an enterprise necessarily requires proof of at least that degree of awareness of the existence and activities of an enterprise suggested by the statutory language of substantive RICO.

The government properly notes that *Scotto* suggests a less demanding standard of awareness for substantive RICO, and that the opinion in *Scotto* states that the "quantum of *mens rea*" required under the RICO conspiracy statute is the same as that required to prove a substantive RICO

offense. 641 F.2d at 56. If the government's literal reading of *Scotto* is correct, then defendants have no basis for dismissal of either the substantive or conspiracy counts. As discussed above, however, one cannot safely read *Scotto* so literally. *See supra* Section II.B. Defendants' motions directed to both the substantive and conspiracy RICO counts will therefore be judged at this point by the same, higher standard of awareness suggested by the statutory language.

b. *Motions of Individual Defendants.* Applying the more demanding standards suggested in this opinion to the motions of those defendants who claim to have had no awareness of the enterprise alleged or its activities, the present record nevertheless requires that the government be permitted to proceed to trial against all the defendants named. Through its various submissions and representations of the evidence it intends to introduce at trial, the government has adequately demonstrated that each defendant is properly joined in the two RICO counts.

 *Judith May Hellman.* The government argues that Judith Hellman possessed sufficient knowledge of the enterprise charged in the indictment due to her participation as a juror in *People v. Gaggi*, Indictment No. 3325/79 (Sup.Ct. Kings Co.). That case involved directly the allegations contained in acts of racketeering 18, 19, and 20 (the two Eppolito murders and the attempted murder of Paul Roder). The present indictment also charges that acts of racketeering 23 (the murder of Patrick Penny), and 29–35 (various bribes and attempted bribes of witnesses and defendant Judith Hellman) were collateral consequences of the prosecution of *People v. Gaggi.* The government argues that the trial must have made Judith Hellman aware that Gaggi was part of a criminal organization that engaged in at least the illegal activities of loansharking, weapons possession, bribery, and murder:

> When the Hellmans joined the enterprise, Judy had sat for weeks as a juror in Brooklyn hearing the most graphic

evidence of what this "killer crew" was all about; the dead bodies of the Eppolitos with their brains and blood splattered all over the car; the efforts by Gaggi to kill Sergeant Roder; the eyewitness accounts given by Patrick Penny and Sergeant Roder. She then at the instance of Wayne, her fiance, and Sol, her future father-in-law, sold her vote on the jury to Gaggi in order to acquit him of murder and attempted murder. Gaggi was thereby released to return to captaining his crew. The Hellmans' entry into the enterprise was with full, indeed vivid, knowledge of its workings. They may not be heard to claim that they should be separated from the violent personnel and acts of the enterprise. A violent enterprise is what they bargained into.

Government Memorandum at 30. The government submitted a supplemental memorandum discussing specifically "why a trial juror sitting in *People v. Gaggi* ... would have concluded that the murders of James Eppolito, Sr. and James Eppolito, Jr. were the result of organized criminal activity." Supplemental Government Memorandum in Opposition to Defendants' Omnibus Motions at 1 (Apr. 2, 1985) ("Government's Hellman Memorandum").

The trial testimony strongly indicated that the murders of the Eppolitos were premeditated and committed by experienced killers. The victims were shot repeatedly at close range; the killers "left the scene in a controlled, professional manner"; *id.* at 7; and Patrick Penny, one of the main prosecution witnesses, "stated his clear preference not to have testified and his wish not to have been involved," *id.* at 4, suggesting that he feared retaliation. Gaggi himself testified that he was present at the scene of the murder because his friends "wanted his aid in straightening out a money problem [the junior] Eppolito [had] with an unknown third party." *Id.* at 5. For a financial problem to result in murder could suggest that illegal activity and an illegal enterprise were involved; and Eppolito's request that Gaggi accompany him might indicate that Gaggi occupied a position of authority within some under-

world organization. Gaggi's testimony that the killer told him and his codefendant that they "must 'forget his face' or they would be killed along with their families," *id.* at 6, is language suggesting that professional criminals were responsible for the killings.

Finally, Judith Hellman's sworn, roughly contemporaneous statements about her impressions of the trial demonstrate her awareness of likely "mafia" involvement. She swore, for example, in support of Gaggi's motion to set aside the convictions because of improprieties concerning the jury, that the jurors saw Gaggi's codefendant, handcuffed to his stretcher, being escorted into the courthouse by policemen wearing bulletproof vests and carrying shotguns. "[V]iewing this scene immediately prompted our speculation about whether this case involved 'the mafia.'" Affidavit of Judith Hellman ¶ 9 (Sept. 25, 1981). She also swore that, when the jurors in *Gaggi* asked their guards why they had been sequestered from the moment they were sworn, the guards "told us that this was a 'special case' and that we were being sequestered 'for our own protection.'" *Id.* ¶ 10. These events led Judith Hellman to conclude:

> that there was something unusual about this case and that it did perhaps involve members of organized crime. This feeling, which was also held by some of the other jurors carried throughout the trial and deliberations. Indeed, I specifically remember during our deliberations one of the jurors saying, "If they're mafia (the defendants) they will take care of their kind. If they killed them (the Eppolittos) [*sic*] they will take care of them."

> This mafia suspicion was, of course, finally confirmed for us by District Attorney Samuels and Officer Rhoder [*sic*] after we had reached our verdict. Before we left the courthouse, District Attorney Samuels and Police Officer Rhoder [*sic*] came into our room quite angry and excited. They told us these defendants were high up in the mafia and that they could not understand how we could

not have convicted them of all the charges.

*Id.* ¶ ¶ 11–12. Her subsequent testimony at the post-trial hearing confirmed these allegations. *See People v. Gaggi* Tr. at 16–17, 24–26 (Feb. 5, 1982). She also acknowledged that she knew that Patrick Penny, a key government witness, had been killed after the trial. *Id.* at 27–28. Moreover, Hellman also explained that, although defendant's counsel had helped her to prepare her affidavit, *id.* at 31–34, she had suggested a modification of significance to the present motion:

A. When I first read my affidavit I think there was something missing or—and I had them add it, but that was it.

Q. Do you recall what that was?

A. I believe it had something to do with the conversation about the Mafia.

Q. And you asked them to add that?

A. Yes.

Q. Because you felt that was missing?

A. Yes.

*Id.* at 34. Justice Scholnick found, in granting Gaggi's motion, that "the jurors were informed on several different occasions ... that they were being sequestered because of 'bribery' attempts, for 'their own protection,' and because the case involved the 'Mafia.'" *People v. Gaggi,* slip op. at 2, No. 3325/79 (Sup.Ct. Kings Co. May 14, 1982) (citations omitted).

The record presented by the government therefore demonstrates that its theory concerning Judith Hellman's participation is legally sufficient, and that the evidence and allegations made would justify her conviction if credited by a jury. The fact that Gaggi was convicted of a weapons violation and assault shows that she was aware from the trial testimony that Gaggi engaged in various forms of illegal activity, and the evidence that came to her attention could reasonably lead a jury to conclude that she knew that Gaggi was part of an organized criminal enterprise when she allegedly accepted a bribe from him to cause the jury to refuse to convict him of murder, and lied in support of his motion to set aside the verdict. Thus, she had sufficient knowledge of the existence and activities of the enterprise charged in this indictment to make her joinder in the two RICO counts appropriate.

■ *Sol Hellman.* The government's theory and evidentiary support for naming Sol Hellman in counts 1 and 2 is that he was aware from personal dealings with various individuals that Gaggi was associated with an organized crime family, and that, knowing this, he participated with members of the crew in several acts of racketeering that had direct effects on the crew. "The evidence will reveal the long-standing acquaintance of Sol Hellman with the crew's captain [Gaggi]...." Government Memorandum at 29. In particular, the government has argued, both at oral argument and *in camera,* that it possesses evidence (in addition to the testimony connected to Gaggi's trial) that will show that Sol Hellman was aware of the crew's loan-sharking activities, that he questioned a member of the crew as to which organized crime family that member was associated with, and that he went to other members of the crew (not to Gaggi directly) with the proposition that Judith might be helpful to Gaggi. Furthermore, the government alleges that it will prove that Sol Hellman purchased the Glenwood Flea Market with the proceeds from Judith's racketeering activities, and then funneled money from that operation back into the enterprise, ultimately to defendant Castellano. Taken together, this evidence could show that Sol Hellman was aware of the alleged enterprise and that his activities amounted to conscious participation with the enterprise in racketeering acts.

■ *Wayne Hellman.* The government's theory and evidentiary representations concerning Wayne Hellman are sufficient to justify his joinder in the RICO counts. Wayne Hellman is the son of Sol Hellman, and allegedly was Sol's connection to Judith, who was Wayne's fiancee during Gaggi's trial. As such, the government argues it would have been impossible

for Sol and Judith Hellman to have participated in the affairs of the DeMeo crew without Wayne's knowledge, especially since that participation included the acquisition and management of the Glenwood Flea Market, where Wayne worked. The government intends to present evidence to show that Wayne was acquainted with Anthony Gaggi prior to Judith's participation in *People v. Gaggi*, and that Wayne participated in a meeting with Roy DeMeo concerning the scheme to influence the verdict in *People v. Gaggi* (thereby showing that he knew of the relationship between DeMeo and Gaggi). The government will also attempt to show that Wayne was aware of the information concerning Gaggi that Judith learned during and after the trial. Finally, it will attempt to prove that Wayne, aware of the nature of the enterprise involved, joined his father in acquiring and operating the Glenwood Flea Market, which was purchased with and generated enterprise funds. Whether the government will establish its claims is possibly more doubtful with respect to Wayne than any other defendant, but its allegations, in court and *ex parte*, are sufficient to satisfy the threshold burden required at the pretrial stage.

 That the Hellmans are all properly joined in the two RICO counts does not end this inquiry. The question remains whether all the acts of racketeering in which they are charged are legally sufficient. In light of the foregoing discussion, acts of racketeering 33, 34, 35, 41, and 53–54 are proper subjects for this RICO indictment. Acts of racketeering 49–51 raise a more difficult problem. These acts of mail and wire fraud concern misrepresentations allegedly made by Judith and Wayne Hellman in the course of seeking a home mortgage and an automobile loan. The government claims that these misrepresentations were directly tied to the bribe paid Judith for her activities as a juror in *People v. Gaggi*: "[t]he house and the way it was accounted for, the buying of the automobiles, had to be done in a certain fashion," to avoid revealing the source of the money. Transcript of Oral Argument

at 36 (Feb. 21, 1985). Section 1962(c) is concerned with acts of racketeering only to the extent that those acts are connected to the conduct of the affairs of an enterprise engaged in interstate or foreign commerce. The government argues that the fact that the Hellmans devised the fraudulent schemes alleged in acts of racketeering 49–51 in part to avoid revealing the enterprise source of their money is sufficient to connect these acts to the enterprise. The government alleges that it will attempt to prove, in fact, that the enterprise extended accounting assistance to the Hellmans to assist them during these alleged activities in hiding the enterprise source of the funds involved. *See* Transcript of Oral Argument at 36 (Feb. 21, 1985).

The government's theory for treating the Hellmans' alleged mail frauds as acts of racketeering is legally sufficient. What a racketeer does with his or her income from a criminal enterprise may itself be an act of racketeering, but it is not necessarily one. The test remains that provided in RICO: to be relevant in a RICO prosecution an act of racketeering must tend to establish conduct or participation in the alleged enterprise, which means that the act must at least have some effect upon the enterprise. When a person takes funds from enterprise activities and buys a car for his personal use, the act of buying the car has nothing to do with conducting or participating in the enterprise. If the individual engages in mail fraud, however, in making the purchase, and if the fraud is designed to avoid revealing the enterprise and is committed with the assistance of enterprise members or associates, then those acts of fraud satisfy the statutory requirements.

 *Pedro Luis Rodriguez.* Rodriguez argues that his alleged participation in various drug deals and stolen car operations, even if true, is insufficiently tied to the crew's own activities. At oral argument, his counsel analogized the allegations concerning Rodriguez' activities and the enterprise to "IBM dealing with Sperry Rand...." Transcript of Oral Argument

at 83 (Feb. 21, 1985). *See also* Affidavit of Thomas H. Nooter ¶ 19 (Jan. 14, 1985) (Rodriguez' drug and stolen automobile transactions were separate from those of the DeMeo crew). That Rodriguez may have been a member or leader of a distinct enterprise does not mean, however, that he was not "associated with" the DeMeo crew. An individual may simultaneously be associated with, and even employed by, wholly independent enterprises. Rodriguez cannot be prosecuted in this RICO action for acts of racketeering unrelated to his association with the DeMeo crew. *See Scotto*, 641 F.2d at 54. But the government represents that the racketeering acts of which he is accused in this indictment were undertaken in association with crew members. Moreover, although Rodriguez is not named in the act of racketeering concerning the alleged murder of Chris Harvey Rosenberg (a member of the DeMeo crew), the government claims that its proof will show that Rosenberg's murder was instigated by Rodriguez.

These representations easily satisfy the requirement that the government proceed on a theory and allege evidence legally sufficient to warrant prosecution. If the government can show that Rodriguez "demanded" that the crew execute Rosenberg, Government Memorandum at 34, then it will necessarily have shown that Rodriguez was sufficiently aware of the enterprise's existence and of its willingness to engage in murder. The government also claims that the drug deals and stolen car operations were central to the DeMeo crew's activities, and that Rodriguez knew that his own functions were tied to the enterprise's schemes. The burden remains on the government to prove the nexus between each act of racketeering and the enterprise at trial, but the government's representations entitle it to the opportunity to try Rodriguez on the RICO counts.

■■■ *Gus Kalevas.* Kalevas is charged only with acts of racketeering related to his participation in a prostitution operation. He argues that to include him in the RICO charges merely because of "the government's inclusion of prostitution as one of the 'objects of the enterprise'" strains "the already amoebic concept of enterprise." Memorandum in Support of Applications by Gus Kalevas at 7. Kalevas also argues that applying RICO 'to a defendant ... [who is] at best 'a small fry with only a tangential relationship to the enterprise,' is impermissible." *Id.* at 8–9 (quoting *United States v. Swiderski*, 593 F.2d 1246, 1249 (D.C.Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979)).

According to the government's representations of what its evidence will show, however, Kalevas is no small fry with only a tangential relationship to the DeMeo crew. The government contends that Kalevas falls within the first prong of the *Scotto* test, that is, that he was "enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise...." 641 F.2d at 54. The government intends to show that Kalevas frequented the Gemini Lounge (the crew's meeting place), that Kalevas' prostitution-related business was financed by Gaggi and DeMeo, as leaders of the crew, and that Kalevas received protection from persons he knew were crew members. Moreover, the government intends to show that a portion of Kalevas' profits were funnelled back to the crew, and that the bribery charged as act of racketeering 37 involved an attempt to preserve the value of real estate owned in part by the enterprise's leadership. *See* Transcript of Oral Argument at 106–11 (Feb. 21, 1985).

Kalevas' argument reflects the common confusion among some defendants between proof of an enterprise and proof of a pattern of racketeering affecting the enterprise. The government must prove the existence of the DeMeo crew—a core of individuals linked by a common purpose and a hierarchical structure—but it need not prove that every defendant was a "member." All it need show is that each defendant was somehow "associated with" the crew. Thus, the government is entitled to

charge individuals with a violation of RICO if it has evidence to show that they performed a specific and limited function for the enterprise, while aware of the existence of the enterprise involved. Here, the government claims it will show that Kalevas was aware of the enterprise and many of its illegal activities, and that he played an active role in the enterprise by running a prostitution operation in which enterprise leaders had an interest, and by participating in the enterprise through the bribe referred to above. The allegations are sufficient to justify Kalevas' trial along with the rest of the crew.

■ *Salvatore Mangialino.* Mangialino is charged with three acts of racketeering—24, 25, and 36—all of which are alleged to have grown out of his desire to prevent Charles Mongitore from testifying against Mangialino's son in an assault case in state court. The government's theory concerning Mangialino is essentially that he "hired" the enterprise, first to bribe Mongitore and then, when that attempt failed, to kill him. When Mongitore's partner, Daniel Scutaro, happened upon the scene, he too was murdered. *See* Government Memorandum at 35–36.

The government has presented evidence that sufficiently suggests that Mangialino was aware of the nature of the enterprise when he sought its aid. Indeed, the government alleges that its evidence will show that he sought the enterprise's aid to serve as a "killer crew." *See, e.g.,* Transcript of Oral Argument at 129–30 (Feb. 21, 1985). Mangialino cannot argue that the proffered representations are legally insufficient to show that he was aware of the enterprise's willingness to engage in acts of murder.

Mangialino's motion can be read to suggest a different point. He argues that the various people who hire the same hit squad, each for his own reasons, cannot be grouped together in an enterprise. *See id.* at 131. This point is valid, to the extent that various "employers" cannot legitimately be said to constitute a RICO enterprise. But a "hit squad" may itself consti-

tute or reflect the existence of a RICO enterprise. The government need only prove with respect to a defendant like Mangialino that he was aware of the existence of the enterprise and that he participated in the enterprise's affairs through a pattern of racketeering. Such participation is established when the government shows that "the predicate offenses are related to the activities of that enterprise." *Scotto,* 641 F.2d at 54. Here, Mangialino's predicate offenses involve one of the paradigmatic activities of the DeMeo crew, the murder of potential witnesses. Just as the government was not required to show in *Scotto* any particular effect on the labor union of Scotto's acceptance of payoffs during his tenure as union president, so here the government is not required to show that the crew's participation with Mangialino in particular acts of racketeering resulted in a tangible benefit or detriment to the crew.

### 2. *Joinder of Offenses in the Non-RICO Counts.*

■ Several of the counts in this indictment—counts 48, 55, 56, 66, and 67—pose a serious problem of misjoinder of offenses, or duplicity. Count 48 charges eleven defendants with transporting and aiding and abetting the transportation of stolen automobiles and automobile engines and counterfeit securities (automobile certificates of title) in violation of 18 U.S.C. § 2314 (1982), over an eleven-year period. Count 55 charges four defendants with travelling in and using the facilities of interstate commerce, from 1972 to 1984, to distribute the proceeds of prostitution activities, and to commit crimes of violence to further, and otherwise promote and facilitate, prostitution activities, in violation of 18 U.S.C. §§ 1952 and 2 (1982). Count 56 charges the same four defendants with transporting women in interstate commerce, during the same twelve-year period, for the purpose of prostitution, in violation of 18 U.S.C. §§ 2421 and 2 (1982). Count 66 charges sixteen defendants with using firearms to commit felonies, and with carrying firearms unlawfully during the

commission of certain felonies, specifically those charged in counts 1, 2, 4–17, 30–56, and 67–69, in violation of 18 U.S.C. §§ 924(c) and 2 (1982), from April 1, 1979 to 1984. Count 67 charges fourteen defendants with receiving, possessing, making, delivering, changing, altering, and transferring firearms made, possessed, transferred, delivered, changed and altered, in violation of 26 U.S.C. §§ 5845, 5861, 5871, and 2 (1982), during the same five-year period.

Apart from other deficiencies from which these counts may suffer, they charge multiple crimes in single counts. Defendants have not raised this objection, but it became apparent in the course of evaluating other claims. Unless the government presents some satisfactory explanation for the charges, they must be dismissed.

Rule 8(a) authorizes the joinder of offenses in the same indictment, "in a separate count for each offense," where the offenses charged are of similar character, are based on the same act or transaction, or are based on two or more acts or transactions constituting a "common scheme or plan." Rule 8(b), rather than Rule 8(a), governs joinder of offenses in cases in which multiple defendants are charged. *See United States v. Papadakis*, 510 F.2d 287, 299–300 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *Federal Practice and Procedure: Criminal 2d, supra*, § 144, at 494–95. But the principle implicit in the requirement of Rule 8(a)—that separate charges be filed in separate counts—is based ultimately upon broader considerations. "Important policy considerations underlie the rule that two or more distinct crimes should not be alleged in a single count of an indictment." *United States v. Murray*, 618 F.2d 892, 896 (2d Cir.1980). A general verdict masks the possible absence of jury unanimity whenever a single count includes more than one offense. *See also* 8 J. Moore et al., *Moore's Federal Practice* ¶ 8.03[1], at 8–6 (1984) (duplicity denies defendants proper notice, and potentially subjects them to double jeopardy).

The duplicity problem posed by the counts at issue could readily have been overcome by converting them into conspiracy charges. The crime of conspiracy is the agreement to commit other, substantive offenses. *See Murray*, 618 F.2d at 898. So long as the jury unanimously finds that a conspiracy was proved, including some overt act, no requirement exists that it unanimously agree to any of the other particulars charged. None of the counts at issue, however, charges a conspiracy, or any other form of joint action by agreement (beyond aiding and abetting). Nor was this possible form of charge overlooked. All but one of the counts at issue are similar to or replicate a conspiracy charge or racketeering act alleged in the indictment. *See* count 30 (conspiracy to transport stolen automobiles and engines, and counterfeit certificates of title) (replicates count 48); count 54 (conspiracy to travel and use facilities in interstate commerce in aid of prostitution offenses) (replicates count 55); count 65 (conspiracy to violate various firearms statutes) (replicates counts 66 and 67).

An apparently illegal joinder of offenses may be proper because the allegations in a particular count constitute a "continuing offense." A continuing offense is one which by its nature or by its terms is a single, ongoing crime. A person who participates in any part of the offense, or in all of it, can only be charged with one crime. The Supreme Court has made clear that "the doctrine of continuing offenses should be applied in only limited circumstances.... [A] particular offense should [not] be construed as a continuing one.... unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970); *see also* Judge Schwarzer's illuminating opinion in *United States v. UCO Oil Co.*, 546 F.2d 833, 836–38 (9th Cir.1976) (establishing test based on statutory language; legislative history and statutory

context; nature of proscribed conduct; and propriety of multiple punishment to determine whether count is duplicitous), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

None of the statutes involved can be treated as a continuing offense under either prong of the test enunciated in *Toussie.* The statutes contain no language to suggest that the conduct proscribed, performed on numerous, separate occasions over periods ranging from five to twelve years, constitutes one offense. In fact, defendants in other cases have often been indicted, tried, and sometimes sentenced consecutively for multiple violations of the statutes involved. *See, e.g., United States v. Morris,* 700 F.2d 427 (1st Cir.) (each transportation of minors for purposes of prostitution, 18 U.S.C. § 2423), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *United States v. White,* 524 F.2d 1249, 1254 (5th Cir.1975) (violations of section 2314), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976); *United States v. Tarrant,* 460 F.2d 701, 704 (5th Cir.1972) (violations of section 5861). To the extent that Congress intended to permit prosecution of a large number of defendants for a large number of violations over a long period of time, it provided two clear options: indicting defendants for conspiracy under 18 U.S.C. § 371, or for participating in an illegal enterprise under RICO, 18 U.S.C. § 1962. Here, the government has already pursued both options. It cannot also be permitted to prosecute the named defendants as a group for a third time by joining together separate offenses.

Finally, the counts at issue cannot be regarded as proper under the rationale that each alleges "the commission of a [single] crime by several means," rather than the commission of "several offenses in the same count." *Murray,* 618 F.2d at 896. The distinction drawn in *United States v. Tanner,* 471 F.2d 128, 138–39 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972), seems particularly relevant here. The indictment in *Tanner* contained one count which charged four defendants with several, separate transporta-

tions of explosives, with intent to use them to damage property, during a three-month period, between several different cities, on trips that involved different defendants. The Court held that "[e]ach trip could be considered part of a continuing scheme to transport explosives only if the scheme were so broadly defined as to amount to a general conspiracy allegation rather than a substantive offense. Since Count III alleges a substantive offense, we find it duplicitous." *Id.* at 139.

Charges based upon the statutes charged in the counts at issue may well, in appropriate circumstances, be found to allege a single offense, committed by various means. *See, e.g., United States v. Alsobrook,* 620 F.2d 139, 142–43 (6th Cir.) (several violations of Travel Act "that occurred within a short period of time and that involved the same defendant" not duplicitous), *cert. denied,* 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980). No such claim can reasonably be made here, however. In this case, each of the counts at issue merely recites the names of certain defendants as having violated a specified statute in one of several possible ways, over long periods of time. The indictment makes clear, moreover, that many acts or transactions will be presented by the government at trial, and many will involve fewer than all the defendants named in the counts involved. The government has itself treated some of the specific instances it will attempt to prove as separate crimes, alleged in other counts, *see, e.g.,* counts 32–47, and no doubt would object to a ruling that permitted it to punish each defendant only once for all the conduct related to all the "means" one would have to allege were utilized in each of the counts at issue.

### E. *Severance.*

Defendants claim that a joint trial of all those named in the present indictment, on all the charges made, would be "inherently prejudicial." Their detailed arguments fall into the two categories of concern repeatedly referred to in decisions on sever-

ance motions: jury confusion and prejudicial spillover.

Defendants argue that the size and complexity of this case will cause jury confusion. The government presently intends to try all 21 available defendants jointly, on the 78 counts charged. The large number of defendants and charges are factors that make jury confusion more likely than if fewer defendants and charges were involved, all other circumstances being equal. If all the defendants were in fact tried on all charges, the jury would be required to reach over 500 separate verdicts. *See* Defendants' Memorandum at 4. The government estimates its case will take approximately four months to present, if it is permitted to proceed on all charges. The possible prejudice from the lengthy trial anticipated may be exacerbated if the jury is to be sequestered. A large number of exhibits will be presented, making it difficult for the jury to follow and remember the evidence. The charges made in the present indictment are, moreover, varied, including a RICO count with some 80 racketeering acts, and alleged crimes involving narcotics, loansharking, extortion, auto theft, prostitution, weapons, and civil rights violations (murder to prevent testimony). The vast array of charges will tend to create jury confusion. *See United States v. Branker*, 395 F.2d 881, 887–88 (2d Cir.1968) ("as the number of counts is increased, the record becomes more complex and it is more difficult for a juror to keep the various charges against the several defendants and the testimony as to each of them separate in his mind"), *cert. denied*, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969). The evidence concerning these charges will likely include materials that the trial court will find admissible on some counts and as to some defendants, but inadmissible on other counts and as to other defendants. Hearsay testimony may present difficult problems for the jury, particularly if the trial court concludes under *United States v. Geaney*, 417 F.2d 1116, 1120–21 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), that some such testimony may not be considered in evaluating the guilt of some defendants on specific counts.

Prejudicial spillover also will inevitably occur, defendants contend, in part because of the factors relevant to jury confusion, but also because of the highly inflamatory evidence that will be heard concerning the alleged murders. The government will attempt to prove the murders charged through oral testimony of participants and observers, as well as autopsy reports, including photographs. The stories and the pictures will be grisly, and include many cold-blooded executions, with subsequent body dismemberments and disposals. The potential prejudice from these murder charges may fall most heavily on the eight defendants not named in any act of murder, and particularly on those defendants who were relatively peripheral members of the alleged enterprise. *See Branker*, 395 F.2d at 888 (prejudice is "particularly injurious to defendants who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their codefendants"). Defendants jointly suggest, in fact, that the trial of all those named in connection with murders be separated from those not so named.

A motion to sever or for other relief under Rule 14 requires a court to consider all the factors relevant to possible prejudice, as well as the government's interest in trying the defendants together. *See United States v. Losada*, 674 F.2d 167, 171 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); *Weisman*, 624 F.2d at 1129–30. Where the government demonstrates a strong interest in a joint trial, a defendant seeking relief under Rule 14 will be required to make a strong showing of possible prejudice, particularly if severance would entail a substantial expenditure of resources and involve other relevant dangers or inefficiencies. *See, e.g., United States v. Rucker*, 586 F.2d 899, 902 (2d Cir.1978) (moving defendant must show "facts demonstrating that he will be so severely prejudiced by a

joint trial that it would in effect deny him a fair trial").

The government has presented a strong case for a joint trial of virtually all the charges in the present indictment. This indictment alleges not merely a conspiracy, or a series of crimes by the same persons, but a criminal enterprise to which all the defendants were connected, and which had as its businesses the various illegal activities charged as acts of racketeering and as separate crimes. In this case, therefore, all the evidence relating to all but a few of the 80 alleged acts of racketeering is potentially probative of the enterprise's existence, scope, purposes, and membership. To separate out the alleged murders from all the other crimes, therefore, would prejudice the government in numerous, serious ways. If the government were permitted to try the alleged murderers only for the murder charges alleged in the RICO and civil-rights counts, the government would be denied the use of substantial evidence probative of the RICO allegations. The defendants' alleged activities in racketeering and criminal acts other than murder would be highly relevant in determining whether they were in fact working together in a criminal enterprise, as well as in determining their motives and opportunities to commit the murders alleged. To separate the murder allegations from all other charges, therefore, would so unfairly prejudice the government as to render that option unacceptable.

Alternatively, the government could be required to proceed against the alleged murderers for all the acts of racketeering and crimes with which they are charged. This approach would assure the government a fair opportunity to prove its case against these defendants, but would require at least one other trial, in which the government would have to attempt a second time to prove many of the same acts of racketeering and crimes. Thus, for example, the government would be required to prove at two trials such complex and time consuming charges as the enterprise's alleged auto-theft, narcotics, extortion, prostitution, and loansharking activities. *See*

*United States v. Hattaway,* 740 F.2d 1419, 1424 (7th Cir.) ("strong judicial policy favors joint trial of defendants where largely the same evidence would be admitted in separate trials of each defendant"), *cert. denied,* —— U.S. ——, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984). Furthermore, the government would be deprived, in attempting to prove the RICO charges against those defendants not named as murderers, of valuable evidence tending to establish an enterprise in which all the defendants named were members, and in which most if not all of those not actually named in connection with any murder were aware that the crew's activities included committing homicides. *See United States v. Pickett,* 746 F.2d 1129, 1134 (6th Cir.1984) (affirming trial court's denial of severance motion where "[m]ost, if not all, of the evidence relating to all of the [defendants] was necessary to show the agreement to act together in [a] scheme to defraud the government"), *cert. denied,* —— U.S. ——, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985). The government has represented, with varying degrees of specificity, that all the defendants were aware of at least one homicide, and of the fact that an enterprise existed which used violence to achieve its objectives. Finally, considerable danger exists in connection with any severance that could require the government to prove the alleged enterprise more than one time. The principal witnesses in this case appear to face a substantial likelihood of physical harm if they are located by alleged former crew members. The costs and inconvenience of protecting them are great. The dangers and costs associated with their testimony and protection will be at least doubled if they are required to testify twice.

The Second Circuit has confirmed that a trial judge should give proper weight to a demonstration that a proposed severance would cause unfairness, substantial costs, and a danger to witnesses. "[T]he general rule that persons jointly indicted may be jointly tried where the crime charged may be proved against all by substantially similar evidence .... 'conserves judicial re-

sources, alleviates the burdens on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials.' " *United States v. Lyles,* 593 F.2d 182, 191 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) (quoting *United States v. Borelli,* 435 F.2d 500, 502 (2d Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971) ). This general rule has particular force, as the government argues, in conspiracy and RICO cases, where proof of many elements of the charges against all the defendants is based upon the same evidence and acts. The government is almost invariably allowed to try large numbers of defendants together in such situations. *See, e.g., United States v. Moten,* 564 F.2d 620, 626–28 (2d Cir.) (14 defendants), *cert. denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977); *United States v. Shipp,* 578 F.Supp. 980, 995–96 (S.D.N.Y. 1984) (Weinfeld, J.) (13 defendants).

The claim of jury confusion is, in general, overstated in this case. While the possibility of confusion in any significant degree is a factor properly to be weighed on this motion, the evidence and arguments presently before the court make clear that the joint trial of all defendants named in all the central charges in this case will be well within a jury's capacity to follow and judge. For reasons given at various other points in this opinion, several of the charges in the present indictment have been dismissed. The remaining claims are varied, but are nevertheless all aspects of the RICO enterprise and conspiracy alleged, and will readily be understood as such by the jury. A variety of mechanical aids—such as notebooks, exhibit lists, and verdict forms—will help the jury proceed in an orderly manner through the many charges, and should eliminate confusion in reaching individual verdicts. The crimes and racketeering acts involved, moreover, are conceptually simple; the charges to be jointly tried include no matter that can be said to resemble a complex mail fraud or securities case. Even as pared down, the case will take several months to complete, but the trial will be shorter than many

regularly held in this courthouse, and could well be shorter than the parties estimate. Whether the jury should be sequestered will be decided by the trial judge, after alternatives are considered. If sequestration is ordered, it will be no more prejudicial in a joint trial than in a severed trial, since both would be of comparable length. In any event, sequestration will also help ensure a fair verdict, uncontaminated by potentially prejudicial exposure.

■ Defendants' claims of prejudicial spillover are also exaggerated. Evidence about the murders alleged in this case is no doubt potentially prejudicial. The trial court should ask prospective jurors whether they could serve fairly and impartially in a case involving such allegations and proof, and thereby screen out those with fragile sensibilities. Jurors have shown themselves capable in cases of this sort to perform their sworn duty. The fact that many murders are involved, rather than one or two, seems relatively unimportant. A juror hearing about numerous murders may well become accustomed to the evidence rather than more greatly affected by it. Also significant here is the fact that almost all the victims are alleged to have been criminal associates of the defendants. Some innocent witnesses were also killed, but the case does not involve the sorts of indiscriminate and sadistic killings which jurors are required sometimes to judge. Defendants are correct in suggesting that prejudicial spillover is most likely to occur with respect to those defendants not named in acts or counts involving murders. The jury cannot, however, be deemed incapable in principle of giving a fair trial to those named only in nonmurder charges. The trial judge should be able, in this as in other cases in which some defendants face less heinous charges than others, to guide the jury in successfully performing its duty to judge each defendant individually, despite the presence of inflammatory evidence. Thus, while the fact that a defendant is not named in any murder charge is a circumstance that should be considered in appraising the claims of individual defend-

ants for severance, that circumstance alone does not establish prejudice under Rule 14.

■ Several defendants have offered to stipulate in some unspecified form to be bound, with respect to the issue of the existence of the enterprise, by the results of a first trial. This, they argue, should enable the government to avoid having to retry most if not all the potentially repetitious issues. This argument is theoretically interesting, but no party has presented to the court a proposed stipulation that would effectively avoid the need for a largely repetitious second trial. No stipulation seems likely to be offered that would reliably settle issues in a way that would be acceptable to all parties. Before any such proposal can be given serious consideration it must be put into concrete form, so that its scope and effects can meaningfully be considered.

■ In addition to these general arguments for a severance, virtually every defendant has made some sort of motion to sever one or more of the counts in which he or she is charged. Almost all these motions are meritless. The counts involved are with few exceptions based on acts or transactions connected together with or constituting parts of the RICO scheme alleged in count 1. *See* Fed.R.Crim.P. 8(a). To try these counts along with those found proper for trial will cause no significant prejudice, and to sever them will produce unnecessary inconvenience. *See* Fed.R. Crim.P. 14. The only possible exceptions are the tax charges against Gaggi and Sol Hellman, counts 57, 59, 61, and 63. (The government has agreed that the corresponding tax counts concerned with false filings (counts 58, 60, 62, and 64) must be dismissed for lack of venue.)

The tax counts charging evasion could, theoretically, have little to do with the RICO enterprise or conspiracy. They could deal with matters that have nothing to do with the other defendants named in the indictment, or with the enterprise as such. *See United States v. Bledsoe*, 674 F.2d 647 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The

government has indicated, however, that the proof it intends to offer as to the evasion involves amounts of incomes allegedly unreported and derived from acts of racketeering charged in count 1 or other crimes related to the enterprise it intends to prove at trial. On this premise, these counts should be tried with the rest of this indictment. To require the government, for example, to prove separately at a future trial that Gaggi earned some $600,000 through enterprise activities that he did not report would be grossly wasteful of resources and pointless. Unless the government commits itself, however, to introducing no non-enterprise related evidence for the purpose of proving these charges, it must place before the court a detailed representation of all other evidence it would seek to introduce. These charges cannot be permitted to serve as a vehicle for adding potentially prejudicial materials to the record, and for further complicating the tasks to be faced by the court and jury.

### III. Motions To Strike Acts of Racketeering and Counts

#### A. *Double Jeopardy.*

Defendants argue that the double jeopardy clause requires dismissal of various acts of racketeering and substantive counts of the indictment, because matters "which have already served as the basis for prior federal and state prosecutions" cannot serve as bases for prosecution in this case. Defendants' Memorandum at 60. Their claims, which extend to 36 of the 80 acts of racketeering alleged in the substantive RICO count, fall into three categories: (i) acts of racketeering which were the subject of prior state proceedings; (ii) acts of racketeering which have previously resulted in federal convictions; and (iii) acts of racketeering which were the subject of favorable federal rulings. In addition, defendant Gaggi argues that the Rule 29 dismissal he obtained in *United States v. DePalma*, 78 Cr. 401 (RWS), precludes his prosecution on counts 7 and 8; defendant Borelli argues that a guilty plea he entered in the District of New Jersey on or about August 4, 1981 precludes his prosecution on the counts "in-

volving stolen automobiles"; and defendant Mastrangelo argues that his prior conviction in *United States v. Mastrangelo,* 80–Cr–285(S–1) (E.D.N.Y.) precludes his prosecution on count 68.

### 1. *Acts of Racketeering Involved in Prior State Proceedings.*

A prior state proceeding—whether it resulted in acquittal or conviction—provides no double jeopardy protection against a federal RICO prosecution. *United States v. Wheeler,* 435 U.S. 313, 316–17, 98 S.Ct. 1079, 1082–83, 55 L.Ed.2d 303 (1978); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (state conviction does not preclude federal prosecution based on same acts). Thus, defendants' claims regarding acts of racketeering 1, 18–19, 54, and 74 must be denied.

Defendants attempt to avoid this normal rule by arguing that state acquittals or dismissals remove the acts with which they are charged from within the parameters of 18 U.S.C. § 1961(1)(A) (1982), which defines various acts as racketeering activity if they are "chargeable under State law and punishable by imprisonment for more than one year." Defendants claim that, because they can no longer be charged with or punished for such acts by the state, those acts cannot form the basis for a RICO prosecution. The legislative history of RICO establishes, however, that section 1961(1)(A) merely refers to state law for exemplary purposes. Section 1961(1)(A) does not incorporate specific state-law offense definitions or procedural bars to prosecution. Thus, in *United States v. Bagaric,* 706 F.2d 42, 62–63 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), the Second Circuit quoted with approval the Third Circuit's statement in *United States v. Frumento,* 563 F.2d 1083, 1087 n. 8A (3d Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), that section 1961 does not require "that the particular defendant be 'chargeable under State law' at the time of the federal indictment." *Frumento* upheld a RICO prosecution despite defend-

ants' prior state acquittals. *Id.* at 1086–89; *see United States v. Licavoli,* 725 F.2d 1040, 1047 (6th Cir.) (adopting *Frumento* rule), *cert. denied,* —— U.S. ——, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984).

Defendants' reliance on *United States v. Mason,* 213 U.S. 115, 29 S.Ct. 480, 53 L.Ed. 725 (1909), is misplaced. The statute at issue in *Mason,* Rev.Stat. § 5509, provided that, if in the act of violating Rev.Stat. § 5508 a defendant also violated a state felony or misdemeanor statute, then the punishment for the violation of section 5508 would be the same as the punishment attached by the state to the state-law violation. The Court held that, when a defendant had already been acquitted of the state crime alleged in the federal indictment, section 5509 did not apply. *Id.* at 124, 29 S.Ct. at 482. Nevertheless, the Court stated that defendants could still be prosecuted under section 5508 for the violation of federal law. *Id.* at 125, 29 S.Ct. at 483. As the Third Circuit noted in *Frumento,* this is not the equivalent of a holding that "a federal indictment predicated upon state offenses [is] barred by a prior state acquittal." 563 F.2d at 1087. To the contrary, *Mason* supports the view that, if a federal interest is involved, federal prosecution should not be barred merely because a state court has acquitted a defendant of state-law crimes involving the same acts.

Defendants respond that, because RICO is a "derivative" statute, no federal interest is implicated "merely by the commission of acts which are punishable under specific state laws." Defendants' Memorandum at 68, 69. RICO, however, does not criminalize acts of racketeering themselves. *See United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984). Rather, it forbids conducting or participating in the conduct of an enterprise engaged in or affecting interstate commerce through a pattern of acts of racketeering. 18 U.S.C. § 1962(c). The purpose of RICO is to eradicate the economic impact and influence organized crime has on the national economy. *Unit-*

*ed States v. Turkette,* 452 U.S. 576, 588–93, 101 S.Ct. 2524, 2531–34, 69 L.Ed.2d 246 (1981). Thus, the reason the government charges the murders alleged in this indictment as predicate acts of racketeering is not because it seeks to vindicate the interest in the sanctity of human life served by New York's prohibition of murder but because it claims these killings were committed to further and protect the economic interests of an illegitimate enterprise that affected interstate commerce through its illegal operations. Vindication of such federal interests cannot be barred by prior state prosecutions. *Abbate,* 359 U.S. at 195, 79 S.Ct. at 671.

■■■ Defendants also argue that the state crimes alleged as acts of racketeering constitute "lesser-included offenses" of RICO and that the current RICO prosecution is therefore prohibited by *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). *See* Defendants' Memorandum at 70. This claim is flawed because different sovereigns are involved. The argument also misconstrues the test established by *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and refined in *Brown v. Ohio,* 432 U.S. at 166–67, 97 S.Ct. at 2225–26. *Blockburger* is simply a rule of statutory construction to be used to discern Congress' intent when it is uncertain. *Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981). Here, Congress intended to use RICO to enhance the sanctions faced by particular offenders. *Turkette,* 452 U.S. at 589, 101 S.Ct. at 2531. Defendants' claim, taken to its logical conclusion, would render section 1961(1)(A) virtually meaningless. The federal government would be entitled to vindicate its interests only when the state had totally abdicated vindication of its own interests. But RICO contemplates prior state proceedings, since it tolls the time requirement embodied in the definition of "pattern of racketeering activity" during "any period of imprisonment...." 18 U.S.C. § 1961(5) (1982).

### 2. Acts of Racketeering Involved in Prior Federal Convictions.

■■■ Defendants also argue that RICO prosecutions cannot be based on predicate racketeering acts for which prior federal convictions have been obtained. *See* Defendants' Memorandum at 60–66. They rely on the strand of the protection afforded against double jeopardy that "protects against a second prosecution for the same offense after conviction." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *see Brown,* 432 U.S. at 165, 97 S.Ct. at 2225. The prior federal convictions are lesser-included offenses of RICO, they claim, and are therefore the "same offense" for double jeopardy purposes under *Blockburger.* *See Brown,* 432 U.S. at 166 n. 6, 97 S.Ct. at 2226 n. 6. Here again, however, the *Blockburger* test is inapposite, since Congress meant to allow punishment for both RICO and the predicate acts of racketeering. *See, e.g., United States v. Walsh,* 700 F.2d 846, 856 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980).

Moreover, defendants' interpretation would force upon the government an unacceptable strategic choice. If the government chose to prosecute a defendant for an offense classified as a RICO predicate under 18 U.S.C. § 1961(1)(B)–(D), it would forego a later RICO prosecution if that crime turned out to be part of a pattern of racketeering activity. *Brown v. Ohio,* recognized that an exception to the guarantee against double jeopardy "may exist where the [prosecution] is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence." 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7. If the government chose to delay prosecution of a substantive offense until it could determine whether a RICO prosecution was warranted, however, it could face claims of prosecutorial delay in seeking indictment in violation of the due

process clause. RICO was not meant to force prosecutors to elect between prosecuting substantive crimes and prosecuting acts of racketeering.

Defendants' final argument is that *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), permits no distinction between acquittals and convictions. *See* Defendants' Memorandum at 64–65. But *Ashe* strongly supports such a distinction. It is explicitly based on the incorporation of principles of collateral estoppel into the guarantee against double jeopardy, 397 U.S. at 442–43, 90 S.Ct. at 1193–94, and one of the Court's primary concerns seems to have been to avoid allowing prosecutors to "trea[t] the first trial as no more than a dry run for the second prosecution," *id.* at 447, 90 S.Ct. at 1196. The danger of prosecutorial "dry runs" is minimal when the prior proceeding resulted in a conviction. Furthermore, the danger that the prosecution will be able to manipulate its evidence, as apparently occurred in *Ashe, see* 397 U.S. at 440, 447, 90 S.Ct. at 1192, 1196, exists perhaps exclusively after an acquittal. Indeed, the rule established in *Ashe* removes the incentive for a prosecutor to fractionate a case based on a single transaction: if, in any prosecution, a defendant obtains an acquittal, the prosecutor is barred from prosecuting all untried crimes arising from the same factual circumstances. The *Ashe* strand of double jeopardy is therefore specially relevant to prior acquittals, and should not be expanded to preclude RICO prosecutions based on prior federal convictions.

### 3. *Other Claims Based on Prior Federal Proceedings.*

 *Henry Borelli.* Defendant Borelli claims that his guilty plea in a stolen car case in New Jersey in 1981 precludes the government from prosecuting him on counts 30–48, which, he appears to claim, cover the same cars. "A defendant claiming double jeopardy has the burden of presenting evidence to establish a prima facie nonfrivolous double jeopardy claim." *United States v. Booth,* 673 F.2d 27, 30

(1st Cir.), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). Borelli has failed to satisfy this burden. The conspiracy charged in count 30, and the cars and certificates of title referred to in counts 31–48 may indeed be identical with the conspiracy and 100 cars referred to in the New Jersey indictment. Borelli has failed to prove this, however. He has not provided a copy of the indictment to which he entered his plea, a transcript of his plea allocution, or any other evidence that would establish whether the New Jersey case and any of the challenged counts of the present indictment are the same for double jeopardy purposes. Until and unless he does so, his double jeopardy claims must be rejected.

 *Anthony Frank Gaggi.* Defendant Gaggi argues that acts of racketeering 41–44 and counts 7–8 of the indictment should be dismissed against him because of his acquittal on bankruptcy-related charges in a 1978 trial. *See* Defendants' Memorandum at 64 n. 25. In *United States v. DePalma,* 78 Cr. 401 (RWS), Gaggi was charged, in count 15, with having received $700 from the Westchester Premier Theatre ("WPT") in violation of 18 U.S.C. § 152, which prohibits receiving property from a bankrupt with the intention of defeating the provisions of the bankruptcy laws, and, in count 13, with conspiring with six other defendants (none of them named in the instant indictment) in a large-scale scheme to defeat the bankruptcy laws, 18 U.S.C. § 371. The government's theory against Gaggi in *DePalma* seems to have been that, prior to WPT's bankruptcy, he had loaned WPT a large amount of money at usurious interest rates and that, during the post-bankruptcy period, "he received cash payments out of the looted proceeds of the theatre to the detriment of the creditors of the Westchester Premier Theatre." (Trial Tr. at 696, *DePalma*) (quoted in Affidavit of Michael J. Rosen, Esq. at 13 (Jan. 14, 1985)).

When the prosecutor referred to Gaggi as a "loanshark" during his opening statement, Gaggi moved for a mistrial. In a

letter responding to Gaggi's motion, the government stated:

> The opening statement was an accurate description of what the Government's proof at trial will show. The evidence will show that the proceeds of the Westchester Premier Theatre which Gaggi looted while it was in Chapter XI bankruptcy proceedings were monies owed to him by the Theatre for shylock loans—loans made at usurious interest rates. These shylock loans are part and parcel of his fraud and reflect the complete story of its commission.... Gaggi's commission of the bankruptcy violations is inexorably tied to his loan sharking activity.

Letter from Nathaniel H. Akerman to Judge Robert W. Sweet at 1 (Oct. 27, 1978) (Rosen Aff., Exh. B). At the end of the government's case, Gaggi moved pursuant to Fed.R.Crim.P. 29 for a judgment of acquittal, based in significant part on the claim that the government had failed to meet its burden under *Geaney*, 417 F.2d at 1120, of proving Gaggi's participation in the alleged conspiracy by a fair preponderance of the independent evidence. *See, e.g.,* Trial Tr. at 7158–63, 7270–78, *DePalma* (reprinted in Government's Memorandum of Law in Opposition to Defendants' Joint Omnibus and Individual Motions, Exh. B) [hereinafter cited as "Government Exh. ——"]; Memorandum of Law in Support of Defendant's Motion Pursuant to Rule 29 of the F.R.C.P. at 9–20, *DePalma* (Government Exh. C). Gaggi stressed the fact that much of the evidence concerning him was not probative of conduct during the period following WPT's filing for bankruptcy and that the government therefore should not be permitted to use testimony that Gaggi had loaned WPT money prior to the bankruptcy period to show that he was a creditor or received payments during the relevant time period. *See* Government Exh. C at 3. On December 12, 1978, Judge Sweet granted Gaggi's motion on the record. (Rosen Aff. at 14, Exh. B). In the subsequent written opinion, Judge Sweet explicitly stated that he had determined that there was "insufficient independent proof as to [Gaggi's] involvement in the bankruptcy conspiracy." *United States v. DePalma*, 78 Cr. 401 (RWS), slip op. at 1 (S.D.N.Y. Dec. 14, 1978) (Government Exh. D).

The current indictment does not charge Gaggi with any bankruptcy-related acts. Rather, act of racketeering 41 charges him and twelve other defendants with conspiring during the years 1972–1983 to make extortionate extensions of credit; act of racketeering 42 charges him and defendant Castellano with making an extortionate extension of credit to WPT during the period 1976 to 1978; act of racketeering 43 charges him and defendant Castellano with advancing money to others with the understanding that those persons would make extortionate extensions of credit; and act or racketeering 44 charges Gaggi and the other defendants named in act of racketeering 41 with conspiring to use extortionate means to collect, attempt to collect, and punish persons for the nonrepayment of, extensions of credit. Counts 7 and 8 are conspiracy counts which essentially replicate acts of racketeering 41 and 44.

Only act of racketeering 42 is concerned solely with loans Gaggi allegedly made to WPT. The other acts of racketeering and the two extortionate credit counts all concern allegations of "an overall loan-sharking operation [running] from January 1, 1972 to February 28, 1983." Rosen Aff. at 12. Thus, Gaggi's motion cannot be read to suggest that prosecution of acts of racketeering 41, 43, and 44, and counts 7 and 8 should be barred altogether. Rather, both the claim made in the omnibus motion on Gaggi's behalf and the argument of his own counsel would serve only to bar using the WPT allegations as "evidentiary" facts at the *Castellano* trial. *See United States v. Mespoulede*, 597 F.2d 329, 335 (2d Cir. 1979); Defendants' Memorandum at 60 n. 23; Rosen Aff. at 14.

Gaggi cannot rely on that aspect of the guarantee against double jeopardy that "protects against a second prosecution for the same offense after acquittal." *Pearce*, 395 U.S. at 717, 89 S.Ct. at 2076. The most

cursory comparison of 18 U.S.C. § 152 with 18 U.S.C. §§ 891–94, and 1962 reveals that they do not constitute the "same offense" under the test established in *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182. Gaggi relies instead on the collateral estoppel component of the guarantee against double jeopardy discussed in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), claiming the issue of his having been a loanshark in connection with WPT was decided in his favor.

*Ashe* involved a second robbery prosecution brought against a defendant who had already been acquitted, by a jury, of robbing a different victim of the same criminal episode. The Supreme Court held that the second prosecution was barred, *id.* at 442–45, 90 S.Ct. at 1193–95, and explained how principles of collateral estoppel applied in criminal cases:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

*Id.* at 444, 90 S.Ct. at 1194 (quoting Mayers & Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1, 38–39 (1960)). If a reasonable alternative basis for a general verdict of acquittal exists, then the court must reject the collateral estoppel claim, "since the defendant can prevail only if the issue which he seeks to preclude from consideration was 'necessarily' resolved in his favor in the prior proceeding." *United States v. Cala*, 521 F.2d 605, 608 (2d Cir.1975); *see, e.g., United States v. Russotti*, 717 F.2d 27, 35 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977). The defendant bears a particularly heavy burden in showing that a prior acquittal on a conspiracy

count bars a subsequent prosecution. *United States v. Clark*, 613 F.2d 391, 400 (2d Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *see United States v. Tramunti*, 500 F.2d 1334, 1346–47 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

The first step in assessing a claim of collateral estoppel of a criminal prosecution is "to determine what the first judgment determined...." *United States v. Kramer*, 289 F.2d 909, 913 (2d Cir.1961) (Friendly, J.); *see Mespoulede*, 597 F.2d at 333. This task is often difficult, for the precise ground upon which a jury rendered a general verdict of acquittal "cannot generally be ascertained...." *Id.; see Ashe*, 397 U.S. at 444, 90 S.Ct. at 1194. But, in the special circumstances of this case, assessing Gaggi's claims is simplified because he was acquitted, not by a general jury verdict, but by Judge Sweet's ruling on Gaggi's Rule 29 motion. Judge Sweet's decision was based explicitly on the government's failure adequately to prove Gaggi's membership in a conspiracy to defeat the bankruptcy laws. He did not need to reach the question whether Gaggi had made usurious loans, so litigation of this issue cannot be precluded at the *Castellano* trial.

At oral argument, Gaggi's counsel acknowledged that Judge Sweet "did not have to" reach the question whether Gaggi was a loan shark. Transcript of Oral Argument at 8 (Mar. 12, 1985). He claimed, however, that, because the prosecutor in *DePalma* had viewed Gaggi's alleged loansharking as "inexorably tied" to the commission of the bankruptcy offenses, the loansharking issue had in fact been litigated. *Id.* at 9.

Judge Sweet allowed introduction of evidence concerning the loansharking allegations against Gaggi only for the purpose of showing "a motive for him to engage in bankruptcy fraud, *viz.*, to recover principal and accrued interest on these loans ahead of other creditors of WPT." *United States v. DePalma*, 78 Cr. 401 (RWS), slip op. at 2 (S.D.N.Y. Nov. 2, 1978) (Government Exh.

E). The government was required, however, to show, not only that Gaggi was a loanshark with a motive to collect, but also that Gaggi specifically intended to defeat the provisions of the bankruptcy laws. *See, e.g., United States v. Guiliano*, 644 F.2d 85 (2d Cir.1981). Judge Sweet therefore could have concluded or assumed that Gaggi was indeed a loanshark, collecting usurious interest during the relevant period, but nevertheless was not guilty in that case because his attempts to collect money were not motivated by an intent to violate the bankruptcy laws. *See* Transcript of Oral Argument at 13–14 (Mar. 12, 1985). The government may, in other words, have proved in *DePalma* that Gaggi engaged in loansharking but nevertheless failed to prove the bankruptcy offenses, so Judge Sweet's decision cannot preclude litigating allegations of loansharking involving WPT in the instant case.

 *Richard Mastrangelo*. Mastrangelo raises two double jeopardy/collateral estoppel claims which can be resolved only by a close factual examination. First, he claims that count 68 must be dismissed against him because of his prior conviction in *United States v. Mastrangelo*, 80 Cr. 285(S–1) ("*Mastrangelo I*"). *See* Defendants' Memorandum at 71–72. Count 68 of the current indictment charges a conspiracy to violate 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 841(b)(6) (1982), which is alleged to have existed from January 1972 until the filing of the final superseding indictment on October 4, 1984. Mastrangelo, however, is named "as a co-conspirator for the entire term of the conspiracy, but [named] as a defendant only from November 12, 1978," up to and including the date of filing of the Indictment. Indictment, Count 68. The indictment in *Mastrangelo I* had charged him with a similar conspiracy that ended on November 11, 1978. Mastrangelo charges here that "the indictment in this case was craftily drafted in an attempt to avoid a claim … of prior prosecution." Defendants' Memorandum at 72.

The government conceded in its papers and at oral argument that the conspiracy prosecuted in *Mastrangelo I* and the conspiracy charged in count 68 of *Castellano* are "the same." *See* Government's Memorandum at 78 n. *; Transcript of Oral Argument at 18 (Mar. 12, 1985, 9:50 a.m.) ("Hearing Tr."). It claims, however, that Mastrangelo "continued in" or "rejoined" that conspiracy following the period charged in *Mastrangelo I*, and points to overt act 4 of count 68 which charges that Mastrangelo, on February 17, 1984, in furtherance of the conspiracy, possessed cocaine, narcotics records and paraphernalia, a handgun, ammunition, and a quantity of currency. It argues that prosecution for such a continuation or rejoining is not barred by the double jeopardy clause.

Given the constitutional considerations embodied in the double jeopardy clause, courts should presume that conviction and incarceration for a conspiracy constitutes withdrawal. "The Double Jeopardy clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Brown*, 432 U.S. at 169, 97 S.Ct. at 2227. Mastrangelo implicitly suggests that this case poses the question left open by *United States v. Panebianco*, 543 F.2d 447, 453–54 & n. 5 (2d Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977), and *United States v. Borelli*, 336 F.2d 376, 390 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), which "assum[ed] without deciding that the unlikelihood of the other conspirators' relying for further aid on a person known to be confined for the very offense in which they were engaging makes such confinement a sufficient 'affirmative act' to sustain the defense of withdrawal in the absence of countervailing evidence...." But the presumed withdrawal should be rebuttable, and the government must have the opportunity to prove that a once-convicted conspirator either continued to participate in the conspiracy or joined it for a second time. *See Panebianco*, 543 F.2d at 454 n. 5; *United States v. Agueci*, 310 F.2d 817, 838–39 (2d Cir.1962) (finding that defendant "continued to have a stake in the

success of the [conspiracy]" during his incarceration), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Here, the government alleges that Mastrangelo committed an overt act in furtherance of the conspiracy over five years after the period covered in *Mastrangelo I.* If the government is able to prove Mastrangelo's active participation in the count–68 conspiracy during the post-*Mastrangelo I* period, through proof of an overt act on Mastrangelo's part, then it will have rebutted satisfactorily the presumption that Mastrangelo withdrew from the conspiracy following his conviction.

 Mastrangelo also argues that a prior finding by Judge Joseph McLaughlin collaterally estops prosecuting the allegation in act of racketeering 27 that he conspired with codefendant Carlo Profeta and others to murder James Bennett. *See* Defendants' Memorandum at 73–75. That finding resulted from an unusual procedural history. Mastrangelo, along with one codefendant, was brought to trial in the Eastern District of New York in late April 1981 for his role in the *"Terry's Dream* conspiracy," a conspiracy to import large quantities of marijuana and methaqualone on a boat of that name. *United States v. Mastrangelo,* 80 Cr. 285(S–1). "The sole link between Mastrangelo and the drug conspiracy [was] evidence of his purchase of four trucks which were seized by federal narcotics agents while loaded with the drugs" taken from the *Terry's Dream. United States v. Mastrangelo,* 693 F.2d 269, 271 (2d Cir.1982) (*"Mastrangelo IV"*). James Bennett, who had apparently sold the trucks to Mastrangelo, was the critical prosecution witness. In a taped conversation between Mastrangelo and Bennett on February 1, 1979, prior to Bennett's appearance before the grand jury, Mastrangelo had made a number of arguably threatening statements, seeking to dissuade Bennett from testifying. "[A]ccording to the Government's uncontested representation, Bennett, on his way to the courthouse on April 29, 1981, 'left his daughter's home chased by two men, and [was] shot dead on the street.'" *United States v.*

*Mastrangelo,* 662 F.2d 946, 949 (2d Cir. 1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982) (*"Mastrangelo II"*).

Immediately after learning of Bennett's murder, Judge Weinstein granted a mistrial against Mastrangelo, over Mastrangelo's objection, and rejected his claim of double jeopardy. *See Mastrangelo IV,* 693 F.2d at 271. The Second Circuit found that "the district court's underlying reason for declaring a mistrial was that the judge quite understandably believed that Mastrangelo was responsible for Bennett's death." *Mastrangelo II,* 662 F.2d at 950. Mastrangelo acknowledged on appeal that, if he had in fact arranged for Bennett to be killed, this would have provided an adequate basis for declaring a mistrial. He argued, however, that he was entitled to an evidentiary hearing before such a step was taken. The Second Circuit disagreed. *Id.* at 951–53. Its opinion opened the way for Mastrangelo's retrial on the *Terry's Dream* conspiracy.

Mastrangelo's second trial began on February 22, 1982. Prior to the trial, the government moved for the admission of Bennett's grand jury testimony under Fed. R.Evid. 804(b)(5), the residual exception to the hearsay rule. Mastrangelo argued that its admission was flatly prohibited by the confrontation clause of the sixth amendment. Judge McLaughlin, to whom the case had been reassigned, held that Mastrangelo's sixth amendment rights would not be violated by admission of the testimony, noting that, "although this is not dispositive, there is a finding by the prior trial judge that the defendant was implicated in the murder of Bennett...." *United States v. Mastrangelo,* 533 F.Supp. 389, 390 (E.D.N.Y.1982) (*"Mastrangelo III"*).

The Second Circuit remanded. *Mastrangelo IV,* 693 F.2d at 274. It stated that Judge Weinstein's finding "raise[d] an issue as to whether Mastrangelo waived his sixth amendment rights" by somehow being involved in Bennett's death. *Id.* at 272. It decided that an evidentiary hearing was

required to decide whether Mastrangelo, by his conduct, had waived his right to confront Bennett:

> If the District Court finds that Mastrangelo was in fact involved in the death of Bennett through knowledge, complicity, planning or in any other way, it must hold his objections to the use of Bennett's testimony waived. Bare knowledge of a plot to kill Bennett and a failure to give warning to appropriate authorities is sufficient to constitute a waiver.

*Id.* at 273–74. The Court of Appeals termed the issue of the burden of proof at this evidentiary hearing a "difficult" one: "While it is clear that the government bears the burden, the weight of that burden is in doubt." *Id.* at 273. After discussing the conflicting precedents, the Court stated that "[w]e see no reason to impose upon the government more than the usual burden of proof by a preponderance of the evidence where waiver by misconduct is concerned." *Id.* Nevertheless, the Court went on to "suggest, in order to expedite any further proceedings, that the trial judge make findings under the clear and convincing standard as well." *Id.* at 274.

Pursuant to the Court of Appeals' mandate, Judge McLaughlin held a four-day evidentiary hearing in late December 1982. *United States v. Mastrangelo,* 561 F.Supp. 1114 (E.D.N.Y.1983) (*"Mastrangelo V"*). Based upon the evidence presented, Judge McLaughlin found that the government had established, by a preponderance of the evidence, that "Mastrangelo had prior knowledge of a plot to murder James Bennett and failed to warn the appropriate authorities." *Id.* at 1115. He also found, however, "that the Government has not established Mastrangelo's prior knowledge of the murder plot by 'clear and convincing' evidence." *Id.* The court based its finding on several considerations: "Mastrangelo had an obvious motive to conceal a plot to kill James Bennett," *id.* at 1120; Mastrangelo's statement to Joseph Bennett (one of the witnesses at the evidentiary hearing) suggested either that he intended to pre-

vent James Bennett from testifying or that he at least knew others would prevent him from testifying; and Mastrangelo's statements to Nicholas Berardi (another witness at the evidentiary hearing) about a telephone call made prior to the murder, presumably to discover James Bennett's whereabouts, did not preclude inferring his prior knowledge. The court concluded that, under the Second Circuit's mandate, the government did not need to show that Mastrangelo was aware of the actual plans communicated through the telephone call; "[i]t [was] enough to show that Mastrangelo had general knowledge of a plan to murder Bennett. This the Government has done by a preponderance of the credible evidence." *Id.*

On appeal, Mastrangelo conceded that Judge McLaughlin's finding under the preponderance-of-the-evidence standard was not clearly erroneous, but argued that the Court should reject that evidentiary standard and its holding that "prior knowledge and a failure to warn appropriate authorities is sufficient to constitute waiver...." *United States v. Mastrangelo,* 722 F.2d 13, 14 (2d Cir.1983) (per curiam), *cert. denied,* —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 343 (1984) (*"Mastrangelo VI"*). The Court of Appeals rejected Mastrangelo's arguments and therefore affirmed the judgment of conviction. *Id.*

"It is firmly established that collateral estoppel applies to criminal prosecutions as an element of the double jeopardy clause, and that the Government is precluded from relitigating an issue decided in defendant's favor by a valid final judgment." *United States v. Mespoulede,* 597 F.2d at 332 (citations omitted). The government argues that *Mastrangelo V* involved neither a decision in Mastrangelo's favor nor a final judgment on the merits. The government also relies on the fact that Judge McLaughlin did not apply the evidentiary standard—proof beyond a reasonable doubt—that will apply to the government's proof of act of racketeering 27 at this trial. *See, e.g.,* Government Memorandum at 80–81; Transcript of Oral Argument at 13–15 (Mar. 12,

1985). The government's argument is correct, insofar as it means that "a party who has carried the burden of establishing an issue by a preponderance of the evidence is not entitled to assert preclusion in a later action that requires proof of the same issue by a higher standard." *Federal Practice and Procedure, supra*, § 4422, at 214. A finding that the lesser standard has been satisfied says nothing about whether a greater burden has been met. Mastrangelo, however, is relying on the converse proposition. He claims that the government's failure to meet a lesser standard—proof by clear and convicing evidence—necessarily means that the government would have failed to meet a more stringent standard—proof beyond a reasonable doubt. As a matter of logic, his analysis is correct. *See* 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.418[1], at 551–52 (3d ed. 1984) (suggesting that finding that a defendant is *"not* civilly liable [in a case where the government was a plaintiff should] be conclusive in his favor in a subsequent criminal prosecution as to the issues adjudicated in the civil suit"). The apparent absence of any case law concerning this point reflects its soundness. The government is unlikely, for example, to bring a criminal antitrust prosecution against a person or company against whom it has already lost a civil suit. In this case, Judge McLaughlin's finding that the government was unable to prove clearly and convincingly that Mastrangelo even had "bare knowledge" of a plot to kill Joseph Bennett logically suggests that the government would have been unable to prove beyond a reasonable doubt that Mastrangelo in fact agreed to join a conspiracy to murder Bennett.

The government suggests that, because it faced a lower burden of proof at the *Mastrangelo V* hearing, it refrained from producing all its evidence. *See* Transcript of Oral Argument at 25 (Mar. 12, 1985, 9:50 a.m.). This argument relies implicitly on the Second Circuit's decision in *The Ever-*

*greens v. Nunan*, 141 F.2d 927, 929 (2d Cir.), *cert. denied*, 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944), which held that collateral estoppel should not be applied when it was unforeseeable at the time of the previous decision that the issue presented in the instant litigation would arise. The government was on notice, however, due to *Mastrangelo IV*, that it might have to prove its contentions clearly and convincingly; if it deliberately refrained from presenting evidence to meet that burden it must now live with the decision. Nor was this a case in which the exigencies of an ongoing trial somehow truncated the government's ability to present a full case on this issue. *Compare Mastrangelo IV* (requiring an evidentiary hearing) *with Mastrangelo II* (permitting granting of mistrial without holding evidentiary hearing).

Nevertheless, Mastrangelo cannot invoke Judge McLaughlin's finding under the clear and convincing standard to preclude relitigation of his involvement in Bennett's murder at the *Castellano* trial. Normally, claims of criminal collateral estoppel rest on general jury verdicts of acquittal, and the question posed is whether the broad, favorable resolution of the prior prosecution against the defendant necessarily resolved a particular, narrow issue in his favor. *See Cala*, 521 F.2d at 608 ("the defendant can prevail only if the issue which he seeks to preclude from consideration was 'necessarily' resolved in his favor in the prior proceeding"). The question posed here, however, is the converse: despite a generally adverse resolution of the prior prosecution (Mastrangelo was convicted), can Mastrangelo rely on Judge McLaughlin's favorable finding on the waiver issue?

The peculiar procedural posture of the finding on which Mastrangelo seeks to rely frees us from having to decide whether a finding made at an evidentiary hearing conducted pursuant to Fed.R.Evid. 104(a) can ever provide a basis for collateral estoppel.[2]

---

**2.** The Second Circuit has never addressed the use of collateral estoppel based on preliminary holdings in criminal cases, although one early

reported district court decision, *United States v. Carlisi*, 32 F.Supp. 479, 480–83 (E.D.N.Y.1940), employed collateral estoppel to exclude evi-

"Issue preclusion attaches only to determinations that were necessary to support the judgment entered in the first action." *Federal Practice and Procedure, supra,* § 4421, at 192. In this case, Judge McLaughlin's finding was not necessary. *Mastrangelo IV* had concluded that a preponderance of the evidence standard was appropriate, but directed the district court to make findings under the more stringent clear and convincing evidence standard as well, apparently because some doubt existed as to the proper burden of proof. 693 F.2d at 273–74; *see id.* at 274 (Oakes, J., concurring). *Mastrangelo VI,* however, explicitly adopted the preponderance of the evidence standard, 722 F.2d at 14, thus effectively vacating the district court's finding under the clear and convincing standard. If the Court of Appeals had decided that a clear and convincing evidence standard was appropriate, then the district court's finding would have been a necessary one, even if a third trial on the *Terry's Dream* conspiracy (at which the grand jury testimony would have been excluded) resulted in Mastrangelo's conviction. As such, it would have been subject to appellate review. But because the Circuit held in *Mastrangelo VI* that the clear and convincing evidence standard was inapplicable to waiver hearings, it did not reach the question whether Judge McLaughlin's finding under that standard was correct. Thus, *Mastrangelo V* cannot be used to preclude relitigation of the issue. *Cf.*

*Commissioner v. Sunnen,* 333 U.S. 591, 600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948) (a change in the law between two proceedings "may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable"); *Federal Practice and Procedure, supra,* § 4421, at 194 (when a jury's special verdict "resolve[s] matters of fact that are then found irrelevant to the controlling legal issues ... the special verdict does not preclude the same matters of fact in later litigation"). The government is therefore entitled to charge Mastrangelo with act of racketeering 27 as a predicate act in count 1.

B. *Conspiracies Charged as Acts of Racketeering.*

 Defendants argue that the racketeering acts in count 1 alleging conspiracies should be stricken. The settled rule, however, is that conspiracies listed in §§ 1961(1)(A) and (D) may be charged as racketeering acts in a substantive RICO count. *United States v. Weisman,* 624 F.2d 1118, 1123 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *Ruggiero,* 726 F.2d at 918. Defendants do not claim that count 1 alleges any conspiracies that are not permitted by §§ 1961(1)(A) and (D).

 Defendants attempt to distinguish *Weisman* by arguing that the conspiracies alleged in count 1 are multiplicitous because the enterprise alleged in count 1 is an "association in fact." De-

dence from a conspiracy trial because the evidence was the fruit of a search which had already been held to have been illegal, resulting in the dismissal of a prior indictment charging a substantive offense. In *Laughlin v. United States,* 344 F.2d 187, 189–92 (D.C.Cir.1965), the D.C. Circuit, relying on *United States v. Kramer,* 289 F.2d 909 (2d Cir.1961) (limiting the scope of *Nunan* in criminal cases), held that a defendant in a conspiracy trial could invoke collateral estoppel to preclude the government from introducing tape recordings of certain conversations when those recordings had been excluded from his previous trial for perjury on the ground that the taping had not been consensual. *But see Watts v. United States,* 402 F.2d 676, 685 (D.C. Cir.1968) ("no authority holds that rulings on unappealable pretrial motions are proper subjects for collateral estoppel"), *rev'd on other*

grounds, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). *Compare, e.g., United States v. McKim,* 509 F.2d 769, 775–76 (5th Cir.1975) (employing collateral estoppel to bar prosecution for escape from lawful custody when defendant's conviction for drug possession had been dismissed due to unlawful arrest) *and Gaitan v. United States,* 295 F.2d 277, 280 (10th Cir.1961) (decision on the admissibility of evidence at a criminal trial is final for collateral estoppel purposes because the subject "was put squarely in issue in the criminal case" and "was determined with pinpointed precision"), *cert. denied,* 369 U.S. 857, 82 S.Ct. 939, 8 L.Ed.2d 15 (1962) *with Martinez v. Craven,* 429 F.2d 18, 20 (9th Cir.1970) (per curiam) (suppression of evidence which led to dismissal of previous information held not to bar introduction of evidence at trial under new information).

fendants are incorrect, however, in equating an "association in fact" with a conspiracy. An association in fact, as contemplated by RICO and as alleged in this case, is an enterprise in many of the same ways in which an association in law would be, but is merely unincorporated. The "crew" alleged in this case is claimed to have had a leader, a discernable hierarchy, and a core group of members. It is no different in principle from the association in fact charged in *Ruggiero*, 726 F.2d at 915 (the "Bonnano crime family"), in which the Second Circuit also permitted conspiracies to be alleged as racketeering acts, *id.* at 918.

Defendants in effect contend that an enterprise in fact, such as the crew in this case or a particular crime "family" cannot be regarded as "an entity separate and apart from the pattern of activity in which it engages," *United States v. Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529, since this sort of enterprise is formed and exists to engage in racketeering activities. In practical effect, however, an enterprise in fact is no different than one in law. Every person who serves or functions in behalf of an enterprise in fact is not necessarily a person who conducts the affairs of such an enterprise by means of a pattern of racketeering activity. Menial employees, for example, could perform tasks for an enterprise in fact, and be paid by its members on a regular basis, but play no part in any of its racketeering activities, or play so insubstantial a role as to fail to violate section 1962(c). As the government contends: "Since merely belonging to an enterprise is not itself a crime, conspiracies to commit specific crimes are not in any sense 'lesser included offenses' of a § 1962(c) violation." Government Memorandum at 45.

### C. Acts of Racketeering Charging Multiple Crimes.

 Defendants also move to dismiss Count 1 or, in the alternative, to strike certain racketeering acts because each charges more than one crime. Each of the acts at issue charges separate crimes arising out of the same criminal episode.

Thus, for example, act of racketeering 10 charges certain defendants with a conspiracy to murder Fred Todaro and with the murder of Todaro. Defendants, noting that a jury is obliged to return a verdict on each racketeering act within the overall RICO charge so that appellate review is possible, contend that the duplicitous nature of certain acts of racketeering precludes effective appellate review, and hence renders the indictment defective. *See* Defendants' Memorandum at 44–45.

The joining together of two criminal acts arising out of the same criminal episode in a single act of racketeering, however, benefits the defendants named without prejudicing them in any respect. This method of charging acts of racketeering ensures that a defendant will not be convicted of a "pattern" of racketeering activity based on a single criminal episode. *See Weisman*, 624 F.2d at 1123 (referring to "the spector of an unintended hypothetical application of RICO" whereby "a single substantive offense enumerated in section 1961 could nonetheless result in a RICO violation if conspiracy to commit that offense were also charged as a predicate act of racketeering"). Defendants will be able to obtain special verdicts from the jury which specify precisely the acts which they have unanimously agreed defendants committed, and this will ensure an exact account of the jury's findings for purposes of appellate review. *See Ruggiero*, 726 F.2d at 922–23 (tentatively approving special verdict form).

### D. Offenses Involving Marijuana as Acts of Racketeering.

 Defendants contend that violations of the federal marijuana statutes cannot constitute acts of racketeering in a RICO prosecution. They argue that the definition of racketeering activity in 18 U.S.C. § 1961(1)(D) (1982) does not encompass violation of the federal marijuana statutes. In addition, they claim that including marijuana offenses as acts of racketeering would violate the rule against double enhancement. *See Busic v. United States*,

446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980).

Section 1961(1)(D) defines racketeering activity to include "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs...." Only one circuit has considered whether marijuana is a "dangerous drug" within the meaning of section 1961(1)(D). In *United States v. Phillips*, 664 F.2d 971, 1039–40 (5th Cir. 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), the court concluded that marijuana offenses could be included in a RICO indictment because "marijuana has been classified as a Schedule I controlled substance." A drug may be so classified only if:

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. § 812(b)(1) (1982). In light of its classification as a Schedule I drug, marijuana appears by legislative determination to fall within the definition of "dangerous drugs" as used in section 1961(1)(D).

With respect to defendants' contention regarding double enhancement, the government correctly responds that the inclusion of marijuana offenses within 18 U.S.C. § 1961(1)(D) does not duplicate the enhancement provisions of 21 U.S.C. § 841(b)(6) (1982). Section 841(b)(6) enhances the penalty for a violation of 21 U.S.C. § 841(a) (1982) that involves a quantity of marijuana that exceeds one thousand pounds. By contrast, the RICO statute is concerned, not with violations of the marijuana laws as such, or with the quantity of marijuana involved, but with the effects of an enterprise on interstate or foreign commerce. The enactment of two separate statutory schemes, dealing with two distinct problems, reflects Congress' intent that persons who commit large-scale violations of the marijuana laws that also affect an enterprise involved in interstate or foreign commerce face exposure to penalties under both schemes. Inclusion of marijuana offenses as acts of racketeering therefore does not violate the rule against double enhancement.

E. *Automobile Certificates of Title.*

■ Defendants move to strike acts of racketeering 55–72 and to dismiss counts 30–48 on the ground that automobile certificates of title are not "securities" within the meaning of 18 U.S.C. § 2311 (1982). *See* Defendants' Memorandum at 52–56. That section defines "securities" to include any "instrument or document or writing evidencing ownership of goods, wares, and merchandise...." A certificate of title is *"prima facie* evidence of the facts appearing on it." N.Y.Veh. & Traf.L. § 2108(c) (McKinney Supp.1983). Four circuit courts have concluded that a state certificate of title for a motor vehicle is a "security" within the meaning of section 2311. *See United States v. Daly*, 716 F.2d 1499, 1508 (9th Cir.1983) (finding that certificate is generally conclusive of ownership and "has value based upon the vehicle whose ownership it evidences," and therefore falls within § 2311's definition), *cert. dismissed*, —— U.S. ——, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *United States v. Zwego*, 657 F.2d 248, 249–50 (10th Cir.1981) (noting "pervasive and broad-ranging definition of securities set forth in § 2311" and holding that an executed application for a duplicate certificate of title is a writing evidencing ownership of goods under § 2311), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1275, 71 L.Ed.2d 460 (1982); *Elliott*, 571 F.2d at 908 (where certificate is *prima facie* evidence of ownership and is sufficient to prove ownership absent clearly contradictory evidence, certificate is a security); *United States v. Dickson*, 462 F.2d 184, 184 (4th Cir.) (per curiam) (definition in § 2311 embraces a statement of source of title of a motor vehicle), *cert. denied*, 409 U.S. 876, 93 S.Ct. 126, 34 L.Ed.2d 129 (1972).

Defendants' reliance on *United States v. Canton*, 470 F.2d 861 (2d Cir.1972), is mis-

placed. *Canton* involved a New York state certificate of *registration*, "the purpose of which is to show that the motor vehicle may rightfully be operated on public highways." *Id.* at 862. The court there explicitly distinguished certificates of registration from certificates of title, finding that "the legislature did not consider a certificate of registration to be the equivalent of a certificate of title as evidence of ownership." *Id.* at 863. N.Y.Veh. & Traf.L. §§ 2101 *et seq.* (McKinney Supp. 1983) draws the same distinction. *See id.* § 2110 ("If the commissioner is not satisfied as to the ownership of the vehicle ... the commissioner may register the vehicle but shall withhold issuance of a certificate of title until the applicant presents documents reasonably sufficient to satisfy the commissioner as to the applicant's ownership of the vehicle"). *Compare* § 2113 (providing that transfer by an owner is not perfected until transferor has transferred his certificate of title and transferee has executed application for a new certificate and delivered it to commissioner) *with Canton*, 470 F.2d at 863 (transfer of certificate of *registration* not necessary to effect transfer of title in an automobile).

Thus, although a certificate of title is only *"prima facie* evidence" of ownership, it still "has value as evidence of ownership of the vehicle," *Zwego*, 657 F.2d at 250, and in the absence of evidence clearly contradicting the facts recited in the certificate, it will serve as ample proof of ownership, and is thus a "security" within the meaning of section 2311. *See Elliott*, 571 F.2d at 908.

### F. *Victim and Witness Protection Act.*

▮▮▮▮ Defendants have moved to dismiss counts 4–6 of the indictment, which charge conspiracies to deny civil rights in violation of 18 U.S.C. § 241 (1982). They contend that the scope of section 241 does not include a conspiracy to deprive a person of his right to testify as a witness in a criminal proceeding; that section 241 applies only to cases involving "invidious discrimination or where the conspiracy is motivated by racial or otherwise class-based

animus"; and that the subsequently enacted Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 1512–13 (1982), supersedes and implicitly repeals section 241 by specifically proscribing the harming of witnesses. *See* Defendants' Memorandum at 47–49. Section 241 prohibits conspiracies "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same...." Sections 1512 and 1513 proscribe the substantive offenses of knowingly tampering with or retaliating against a witness, victim, or informant.

The Second Circuit has repeatedly held that the right of a person to be a witness in a federal court or federal proceeding is within the broad scope of section 241, which is not limited to acts involving racial discrimination. *E.g., United States v. Pacelli*, 491 F.2d 1108, 1113 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974); *accord United States v. Walker*, 710 F.2d 1062, 1071 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984); *United States v. Smith*, 623 F.2d 627, 629 (9th Cir.1980).

Defendants correctly assert that, where two statutes deal with the same offense, the more specific statute controls. *See Smith*, 623 F.2d at 629–30. Defendants' argument is misplaced, however, because the Victim and Witness Protection Act and section 241 define different crimes. Sections 1512 and 1513 proscribe the substantive offenses of tampering with or retaliating against a witness, whereas section 241 is a conspiracy statute, proscribing the separate and distinct criminal act of conspiring to prevent a witness' testimony. *See Smith*, 623 F.2d at 630 (holding that fact that defendant could have been charged with a substantive offense under 18 U.S.C. § 1503—which at that time proscribed corruptly endeavoring to impede a witness— did not preclude prosecution under section 241 for conspiracy to prevent a witness' testimony). *See also Pacelli*, 491 F.2d at 1113 (it is "well settled that repeals (or

amendments) by implication are not favored and will be given effect only upon a clear showing of Congressional intent, such as where the two statutes at issue are in irrevocable conflict or the later act unquestionably covers the entire subject of the earlier one and is obviously designed as a substitute for it"). Accordingly, defendants' motion to dismiss counts 4–6 is denied.

## IV. Evidentiary and Miscellaneous Individual Claims

### A. *Hearing Regarding Coconspirator Declarations.*

Defendants have moved for a pretrial hearing outside the presence of the jury to determine the admissibility of statements which the government intends to offer as coconspirator declarations or, alternatively, for an order directing the government to submit a written order of proof sufficient to satisfy the threshold requirement of a foundation based upon a fair preponderance of independent evidence before introduction of any alleged coconspirator declarations. *See* Defendants' Memorandum at 102–06. Fed.R.Evid. 801(d)(2)(E) provides that a statement by a coconspirator of a party made during the course and in furtherance of the conspiracy is not hearsay. Statements are admissible pursuant to Rule 801(d)(2)(E) upon the trial court's determination by a fair preponderance of the independent, nonhearsay evidence that (1) the conspiracy charged in the indictment existed; (2) the defendant and declarant were participants in it; and (3) the statements were made in the course and in furtherance of the conspiracy. The judge alone makes the determination of the admissibility of the coconspirator statements. Fed.R.Evid. 104(a). The question presented by defendants motion is *when* that determination must be made.

The Second Circuit has consistently held that declarations that are otherwise hearsay may nevertheless be provisionally admitted pursuant to Rule 801(d)(2)(E), "subject to connection." *United States v. Margiotta*, 688 F.2d 108, 136–37 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891,

77 L.Ed.2d 282 (1983); *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *United States v. Wilson*, 565 F.Supp. 1416, 1437 (S.D.N.Y. 1983) (Weinfeld, J.). Under this approach, the trial judge determines, at the close of the government's case, the sufficiency of the evidence, independent of the hearsay testimony, that the alleged coconspirators participated in the conspiracy with the declarant and that the statements provisionally admitted were made in the course and in furtherance of the conspiracy. *Wilson*, 565 F.Supp. at 1437. If the trial judge determines that the independent evidence is sufficient, the declarations go to the jury for them to consider together with all the other evidence in determining whether they are convinced beyond a reasonable doubt of the defendant's guilt. If the judge finds the evidence insufficient, then, under *Geaney*, he "must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility, ... declare a mistrial if the defendant asks for it." 417 F.2d at 1120.

Defendants urge that, because of the potential prejudice if statements heard by the jury are not ultimately "connected," and in order to avoid having to declare a mistrial, the court should require the government either to develop its proof of admissibility before offering coconspirator statements, or to present such proof at a pretrial hearing outside the presence of the jury. Defendants cite *United States v. James*, 576 F.2d 1121, 1127–32 (5th Cir.), *modified en banc*, 590 F.2d 575, 577–83 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), but the Fifth Circuit in *James* did not require that the trial court hold a pretrial hearing to determine the admissibility of coconspirator statements. Rather, the court established a preferred, not a mandatory, procedure, holding that "[t]he district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it

before admitting declarations of a coconspirator. If it determines it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up." *James*, 590 F.2d at 582.

The trial judge must have wide discretion regarding the timing of the sufficiency determination under Rule 801(d)(2)(E). In this case, convening a special pretrial hearing would be time-consuming and repetitious—a trial before the trial. Furthermore, the court has now heard enough evidence in this case, in various pretrial proceedings, to establish that a reasonable basis exists to believe that the government will probably be able to connect the "otherwise hearsay" statements to many if not all the defendants. This evidence materially reduces in this case the potential danger of "injecting the record with inadmissible hearsay in anticipation of proof of a conspiracy which never materializes." *United States v. Macklin*, 573 F.2d 1046, 1049 n. 3 (8th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978).

### B. *Prejudicial Surplusage in the Indictment.*

■■■■ Defendants move to strike from the indictment terms such as "crew," "enterprise," "street leader," "captain," "boss," "racketeering," "loanshark," "extortion," all aliases, and the statement made as to each deceased, alleged co-racketeer that he is "not a defendant herein because he was murdered on or about" a certain date. Defendants claim these references are irrelevant to the crimes charged, are inflammatory and prejudicial, and therefore must be stricken. *See* Fed.R. Crim.P. 7(d).

The words and phrases sought to be striken are all relevant to the crimes alleged. Several are the very words used in statutes to describe the conduct charged ("racketeering," "enterprise," "extortion," and "murder"). Others are used in the indictment because they were used by witnesses to describe the positions and activi-

ties alleged ("crew," "street leader," "captain," "boss," and "loanshark"). The aliases are relevant, the government claims, because they are needed to identify the persons involved. *United States v. Miller*, 381 F.2d 529, 536 (2d Cir.1967), *cert. denied*, 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968). The phrase—"not a defendant herein because he was murdered"—is relevant because the murders thus alleged are part of the proof of the scope, nature, and membership of the RICO enterprise and conspiracy. Once relevant, these words and phrases should not be striken, even if they may be somewhat inflammatory and cause some prejudice. *See, e.g., United States v. Napolitano*, 552 F.Supp. 465, 480 (S.D.N.Y.1982). The court may also instruct the jury with respect to the use of some of these words, to lessen their potential impact. *See Jury Instructions, supra*, ¶ 52.02, at 52–7.

That some of the phrases suggest violent conduct is hardly inappropriate here, since violent conduct is what the government is going to attempt to prove. Similarly, the suggestion implicit in such words as "boss" and "crew" that defendants are part of organized crime, and particularly the Mafia, is fitting here, since the government intends to show that the enterprise involved was indeed an arm of an organized crime family. Finally, the use of "murdered" in connection with deceased or missing alleged co-racketeers is appropriate, since the government intends to offer proof that every person so described was in fact murdered, even if some of their bodies are still missing. A grand jury's power to describe crimes goes beyond the bare charges, and encompasses a description of persons as co-racketeers, especially since the government intends to show that it was their association with the defendants that provided the motive for their being killed.

The government correctly notes that, if it fails to offer proof of the aliases and nicknames listed in the indictment as tending to identify the defendants and connect them to acts that are charged, then "a motion to strike may be renewed, the alias [or nick-

name] stricken and an appropriate instruction given to the jury." *United States v. Clark,* 541 F.2d 1016, 1018 (4th Cir.1976). The government has an affirmative obligation, however, to avoid the unnecessary use of aliases or nicknames that might tend to prejudice defendants. The prosecutors should review their evidence to assure themselves that every alias or nickname alleged has a legitimate, evidentiary purpose. The acts charged in this case are in themselves potentially inflammatory, and the government should avoid adding unfairly to the risk of prejudice.

### C. *Motions To Suppress.*

Defendants move generally to suppress any and all statements the government may seek to introduce at trial, claiming simultaneously that the government has not let them know what statements were obtained and that all those unidentified statements were obtained illegally. *See* Defendants' Memorandum at 107–08. These allegations are untrue, in that the government has informed defendants of many statements, some of which the government has made clear it intends to use at least in part. Defendants must move properly with respect to any specific statement they may individually affirm by affidavit was illegally obtained. Their general claims are insufficient.

Defendants also make a number of individual motions to suppress. Some of these motions are groundless, but others will require evidentiary hearings before they can be decided.

### 1. *Pedro Luis Rodriguez.*

Rodriguez moves to suppress evidence obtained through use of a wiretap placed on his residential telephone in Floral Park, New York. Rodriguez' telephone conversations were intercepted pursuant to a warrant signed by Justice Roberts of the New York Supreme Court on May 12, 1980 empowering the District Attorney of the County of New York and officers acting under his direction to intercept and record telephonic conversations of Rodriguez with "co-conspirators, accomplices, agents, deliverers, suppliers, and customers ... pertaining to the purchase, sale, transfer, shipment or possession of narcotic drugs, and conspiracy to commit the above-mentioned crimes...." Government Exh. F., at 1–2. On May 22, 1980, the Assistant District Attorney in charge of the investigation, Keith Ingber, submitted a progress report on the wiretap to Justice Roberts, indicating that the wiretap and related investigative efforts had uncovered evidence of marijuana offenses and "a conspiracy to distribute stolen automobiles" by the named targets of the wiretap. Ingber notified the court that "[a]n application for an amendment to the eavesdropping warrant is accordingly being prepared...." Government Exh. H, at 1–2. On June 2, 1980, District Attorney Morgenthau formally applied for a retroactive amendment to the warrant to cover conversations relating to the alleged stolen automobile conspiracy. *See* Government Exh. J. Justice Roberts granted the application on June 3, 1980. *See* Government Exh. I. On July 10, 1980, an additional retroactive amendment was sought by Assistant District Attorney Ingber to authorize interception of conversations relating to "a conspiracy to commit the following crimes: Criminal Sale of a Controlled Substance, Criminal Possession of a Controlled Substance, Criminal Sale of Marijuana and Criminal Possession of Marijuana, in violation of Chapters 220, 221, and 105 of the Penal Law of the State of New York." Nooter Supplemental Affidavit, Exh. 3, at 4 (affidavit of Assistant District Attorney in Support of Application for an Amendment to Eavesdropping Warrant). This application was granted by Justice Roberts on July 10, 1980. *See* Nooter Supplemental Affidavit, Exh. 1 (amendment to eavesdropping warrant).

 a. *Exhaustion of Alternative Investigative Techniques.* Rodriguez first challenges the admissibility of the intercepted communications on the ground that the original wiretap order was illegal because the government failed to exhaust alternative investigative techniques in com-

pliance with N.Y.Crim.Proc.L. § 700.15(4) (McKinney 1984), and 18 U.S.C. § 2518(3)(c) (1982). Because the government seeks to introduce in a federal prosecution conversations intercepted pursuant to a wiretap order issued under New York State law, the admissibility of the seized conversations must be tested against both state and federal standards. *See United States v. Marion*, 535 F.2d 697, 702 (2d Cir.1976). Section 700.15(4) provides that an eavesdropping warrant may issue only "[u]pon a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ." *Accord* 18 U.S.C. § 2518(3)(c) (1982). The Second Circuit has consistently held that

> the purpose of these "other investigative techniques" requirements "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." Moreover, the required showing is to "be tested in a practical and commonsense fashion." In short, the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime."

*United States v. Fury*, 554 F.2d 522, 530 (2d Cir.) (citations omitted), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *see United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). The affidavits submitted to the state court in support of the wiretap application adequately demonstrate that normal investigative techniques would have been insufficient to accomplish the stated law enforcement objective of identifying the participants, means, method, and scope of the targeted narcotics operation and conspiracy. As the government notes:

The Rodriguez wiretap application detailed the normal investigative efforts attempted and explained their inadequacy: an informant close to Rodriguez's lieutenant had ceased to cooperate with law enforcement despite efforts to convince him otherwise and the officers had no other possible entre into the organization; physical and videotape surveillance of Rodriguez's apartment complex had not and could not reveal the scope of this apparently international narcotics conspiracy; pen register and telephone toll analyses had not and would not reveal the identities and roles of all co-conspirators; search warrants executed at Rodriguez's two apartments would not uncover all the locales and functionings of the international conspiracy.

Government Memorandum at 130–31. *See* Government Exh. G, at 26–28 (Affidavit of Detective Vincent Palazzotto in support of wiretap application). The application thus fully complied with state and federal standards for commencement of eavesdropping.

■ Rodriguez also suggests that, because the police had sufficient probable cause to arrest him prior to commencing the wiretap, the wiretap order was unnecessary and hence invalid. No provision of the wiretap statutes, however, requires the government to effect an arrest as soon as evidence amounting to probable cause has been obtained. *Cf. United States v. Lovasco*, 431 U.S. 783, 791, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977) (no duty that prosecutor file charges as soon as probable cause is found).

■ b. *Maximum Statutory Period.* Rodriguez challenges the automatic issuance of the warrant for the maximum statutory period of thirty days. He claims that no need existed to issue the warrant for the full period when the pen register evidence then available disclosed the large volume of calls to and from the targeted telephone number. He also argues that the government should have terminated the wiretap after conversations during the first week or two had been seized. *See* Nooter Aff. at 2–3.

The controlling statutes provide: "[n]o order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5) (1982); *accord* N.Y.Crim.Proc.L. § 700.10(2) (McKinney 1984). The intercept order at issue in this case stated that the order "shall continue until evidence as described in the aforementioned affidavits shall have been obtained, and said authorization shall not automatically terminate when the communications described herein have been first obtained but in no event shall it exceed thirty (30) days...." Government's Exh. F. The order therefore fully complied with the statutory requirements. Rodriguez has presented no facts, moreover, to support his claim that at the end of the first week or two the government had acquired all necessary evidence of the scope, participants, and method of the targeted narcotics operation and conspiracy. On this record, the judge's qualified authorization, and the government's utilization, of the maximum statutory period fully complied with the requirements of federal and state law. *See United States v. Cohen,* 530 F.2d 43, 46 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976).

c. *Minimization.* Rodriguez next contends that the wiretap evidence should be suppressed because the government failed to comply with federal and state minimization requirements. *See* Nooter Aff. at 3. 18 U.S.C. § 2518(5) (1982); N.Y.Crim.Proc.L. § 700.30(7) (McKinney 1984). While defendant correctly contends that monitoring agents "must make every effort to minimize ... non-pertinent conversation[s]," he concedes that he "has not actually heard the tapes of the conversations, and would reserve the right to make a more detailed application concerning minimization when that can be accomplished." Rodriguez Memorandum at 5. Rodriguez has failed at this time to allege facts sufficient to place in issue his claim that the government failed to comply with minimization standards.

d. *Amendments to the Wiretap Order.* Rodriguez also challenges the procedure by which the original wiretap was retroactively amended to authorize interception of conversations relating to both a conspiracy to distribute stolen automobiles and a conspiracy to sell and possess marijuana. *See* Nooter Aff. at 3. He complains that the two applications for amendments were not timely made, and that the amendments failed to specify the state and federal crimes involved.

An application for an amendment retroactively authorizing interception of evidence of crimes not covered by a wiretap order may be granted only upon a showing that " 'the original order was lawfully obtained, that it [was] sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.' " *United States v. Masciarelli,* 558 F.2d 1064, 1068 (2d Cir.1977) (*quoting* S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2189). In addition, an application for amendment must be made "as soon as practicable" after evidence of the unauthorized offense is discovered. 18 U.S.C. § 2517(5) (1982); N.Y.Crim.Proc. L. § 700.65(4) (McKinney 1984).

Rodriguez' challenge to the timeliness of the two amendments is unsubstantiated. The formal amendment order relating to the alleged stolen automobile conspiracy was entered on June 3, 1980 —two weeks after the initial information of the additional untargeted offense was obtained. This period of time does not suggest an unreasonable delay under the statute. *See United States v. Principie,* 531 F.2d 1132, 1138 (2d Cir.1976) (delay of thirteen days satisfies the "as soon as practicable" requirement), *cert. denied,* 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977). Defendant has alleged no evidence to support his claim that the delay was unreasonable, and the Assistant District Attorney adequately set forth in his affidavit in sup-

port of the amendment the reasons for the delay. *See* Government's Exh. J, Ingber Affidavit at 7–8. Moreover, the interception of conversations relating to the stolen automobile conspiracy may be deemed to have been implicitly authorized by the court on May 22, 1980, when Ingber submitted a progress report advising the court of these conversations and indicating that a formal application for amendment was being prepared. *See* Government's Exh. H., at 1–2; *Masciarelli*, 558 F.2d at 1069 (holding that court authorization for retroactive amendment under § 2517(5) "was implicitly obtained by the government when [the authorizing judge] approved continuation of the wiretap after being fully advised by the Fifth Day Report of the essential facts constituting the unspecified violation").

With respect to the July 10 amendment, the May 22 progress report also notified the court of intercepted conversations relating to marijuana offenses. *See* Government Exh. H, at 4. Although the formal application for a retroactive amendment to cover this unspecified violation was not filed until July 10, interception of these conversations was also implicitly authorized by the court upon its continuation of the wiretap after review of the progress report. On this record, the procedures followed by the government in seeking amendments to cover conversations relating to both a stolen automobile conspiracy and a conspiracy to sell and possess marijuana satisfy the timeliness requirements of state and federal law.

 Rodriguez also complains that the June 3 amendment failed to specify the crimes involved as required by N.Y.Crim. Proc.L. § 700.30(4) (McKinney 1984). That section provides that an "eavesdropping warrant must contain ... [a] particular description of the type of communications sought to be intercepted, and a statement of the particular designated offense to which it relates...." *Accord* 18 U.S.C. § 2518(1)(b) (1982). The amendment to the eavesdropping warrant at issue here refers to specific paragraphs in the accompanying affidavits; the affidavits set forth the spe-

cific conversations to be covered by the amendment, and stated that the conversations constituted "evidence of the participation of certain ... individuals in a conspiracy to distribute stolen automobiles." Government Exh. J, Ingber Affidavit at 2–4. This statement, together with the remainder of the information presented in the affidavit, sufficiently identified and defined the relevant criminal activity. Although the application did not recite the specific statutes which prohibit the targeted criminal activity, this defect is not fatal under either the state or federal particularity requirement. The application does not disclose "an improper intention on the part of the applicant to secure a roving commission." *United States v. Tortorello*, 480 F.2d 764, 781 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

 Rodriguez also argues that, because the government failed to include the federal crimes involved in the original eavesdropping order and in the two amendments, the fruits of the wiretap should be suppressed in this federal prosecution. The failure to specify the federal violations for which Rodriguez has now been indicted (interstate transportation of stolen property; conspiracy to transport stolen property in interstate commerce; conspiracy to distribute narcotics) as additional offenses does not render the "fruits" of the wiretap inadmissible. The description of the relevant criminal activity contained in the original eavesdropping order, two amendments, and affidavits submitted in connection therewith, clearly indicated the specific crimes to be investigated and encompassed the federal violations which are the subject of this indictment. *See Tortorello*, 480 F.2d at 782–83 (federal prosecution for securities fraud based on state wiretaps permissible where the state offense of grand larceny encompassed federal offense of securities fraud). Analogizing from *Tortorello* to the instant case, a state wiretap order and amendments specifying state offenses of trafficking in narcotics (marijuana and cocaine) and stolen automobiles on an interstate if not international scale may

fairly be read to encompass essentially similar federal offenses.

 e. *Interceptions Not Covered by the Original Order or Amendment.* Rodriguez moves to suppress intercepted conversations that were not covered by either the original wiretap or amendment. He has failed, however, to place genuinely in issue his claim that the government intends to introduce such conversations. He states only that "[b]ased on conversations [defense counsel] has had with an Assistant United States Attorney who has responsibility in this matter, [defense counsel] suspects that the government may intend to introduce wiretap conversations which are not covered by the original warrant or by the [June 3] amendment ...], specifically, conversations with co-defendant Patrick Testa." Nooter Aff. at 9. Defendant does not make clear the subject matter of the conversations and hence one cannot tell whether the conversations are covered by the July 10 amendment. Rodriguez' statement of facts is too indefinite and speculative to justify granting any relief at this time.

 f. *Authority To Amend Wiretap Order.* In a supplemental affidavit, Rodriguez seeks to suppress the conversations recorded pursuant to the eavesdropping order of the State Supreme Court Justice which relate to the alleged conspiracy to distribute stolen automobiles, contending that "the Justice had no authority under state law to issue or amend a wiretap order for non-narcotics conversations to be executed outside of his own judicial district." Rodriguez Supplemental and Reply Memorandum of Law at 1. Rodriguez argues that Justice Roberts was not a judge of "competent jurisdiction" as required by 18 U.S.C. § 2516(2) (1982). A judge of "competent jurisdiction" is defined as "a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interception of wire or oral communications." 18 U.S.C. § 2510(9)(b) (1982). Under the relevant New York state statute, only a "justice" is so authorized, *see*

N.Y.Crim.Proc.L. § 700.10(1) (McKinney 1984), and a "justice" is defined to include "... any justice of the supreme court of the judicial district in which the eavesdropping warrant is to be executed...." N.Y.Crim.Proc.L. § 700.05(4) (McKinney 1984). In the instant case, Rodriguez complains that Justice Roberts, an Acting Supreme Court Justice for New York County in the 1st Judicial District, signed amendment orders to be executed in Queens—the 11th Judicial District.

Defendant's argument relates only to the non-narcotics offenses because, in *People v. Rodriguez*, 58 N.Y.2d 327, 461 N.Y.S.2d 248, 448 N.E.2d 102 (1983), the New York Court of Appeals held that the legislature "removed the 'traditional jurisdictional boundaries' and combined all five counties of New York City into a single unit for purposes of prosecuting narcotics indictments." *Id.* at 333, 461 N.Y.S.2d at 251, 448 N.E.2d at 105. The Court made explicit that its holding was limited to the investigation of drug-related offenses, emphasizing that the New York Judiciary Law, Article 5–B, created special city-wide jurisdiction for designated justices to allow them to cope with " 'an emergency of grave dimensions [which] exists in narcotics enforcement in the City of New York.' (Judiciary Law, § 177–a, L.1971, ch. 462)." *Id.*

The government argues that the court need not reach the issue whether Justice Roberts had the authority to issue wiretap warrants which specify other than drug-related offenses, arguing that the conspiracy to distribute stolen automobiles was "drug-related" in that the stolen car and narcotics trafficking offenses were "inextricably intertwined." Government's Memorandum in Opposition to the Supplemental Motions of Defendant Pedro Luis Rodriguez at 2–3. The government notes that the interceptions included conversations about both narcotics and stolen cars, and that the narcotics co-conspirators and the conversants named in the stolen car amendment application are the same individuals. The government asserts, moreover, that a "cars-for-

coke" trade was identified and will be part of the government's proof at trial. *Id.*

A review of the affidavits and progress reports submitted in connection with the wiretapping of Rodriguez' telephone fails to reveal a "cars-for-coke" trade or, indeed, any concrete connection between the alleged narcotics trafficking and the alleged conspiracy to distribute stolen automobiles. The government's showing thus far is simply that certain individuals were engaged in both narcotics trafficking and a stolen automobile conspiracy and that, over the course of a thirty-day period, conversations occurred relating to these alleged offenses over the same telephone. At this time, the government has not so much as demonstrated that "cars" and "drugs" were ever mentioned in the same telephone conversation. The government must make a more substantial showing of the relationship between the alleged narcotics trafficking and stolen automobile conspiracy before the latter can fairly be deemed a "drug-related offense" within a strict reading of the New York Court of Appeals' decision in *Rodriguez.*

Even assuming, however, that the stolen automobile conspiracy is not "drug-related," a Supreme Court Justice with jurisdiction to issue a narcotics wiretap order, and who does so properly and with probable cause, should have the authority, under the circumstances of this case, to amend that order to authorize interception of calls concerning other crimes. The legislative restriction on who may issue eavesdropping warrants and where such warrants may be executed is designed to further more responsible judicial participation in the use of electronic surveillance. *See* S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2177, 2185, 2187, 2189–93; *see also Rodriguez,* 58 N.Y.2d at 335, 461 N.Y.S.2d at 253, 448 N.E.2d at 106 ("responsible judicial participation is guaranteed by requiring the issuing Judge to be familiar with the conditions in the area where the warrant is to be issued and executed"). The issuing judge in this case should be deemed to have been authorized by law to amend the order he initially issued, since recognizing such authority would enhance rather than hinder responsible judicial participation. The judge, by reason of his original participation, was familiar with the conditions in the area where the amendment was to be executed, and with the facts surrounding the specific wiretap at issue. *See id.* ("Special Narcotics Court Judges are sufficiently familiar with conditions existing throughout New York City" due to their special city-wide jurisdiction over drug-related offenses). Such a judge is in the best position to assess whether state and federal requirements for the granting of an amendment have been met. *See Masciarelli,* 558 F.2d at 1068 (before amendment will issue, applicant must show that original order was lawfully obtained, that it had been sought in good faith and not as a subterfuge search, and that the communication containing evidence of the untargeted offense was incidentally intercepted during the course of a lawfully executed order); *see also* 18 U.S.C. § 2517(5) (1982) (application for amendment must be made "as soon as practicable"); N.Y.Crim. Proc.L. § 700.65(4) (McKinney 1984) (same). Enabling a judge to issue an amendment concerning other than drug-related offenses, to a wiretap order executed within his jurisdiction, will also promote judicial economy and convenience, since no new judge will have to become familiar with all the relevant circumstances.

■ g. *Chain of Custody.* Rodriguez requests an order directing a hearing on the chain of custody of all physical evidence and audio and video tape recordings which the government may seek to admit against him. *See* Nooter Aff. at 4. He concedes that the state wiretap tapes were initially properly sealed, but argues that, due to the lapse of time, they may not have remained properly sealed. The passage of time without more does not give a defendant cause to challenge the continued integrity of tapes at a hearing. Until Rodriguez can allege facts sufficient to state a substantial claim as to the tapes' authenticity, or until the government proffers the

evidence at trial, no hearing is required to establish the chain of custody.

### 2. *Gus Kalevas.*

Kalevas moves to suppress on numerous grounds evidence seized on separate occasions from both his residence and the Harem Pleasure Spa, a house of prostitution which Kalevas allegedly owned. He also seeks to suppress statements he made at the United States Attorney's Office on the ground that the statements were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

▇▇▇ a. *Search of April 18, 1984.* Kalevas moves to suppress evidence seized from his residence on April 18, 1984, pursuant to a warrant issued by Judge William H. Huber, Superior Court, Law Division, Ocean County. The warrant authorized a search of Kalevas' home and seizure of:

> cancelled checks and bank statements from Ocean County National Bank checking account # 9–0231, in the name of Penny Kalevas, ... and books, ledgers or records pertaining to transactions or dealings with Edward Kull.

*See* Memorandum in Support of Applications by Gus Kalevas, Exh. A(1) (hereinafter cited as Kalevas Memorandum I). The items seized were subsequently inventoried and identified as, *inter alia,* "Misc[ellaneous] Paperwork Found In Sewing Box, ... Misc[ellaneous] Paperwork Found On Top of Dresser, ... O[cean] C[ity] Nat[ional] Bank Receipt $500.00 Found In Penny's To[p] Right Dresser, ... [and] One Brown Paper Bag containing Two additional clear cellophane Bags with Brown Vegetation." *See id.,* Exh. A(2). Kalevas argues that the Ocean County authorities who executed the warrant engaged in a general exploratory search of his belongings in violation of the Fourth Amendment. He complains that they searched for about four hours and "went through every nook and cranny of [my] home." *Id.* at 10. He contends that "[n]inety-nine and nine-tenths percents [sic] of the items seized had nothing whatsoever to do with the items described in the warrant." *Id.*

The government contends that all the items seized were within the scope of the warrant. Noting that the warrant was issued on a showing of probable cause to believe that Kalevas paid a bribe of $20,000 to town councilman Edward Kull to influence Kull's vote on matters pertaining to the Harem Pleasure Spa, the government asserts that "[a]ny evidence concerning Kalevas' prostitution activities and his sources of financing were ... directly relevant to his 'transactions [and] dealings with Edward Kull,'" as set forth in the warrant. Government's Memorandum at 146. The government also relies on the plain view doctrine to support the seizure of the financial records of Kalevas' New York prostitution activities at the Roxy Theater, contending that the discovery of these records was "inadvertent," and that the value of these records as evidence of prostitution activity was "immediately apparent" from a brief perusal of their contents. *Id.* at 146–47.

An evidentiary hearing must be held to resolve the factual issues presented by this motion. The nature of the items seized and their relation to the items described in the warrant is contested, and the "inventory of property" fails to resolve the dispute inasmuch as the descriptions in it are vague— *e.g.,* "misc[ellaneous] paper work." The issue of whether the items were fairly seized in plain view is similarly contested. The hearing will be limited, however, to the issue of the lawful scope of the April 18 search; Kalevas' contention that the warrant was issued without probable cause is meritless. *See* Kalevas Memorandum I, Exh. A(3), Affidavit of Dane B. Wells (detailing evidence that Kalevas bribed Kull to take action to facilitate prostitution enterprise). Kalevas has failed also to place genuinely in issue his claim that the search was a "subterfuge search" conducted in "bad faith."

▇▇▇ b. *Statement of June 6, 1983.* On June 6, 1983, Kalevas appeared at the United States Attorney's Office pursuant

to a grand jury subpoena to give handwriting exemplars. Kalevas' counsel had previously requested that his client not be questioned while giving the exemplars. Kalevas was not advised of his *Miranda* rights at that meeting, and he made incriminating statements. *See* Kalevas Memorandum I, at 12. The government contends, however, that Kalevas was not in "custody" at the time. *See* Government's Memorandum at 148.

Questions of "custody" and "voluntariness" are issues of fact, to be assessed in the context of the totality of circumstances surrounding the giving of a statement. Kalevas contends he "was questioned in the presence of 3–4 officers, for a period of 3 hours, in the equivalent of a police station to which he had not gone voluntarily," Memorandum in Response to the Government's Reply to the Applications Made by Gus Kalevas at 6, and he denies the government's allegation that his statements were spontaneously volunteered during a casual conversation with the police officer taking the exemplars. *Id.* at 7. An evidentiary hearing must be held to determine whether Kalevas' statements were obtained in compliance with *Miranda*.

■■■■■ c. *Seizure of April 27, 1983.* Finally, Kalevas moves to suppress, on several grounds, the fruits of a seizure of the Harem Pleasure Spa (hereinafter referred to as "the Spa"), effected on April 27, 1983 by New Jersey authorities acting pursuant to a court order. On April 22, 1983, a state grand jury indicted Kalevas and others for, *inter alia*, promoting prostitution at the Spa. *See* Memorandum in Support of Gus Kalevas Application for Suppression, Exh. H., at 6 (hereinafter cited as Kalevas Memorandum II). On April 26, 1983, the State of New Jersey filed a verified complaint for forfeiture, detailing the illegal activity alleged to have been occurring at the Spa over the seven year period preceding the filing of the complaint. *See id.*, Exh. A. The State also filed an application for seizure pursuant to N.J.S.A. § 2C:64–1(b), *see id.*, Exh. B, and an accompanying affidavit filed by Detec-

tive Carnival detailing the probable cause to believe that the Spa was being operated, on a continuing basis, as a house of prostitution. *See id.*, Exh. C. On April 26, Judge Blake of the New Jersey Superior Court entered an order pursuant to N.J. S.A. § 2C:64–1(b), authorizing the seizure of the Spa, which was effected on April 27. *See id.*, Exh. D.

Following the seizure of the Spa, in the course of inventorying its contents, New Jersey officials discovered five voice-activated tape recorders connected to telephone lines. Each contained a cassette. Two other cassettes were found in the same room. During a concurrent inventory of the adjoining "Showland Adult Book Store," also seized at that time, an officer discovered another tape recorder and cassette which was observed to be recording a conversation that Detective Carnival, a member of the inventory team, was having from a phone in that room. The officer who discovered this recorder rewound the tape a short distance and played back a portion of it, confirming that Detective Carnival's conversation had been recorded. Three additional cassettes were found in the same room. The officers filed an application for a warrant to search the eleven tapes, with accompanying affidavits filed by Investigator Fitzgerald and Detective Graham. *See* Government's Memorandum of Law in Opposition to Kalevas' Supplemental Motions at 8; Kalevas Memorandum II, Exh. G. Judge Addison of the New Jersey Superior Court issued a warrant on June 20, 1983, authorizing a search of the tapes. *See* Kalevas Memorandum II, Exh. F.

Relying on *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), Kalevas first contends that the seizure of the Spa without notice or an opportunity to be heard violated his procedural due process rights. The *Fuentes* Court held unconstitutional state replevin statutes permitting creditors to seize goods allegedly wrongfully detained, finding that the statutory procedures deprived debtors of their property without due process by failing to

provide for preseizure hearings. The Court affirmed, however, that seizure of a property interest without an opportunity for prior hearing is constitutionally permissible in limited circumstances. *Id.* at 91, 92 S.Ct. at 2000. In *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 677, 94 S.Ct. 2080, 2088, 40 L.Ed.2d 452 (1974), the Supreme Court held that "seizure for purposes of forfeiture is one of those 'extraordinary situations' that justify postponing notice and opportunity for a hearing. *Fuentes v. Shevin,* 407 U.S. at 90 [92 S.Ct. at 1999]." *See* 416 U.S. at 679–80, 94 S.Ct. at 2089–90. Under the standards applied in *Calero-Toledo,* the prehearing seizure of the Spa did not violate Kalevas' procedural due process rights. *See id.*

Kalevas also challenges the seizure on the ground that it was based on stale information, since the affidavit supporting the application detailed prostitution activities occurring from one to eight years earlier. The Spa was seized by and forfeited to the State of New Jersey because it had been "utilized in furtherance of an unlawful activity." The statute does not require a showing that the property was so utilized when seized. Moreover, even assuming the relevance of staleness, the affidavit of Detective Carnival in support of the application for seizure details a continuing course of illegal activity at the Spa spanning a seven-year period, with the last documented incident occurring one year prior to the application. *See* Kalevas Memorandum II, Exh. C. Under these circumstances, the continuing nature of the alleged illegal conduct renders the passage of time between the last described act and the application less significant. *See United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

Kalevas, moreover, does not claim to be in the position of a new owner who dissociated himself from prior illegal activity at the Spa. Affidavits submitted by the New Jersey authorities in support of the application for seizure indicate that Kalevas owned an interest in the Spa dating at least as far back as December 1981, *see* Kalevas Memorandum II, Exh. C, at 11–13 (Carnival Affidavit), which was several months prior to the last incident of prostitution activity documented by the New Jersey authorities, *see id.,* at 8–9 (describing police raid of the Spa in April 1982 during which law enforcement agents uncovered evidence of ongoing prostitution activities). The information relied upon by the government to justify seizure of the Spa was sufficiently current.

Kalevas contends that the seizure was unlawful because the New Jersey authorities employed the forfeiture proceedings as a device to evade fourth amendment strictures and engage in a general search. The New Jersey forfeiture statute expressly provides, however, for the use of any property subject to forfeiture as evidence in a contemporaneous criminal proceeding. *See* N.J.S.A. 2C:64–1(b) (1982) ("[a]ny article subject to forfeiture under this chapter may be seized by the State or any law enforcement officer as evidence pending a criminal prosecution pursuant to section 2C:64–4"). Kalevas has presented no evidence to suggest an improper motive on the government's part.

■■■■■■ *d. Search of the Cassette Tapes.* Kalevas challenges the search of the eleven tapes seized during the inventory of the contents of the Spa on several grounds. His first claim, that the tapes should be suppressed as "fruits" of the unlawful April 27 seizure of the Spa, is without basis, since that seizure was lawful. He argues in addition that the search of the tapes was unconstitutional, because the rewinding and playback of a small portion of one of the tapes was a "warrantless search for which there was no constitutionally justifiable reason." Kalevas Memorandum II, at 6. Yet, a brief perusal of the tape was constitutionally justified. The law enforcement agents were lawfully present at the Spa inventorying its contents, and the tapes were discovered in plain view. The officers at that time had probable cause to believe the tapes would contain evidence of unlawful prostitution

activity, as detailed in the affidavit of Detective Carnival in support of the application for a seizure order. *See id.*, Exh. C. The officers were therefore entitled to review the tapes briefly to ascertain whether they constituted evidence of the alleged prostitution activity. *See United States v. Ochs,* 595 F.2d 1247, 1258 (2d Cir.) (where police had probable cause to believe defendant had engaged in trafficking in stolen travelers' checks, "police were entitled to glance through the bankbooks and the two notebooks to ascertain whether they constituted evidence or instrumentalities relating to the stolen travelers' check ring"), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

Upon rewinding and replaying the tape, Detective Graham learned that "the tape was a recording of a telephone conversation which Detective James Carnival, a ... fellow member of the inventory team, had just completed from a telephone located near the ... entrance to the Showland Adult Book Store." *See* Kalevas Memorandum II, Exh. G(2) at 2 (Graham Affidavit). On the basis of this information, and other evidence obtained at the Spa, the agents had probable cause to believe that the tapes constituted evidence of a violation of the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. § 2A:156 A–3 (1985), which provides that any person who "[w]illfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire or oral communication ... shall be guilty of a misdemeanor and shall be fined not more than $10,000 or imprisoned not more than 5 years, or both." The affidavit in support of the warrant authorizing the search of the tapes detailed this evidence and amply demonstrated probable cause to search. *See* Kalevas Memorandum II, Exh. G(1), at 4–6 (Fitzgerald Affidavit).

The affidavit also incorporated by reference ample probable cause that the tapes contained evidence of prostitution activities. While the affidavit did not itself recite the evidence showing probable cause that the Spa was being operated as a house of prostitution, it incorporated and attached the Verified Complaint for Forfeiture together with Detective Carnival's affidavit. *See id.* at 3. The Complaint sets forth in detail the evidence of prostitution activities at the Spa, and Detective Carnival states in his affidavit that he had personal knowledge of the factual allegations made in the Complaint. *See id.*, Exh. A. The search warrant was thus lawfully issued, based on probable cause to search the tapes for evidence of prostitution activities and/or wiretap violations.

Finally, Kalevas charges that the search of the tapes was conducted in bad faith, since "no criminal charges relating to wiretapping violations were ever pressed." Kalevas Memorandum II, at 7. The agents had probable cause to believe the tapes contained evidence of prostitution activities, however, and were entitled to search the tapes on that basis alone. The government's decision whether and when to proceed on wiretapping violations is a matter within the prosecutor's discretion, so a failure to prosecute has no bearing on the lawfulness of the search and seizure of the tapes.

### 3. *Anthony M. Senter.*

█ a. *Search of November 19, 1974.* Senter moves to suppress evidence seized during a search conducted by police on November 19, 1974 of a vehicle in which he was a passenger. He claims that the officers lacked probable cause to arrest him and hence had no legitimate basis for searching his person or the vehicle. The government contends that the arresting officer, Officer Root, stopped the vehicle in which Senter was a passenger after having received a report from a New York Corrections Officer who had just observed four men in possession of firearms driving off in a gold-colored Mercury automobile. Upon locating a car matching the description reported, in the area identified by the correction officer, Officer Root stopped the vehicle and directed the occupants to step out. A "frisk" of Senter revealed a loaded .25-caliber Frommer semi-automatic pistol in his back pocket. A similar "pat-

down" of another passenger disclosed a .38-calibre Smith & Wesson revolver. The government further states that the officers then discovered a blackjack on the back seat of the Mercury. Senter was placed under arrest, along with the other occupants of the vehicle. *See* Government's Memorandum at 109–10. Assuming the facts as stated by the government, the seizure of evidence challenged here was proper. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (search and seizure reasonable under fourth amendment where "stop" is based on "reasonable suspicion" derived from current and reliable information confirmed by officer's own observations, and where officer justifiably perceives need to "frisk" individual in order to neutralize the threat of physical harm). Once the officers frisked the vehicle's occupants and uncovered loaded weapons they had probable cause to search the vehicle. *See United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

 A defendant who seeks to suppress evidence bears the burden of showing that disputed issues of material fact exist before an evidentiary hearing is required. *See United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir.1969) (district court "not required as a matter of law to hold an evidentiary hearing if appellant's moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested by appellant"), *cert. denied,* 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970). No evidentiary hearing need be held where a defendant's allegations are general and conclusory or are based upon suspicion and conjecture. *See Grant v. United States,* 282 F.2d 165, 170 (2d Cir.1960); *Federal Practice and Procedure: Criminal 2d, supra,* § 675, at 781–82. Senter's allegations are general and conclusory, and he has not made sufficiently definite factual allegations to establish that a substantial claim is presented.

 b. *Search of June 13, 1981.* Senter also moves to suppress evidence seized during a search conducted on June 13, 1981 on the ground that the search far exceeded the "search incident to arrest" exception to the fourth amendment. In his affidavit Senter states that, while driving in Brooklyn, New York, he was stopped by a police officer and given a summons for driving with a suspended license. He claims that the officer "then undertook to conduct a full search of the car and discovered a firearm hidden therein. Containers within the car were also opened and small quantities of cocaine and methadone and a telephone/address book were discovered. Neither the firearm [n]or the drugs were in plain view.... After discovering the firearm and drugs, the officer told me that I would be taken to the precinct." Senter Affidavit at 2.

According to the government, Police Officer Wuerth stopped Senter on June 13 for an apparent traffic and vehicle violation. Officer Wuerth placed Senter under arrest (prior to conducting the search of the car) after Senter made contradictory claims of residency and failed to produce required vehicle documentation, and after Officer Wuerth learned (pursuant to radio request) that Senter's driver's license had been suspended and that a warrant for his arrest had been lodged by the New Jersey State Authorities. Following his arrest, a pat-down search of Senter was conducted, which uncovered a vial of cocaine; Senter was then placed in the patrol car and driven to the precinct where his personal effects, including the telephone/address book, were inventoried and returned to him. The government claims that only later, when Officer Wuerth prepared to drive Senter's car to the Precinct, did Wuerth find and seize a loaded revolver and more narcotics. *See* Government's Memorandum at 111–12. The government seeks to justify the search and seizure at issue here as a "search incident to arrest," the "routine inventorying of ... personal papers during the 'booking' process," a "permissible inventory search of an impounded car," and/or as permissible seizures under the "plain view" doctrine. *See id.* at 113.

Senter's statement of the facts surrounding the search of his person and vehicle differs materially from the government's. Although not entirely clear and somewhat inconsistent with his legal theory, Senter's affidavit can be read to state that his arrest followed the search of the car. He also states that the contraband seized was not in "plain view," and suggests that all items were seized at the time of the stop and not pursuant to a subsequent inventory or impoundment procedure. If Senter is able to prove that he was stopped for a traffic violation and given a summons, but not arrested until after the search of his person and car, the explanations proffered by the government to justify the officer's conduct in searching the vehicle will be unavailing. An evidentiary hearing must be held to resolve the material factual disputes raised by defendant's motion.

In connection with the June 13 incident, Senter seeks to suppress all post-arrest statements made by him on the ground that he had not received *Miranda* warnings. In his affidavit, he asserts that *"Miranda* warnings were not administered to me. The officer interrogated me and I responded. I was unaware of my *Miranda* rights."* Senter Affidavit at 2. The government contends that Senter was fully advised of his constitutional rights upon being arrested, and that in any event Senter was not in custody and volunteered the statements he made. A hearing is therefore required to resolve the admissibility of Senter's statements.

### 4. *Carlo Profeta.*

Profeta moves to suppress any in-court identification evidence against him which was the product of a line-up conducted on October 3, 1984. He claims that the line-up was impermissibly suggestive, because the government arranged the line-up haphazardly, provided for stand-ins who were distinct from Mr. Profeta in "hair type and color, as well as complexion and physical appearance," prohibited defense counsel from being present at the line-up when the witnesses were present, and denied counsel access to a tape recording allegedly made of the line-up procedures, including the actual statements of the witnesses who were sequestered from the defendant and his counsel. Zeiler Aff. at 2. Profeta also complains, on information and belief, that at least one alleged identifying witness was equivocal in identifying him. *Id.*

Profeta has failed at this time to allege sufficient facts to require an evidentiary hearing. His complaint that the line-up procedures were sloppy and haphazard, "result[ing] in severe prejudice to Mr. Profeta," *id.*, is general and conclusory; he has failed to allege facts sufficiently definite to present a substantial claim of unreliability. The same deficiency exists with respect to Profeta's complaint that an identification made was equivocal. *See Culotta,* 413 F.2d at 1345. With respect to Profeta's claim that the line-up was unduly suggestive in that "Mr. Profeta has a severely pock-marked complexion that stood out from the others like a proverbial sore thumb in severe violation of his rights to fair identification procedures," Zeiler Aff. at 2, the "disparate physical appearances of the lineup participants is not alone sufficient to warrant a finding of suggestiveness." *Swicegood v. Alabama,* 577 F.2d 1322, 1327 (5th Cir.1978); *see United States v. Barron,* 575 F.2d 752, 755 (9th Cir.1978) (not unduly suggestive although the accused was only one with a big nose, beady eyes, and oddly shaped lips); *United States ex rel. Pella v. Reid,* 527 F.2d 380, 384 (2d Cir.1975) (not unduly suggestive that relatively short accused was placed in lineup with taller stand-ins); *United States v. Reid,* 517 F.2d 953, 965 n. 15 (2d Cir. 1975) ("no requirement that ... in line-ups the accused must be surrounded by persons nearly identical in appearance, however desirable that may be").

Profeta's contention that the government improperly prohibited defense counsel from being present at the actual lineup when the witnesses were present is meritless. The Second Circuit has held that, because of the need to protect identifying witnesses from potential harm, the

prosecution may on a proper showing deny defense counsel access to the identifying witnesses. *United States v. Tolliver*, 569 F.2d 724, 730 (2d Cir.1978). That need is pronounced in this case, where the indictment alleges murders of potential witnesses.

The *Tolliver* court recommended that the government obtain a direction from the trial judge permitting exclusion of defense counsel from the actual lineup before the exclusion is accomplished. *See id.* Such a direction was obtained in this case, *see* Transcript at 8, 18, 28 (Oct. 3, 1984), and the government agreed to tape record the proceedings in order to preserve witness' statements, *see id.* at 19; *Tolliver*, 569 F.2d at 728 (statements of witnesses should be preserved through use of videotape or tape recording). Profeta has requested access to the tape recording. Under the circumstances of this case, where the threat of harm to identifying witnesses is substantial, the government's denial of access, based on the possibility of a voice identification, is reasonable. A transcript of the witness' statements should, however, be made available to Profeta. If Profeta is able to raise a substantial claim as to the reliability of the identification, the government will be required to play the tape recording for the court, *ex parte*, at an appropriate time prior to the admission of the identification testimony.

5. *Edward John Rendini.*

Rendini moves to suppress evidence seized from his residence in Brooklyn, New York, on March 23, 1984. The evidence—a handgun and a .30-calibre carbine—was seized in a search that followed Rendini's arrest pursuant to a warrant. According to Rendini, approximately five federal agents broke into his apartment in the early morning hours of March 23, 1984. Upon hearing the forced entry, he went to the kitchen, where he was arrested and immediately handcuffed. His wife was also present in the kitchen and surrounded by the officers. The officers then conducted a general search of his apartment, seizing

from the upstairs bedroom a handgun from inside a closed drawer and a carbine located inside a closet. *See* Rendini Aff. at 4–5. He contends that this warrantless search of his home was unreasonable in that it far exceeded the limited search of the arrestee's person and the area within his immediate control authorized in *Chimel v. California*, 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969).

The government's version of the arrest and subsequent search differs materially from Rendini's. The government states that Rendini was arrested in his bedroom and that the handgun was seized from a night table drawer within Rendini's grasping radius. Later, when Rendini had calmed, dressed, and been advised of his rights, the officers asked and received Rendini's consent to search his home. This search uncovered the carbine. *See* Government's Memorandum at 121–22. The government thus contends that the handgun was lawfully seized as incident to Rendini's arrest under *Chimel*, and that the carbine was lawfully seized pursuant to his consent. An evidentiary hearing must be held to resolve these materially different versions of the seizures.

Rendini also moves to exclude evidence of prior crimes dating from 1969 and 1970, arguing that the evidence has minimal probative value because of its remoteness in time and that it poses a substantial danger of unfair prejudice. On April 8, 1969, Rendini was arrested for reckless endangerment and possession of a weapon. He was arrested on July 16, 1970 for possession of a forged instrument, forgery, and possession of stolen property. The government intends to introduce in its case-in-chief only the evidence of the 1969 arrest. *See* Government's Memorandum at 124 n. *.

Evidence of other acts and crimes is admissible under Fed.R.Evid. 404(b) and 403 only if its probative value is not substantially outweighed by the risk of unfair prejudice. *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir.1980); *see United States v. Levy*, 731 F.2d 997, 1002 (2d Cir.

1984). The evidence which the government seeks to introduce against Rendini is not highly probative; it is evidence of an arrest, not a conviction, and it occurred sixteen years ago. The danger of unfair prejudice to the defendant is substantial. The government intends to prove at trial that Rendini served the racketeering conspiracy charged in the indictment in part by acting as its principal source of illegal weapons. Evidence of his prior arrest for possession of a firearm is likely to cause the jury to rely impermissibly on the prior arrest as an indication of Rendini's criminal propensity. *See Gordon v. United States,* 383 F.2d 936, 940 (D.C.Cir.1967) (when the prior conviction is for the same or substantially the same conduct for which the accused is on trial, strong reasons arise for excluding the evidence because of the inevitable pressure on lay jurors to believe that "if he did it before he probably did so this time"), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968). Rule 403 precludes admission of this evidence.

### 6. *Ronald Ustica.*

 Ustica moves to dismiss the indictment against him because of alleged prosecutorial misconduct. He claims that the government improperly required him to testify before the grand jury after having been informed that he would invoke his fifth amendment privilege in response to all "substantive questions." He contends that the government's conduct unfairly prejudiced him in the eyes of the grand jury.

In July 1982, Ustica received a grand jury subpoena *duces tecum* requiring him to appear before a grand jury and to produce certain records pertaining to the formation of his business and any automobiles purchased, sold, or exported from May 1977 until July 1982. In August 1982, Ustica was called before the grand jury to authenticate the documents he produced pursuant to the subpoena and to answer questions relating to the documents.

A potential defendant may be summoned to testify before a grand jury investigating his conduct, *see United States v. Wash-*

*ington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *United States v. Winter,* 348 F.2d 204, 207 (2d Cir.), *cert. denied,* 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965), even if he has previously advised the government that he will assert his fifth amendment privilege, *see United States v. Wolfson,* 405 F.2d 779, 784–85 (2d Cir.1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969). The Second Circuit has indicated that a potential defendant should not be called before a grand jury for the sole purpose of exposing his claim of privilege. *See United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir.1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). Ustica was called, however, to authenticate the documents he had produced pursuant to the grand jury subpoena, and to answer questions relating to those documents. The government has represented that the prosecuting attorney instructed the grand jury that no adverse inference should be drawn from a witness' invocation of his fifth amendment privilege. *See* Government's Memorandum at 115. Ustica's allegation of prosecutorial misconduct is therefore untenable, and his motion to dismiss the indictment is denied.

 Ustica also seeks a pretrial hearing to determine the reliability of out-of-court photographic identifications of him made by a government witness. The government should make the photographic arrays available for defendant's inspection at this time. No pretrial hearing is now necessary. After reviewing the photographic arrays, Ustica may challenge the reliability of the identification procedures if he believes the arrays were unduly suggestive.

### 7. *Ronald Turekian.*

 Turekian moves to dismiss the indictment against him because of alleged prosecutorial misuse in the grand jury of a transcript of an earlier appearance before a grand jury on July 21, 1981. He argues that, "[i]n light of the strong possibility" that the prosecutor read portions of the 1981 transcript to the grand jury which

voted the indictment against him, the court should inspect the minutes *in camera* to determine whether the transcript was introduced. *See* Defendant Ronald Turekian Memorandum of Law at 2. The government has represented in a memorandum of law that the 1981 transcript was not introduced before the grand jury that voted the indictment. *See* Government's Memorandum at 118. Turekian's unsubstantiated view that improprieties may have occurred is therefore insufficient to justify further inquiry. *See Wilson* 565 F.Supp. at 1436. The government should, however, make its representation in a sworn affidavit, as was done in connection with defendants' joint motion challenging grand jury proceedings.

### V. Conclusion.

For the reasons detailed above, defendants' pending pretrial motions are denied with the following exceptions: counts 13, 48, 56, 66, and 67 are dismissed as having been filed beyond the period provided in the applicable statute of limitations; counts 58, 60, 62, and 64, are dismissed for improper venue, and transferred to the Eastern District of New York for trial; counts 48, 55, 56, 66, and 67 are dismissed for duplicity; further particulars are required with respect to counts 3, 4, 25–29, 31–53, 57, 59, 61, 63, 69, and 71–78; hearings are required on certain motions to suppress made by defendants Kalevas, Senter, and Rendini; the government will not be permitted to use Rendini's prior arrest in its case-in-chief, on the present record; and the government is ordered to produce for Ustica's examination the photographic array it used to obtain any identification it plans to use at trial. The parties must all hold themselves in readiness for trial on September 3, 1985, subject to further order of this court.